1
2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

3   UNITED STATES OF AMERICA   Criminal No.  RDB-07-0244

4                  v.

5   TIMOTHY CLARIDY                Baltimore, Maryland

6        AND

7   FLORA JONES,                   December 17, 2007

8           Defendants.            9:30 a.m.

9   --------------------------------------------/

10                   TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE RICHARD D. BENNETT
11                 UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Government:    United States Attorney's Office
                           By:  PHILIP S. JACKSON, ESQUIRE
14                         36 South Charles Street
                           Fourth Floor
15                         Baltimore, Maryland 21201

16  For the Defendants:    Bates May and Seddiq
                           By:  IVAN J. BATES, ESQUIRE
17                         10 N. Calvert Street
                           Suite 214
18                         Balltimore, Maryland 21202

19                         Law Office of Stanley Needleman
                           By:  STANLEY H. NEEDLEMAN, ESQUIRE
20                         1005 North Calvert Street
                           Baltimore, Maryland 21202
21
    Court Reporter         Lisa K. Bankins RMR
22                         101 West Lombard Street
                           Room 5012
23                         Baltimore, Maryland 21201

24

25  Proceedings recorded by mechanical stenography,
    transcript produced by notereading.

# T A B L E   O F   C O N T E N T S

|                      | DX | CX | RDX | RCX |
|----------------------|----|----|-----|-----|

On behalf of the Government:

DETECTIVE KEITH GLADSTONE

| (By Mr. Jackson)   | 08 |    | 70 |
| (By Mr. Needleman) |    | 33 |    |
| (By Mr. Bates)     |    | 50 |    |

1

2         THE COURT:    Ready to proceed.  Mr. Jackson, if you'll call

3   the case, please?

4         MR. JACKSON:    Yes, Your Honor.  Good morning.

5         THE COURT:    Good morning.

6         MR. JACKSON:    Calling for on behalf of the Government, Phil

7   Jackson, Assistant United States Attorney, the case, United States of

8   America v. Timothy Claridy, that's C-L-A-R-I-D-Y, and Flora,

9   F-L-O-R-A, Jones.  It's case number RDB-07-0244 and we're here for

10  pretrial motions this morning, Your Honor.  Again good morning.

11        THE COURT:    Yes.  Good morning, Mr. Jackson.  And you have

12  with you Keith Gladstone from the Baltimore County Police Department.

13  Is that right?

14        MR. JACKSON:    Baltimore City Police Department, Your Honor.

15        THE COURT:    Is it Detective Gladstone?  Is that right?

16        MR. JACKSON:    It is, Your Honor.

17        THE COURT:    Detective Gladstone, nice to see you, sir.

18        DETECTIVE GLADSTONE:    Good morning, Your Honor.

19        THE COURT:    Nice to see you.  And for the defense?

20        MR. BATES:  Good morning, Your Honor.  Ivan Bates

21  representing Mr. Timothy Claridy.

22        THE COURT:    Yes.  Nice to see you, Mr. Bates, again.  And

23  good morning, Mr. Claridy.  And for Ms. Jones, Mr. Needleman.  Nice to

24  see you.

25        MR. NEEDLEMAN:    Yes.  Nice to see you, sir.  To my right is

1    Flora Jones, Your Honor.

2              THE COURT:    Yes.  And good morning, Ms. Jones.  Nice to see

3    you.

4              DEFENDANT JONES:    Good morning.

5              THE COURT:    And we are ready to proceed with the motions

6    hearing in this case.

7              MR. NEEDLEMAN:    Your Honor, may I just --

8              THE COURT:    Yes.

9              MR. NEEDLEMAN:    Your Honor, I would opine of course whatever

10   His Honor says.  But there will be evidentiary necessity for a hearing

11   and because and I want to thank Detective Gladstone.  This is his day

12   off.  Because of Friday, he came here today.  If we could do that

13   first so he could leave, that would be fine with defense.  I've

14   already broached that with Mr. Jackson.  It's fine with him.

15             THE COURT:    All right.  Well, that's fine.  That's fine.

16   Let me just sort of summarize where we are and what motions we have

17   and then we'll see where we are on this matter.

18             We have presently before the Court is a hearing on

19   suppression motions which have been filed in this case.  The

20   defendants, Flora Lynette Jones and Timothy Claridy, have been charged

21   under 21 United States Code, Section 841(a) and motions have,

22   essentially the indictment in this case charges them with possession

23   with intent to distribute heroin.  Is that correct, Mr. Jackson?

24             MR. JACKSON:    Yes, Your Honor.  And other charges as well.

25             THE COURT:    And other charges as well.  Is there a

1    superseding indictment in this case?

2                    MR. JACKSON:    There is, Your Honor.

3                    THE COURT:    All right.  Hold on one second.  Yes.  The

4    superseding indictment charges Mr. Claridy and Ms. Jones with

5    conspiracy to distribute heroin in violation of 21 United States Code,

6    Section 846, possession with intent to distribute heroin in violation

7    of 21 United States Code, Section 841.  They are both charged in the

8    conspiracy count and the first count.  They are both charged in the

9    second count with possession with intent to distribute heroin.

10   Mr. Claridy is charged in Count 3 with a violation of 18 United States

11   Code, Section 922(g)(1) having been convicted of a crime punishable by

12   imprisonment for a term exceeding one year.  He's charged with

13   knowingly and unlawfully possessing a firearm and he is charged again

14   in Count 4 with the same offense.  And then Count 5, Ms. Jones is

15   charged with controlling the premises and making the premises

16   available for the purpose of unlawfully storing a controlled

17   substance, to wit, heroin.  So it's a five-count superseding

18   indictment and the defendants are charged as noted.  The defendants

19   have filed motions to suppress.  We have presently pending before the

20   Court, we have the Defendant Claridy's motion to suppress which is

21   paper number 12 in which he seeks suppression of all evidence seized

22   as the result of the execution of a search and seizure warrant at 69

23   Stemmers Run Road in Baltimore on May 22, 2007.  The defendant,

24   Claridy, has also filed a motion to suppress tangible evidence,

25   derivative evidence and statements, paper number 24, which was filed

1  in November seeking suppression of all evidence seized and statements

2  made prior to, during and after his arrest.  And then we have the

3  consolidated motions of the defendant, Flora Jones, paper number 36.

4  That motion being filed on December 5th of this year seeking

5  suppression of evidence obtained from 69 Stemmers Run Road and all

6  statements made by Jones, also seeking the disclosure of the identity

7  of a confidential informant number 1 as noted in the materials.  So I

8  believe they are all the motions presently pending before the Court.

9  Is that correct, Mr. Needleman?

10            MR. NEEDLEMAN:    May it please the Court, Your Honor?

11            THE COURT:   Yes.

12            MR. NEEDLEMAN:    Subject to whatever happens here today,

13  there may, I say may, Your Honor, just be a motion concerning

14  severance pursuant to United States v. Schuford and United States v.

15  Barocki, Your Honor.  May, sir.

16            THE COURT:   When are you proposing to file that motion?

17            MR. NEEDLEMAN:    Well, the reason I used the word may is

18  because obviously if the statements allegedly made by Mr. Claridy come

19  in and it might be a moot point.  If you rule -- the object is, sir, I

20  will talk to Mr. Bates about this.  I will opine to you that if

21  Ms. Jones would be tried by herself and first, statements as to

22  ownership which are material, extremely material to Ms. Jones' case

23  may in fact be used.  That's all I'm saying at this point and the word

24  is may at this point, sir.

25            THE COURT:   All right.  Why don't we in light of the fact

1    that the trial date of this case by agreement of the defendants and

2    the Government is now for because of defense lawyers' calendars as I

3    recall is now scheduled for March the 17th --

4              MR. NEEDLEMAN:   Yes.

5              THE COURT:   -- we certainly have time to deal with that

6    issue.  So that if there's going to be another motion for severance,

7    I'm certainly going to give you leave to file that.

8              MR. NEEDLEMAN:   Thank you, sir.

9              THE COURT:   I would like to -- my clerk will make a note and

10   we'll follow up with a letter to you, Mr. Needleman.  We certainly

11   would like to have you file it by January the 15th and then we'll set

12   in another motions hearing on that if necessary.  So you certainly can

13   have leave to file that.

14              So we have before the Court a suppression, a motion for

15   suppression of statements by both defendants, we have the issue of the

16   execution of the search warrant and we have the issue of the both the

17   search warrants and the standing as to search warrants and then we

18   also have the identity, a motion with respect to identity of

19   confidential informants.  So they are the matters before the Court now

20   and we're ready to proceed and will be glad to hear from the

21   Government in terms of presentation of evidence and testimony on this.

22   How do you want to proceed?  Which motion do you want to deal with

23   first?  It's up to counsel.  I don't care.

24              MR. JACKSON:   Your Honor, I would suggest the statement and

25   the reasonableness of the arrest go first.  Those are the things that

1    I think require live testimony.

2              THE COURT:    All right.  So the matter of the suppression of

3    statements and the arrest and search incident thereto is what you want

4    to address first.  That's fine.  And we will deal with that first.

5    That's fine.

6              MR. JACKSON:    And correct me if I'm wrong, Mr. Bates and

7    Mr. Needleman, but I think the rest of it can be decided almost, not

8    almost, truly on the papers.

9              THE COURT:    All right.  Well, that's fine.  I'll be glad to

10   hear whatever evidence anyone wants to present.  And Mr. Jackson, you

11   may proceed, sir.

12             MR. JACKSON:    Thank you, Your Honor.  In that case, the

13   Government calls as its witness, Detective Keith Gladstone.

14             THE COURT:    Okay.

15             THE CLERK:    Good morning, Detective.  Please raise your

16   right hand.

17             (Witness sworn.)

18             THE CLERK:    Please be seated.  Would you begin by stating

19   your name for the record and spelling your last name?

20             THE WITNESS:    Keith Gladstone.  G-L-A-D-S-T-O-N-E.

21             THE CLERK:    Thank you.

22                        DIRECT EXAMINATION

23             BY MR. JACKSON:

24        Q.    Detective Gladstone, good morning.

25        A.    Good morning.

1    Q.    Sir, are you currently employed?

2    A.    Yes, I am.

3    Q.    How so?

4    A.    With the Baltimore Police Department.

5    Q.    And how long have you been employed with the

6    Baltimore Police Department?

7    A.    For over 15 years.

8    Q.    Do you have any particular assignments within the Baltimore

9    Police Department?

10    A.    I'm assigned to the Organized Crime Division, the Drug

11    Enforcement Section.

12    Q.    And how long have you been assigned to that particular

13    section?

14    A.    To that section for approximately three years.  I've been

15    also assigned to a HIDTA Task Force Group 54.

16    Q.    Can you spell HIDTA for the benefit of the record?

17    A.    It's H-I-D-T-A.

18    Q.    And what is HIDTA?

19    A.    It's a high intensity drug trafficking area.  It's a task

20    force consistent of local and federal law enforcement.

21    Q.    And how long were you with this HIDTA Task Force?

22    A.    Over the 15 years, I've been assigned about six years on and

23    off.

24    Q.    Are you still with that task force?

25    A.    No, I'm not.

1    Q.    When did your term with the task force end?

2    A.    Approximately a month ago.

3    Q.    So currently you're just strictly assigned to the Baltimore

4    City Police Department then?

5    A.    Yes, I am.

6    Q.    As a member of this HIDTA Task Force, you had indicated that

7    there were not only local police officers assigned to it, but also

8    federal officers.

9    A.    Yes.

10    Q.    From what agency, sir?

11    A.    The Drug Enforcement Administration.

12    Q.    Were you deputized as a federal officer as part of your

13    duties with that HIDTA Task Force?

14    A.    Yes, I was.

15    Q.    Did there come a time during May of 2007 that you and/or

16    your group that you were with at the time turned your attention to an

17    individual by the name of Timothy Claridy?

18    A.    Yes.

19    Q.    Can you tell for the benefit of the record and the Court how

20    that came about?

21    A.    I received information from two confidential informants and

22    they related that an individual known to them as Tim was selling

23    heroin in the area of the 1500 block of North Barclay Street, related

24    that Tim was driving a Porsche Cayenne, was able to give me a tag

25    number and that he was assisted with the distribution of heroin by two

1    individuals.  One being Flora who drove a silver Town and Country

2    minivan and a male known as Bo who drove a black Acura.

3         Q.    Okay.  Now did these two confidential informants as you've

4    termed them, did they come at you separately or did they come

5    together?

6         A.    They came separately.

7         Q.    Okay.  Did you have any kind of track record with either one

8    or both of these confidential informants?

9         A.    How I described them in my search warrant as CS-1,

10   Confidential Source 1 had a history of giving me information which I

11   was able to make arrests, obtain search warrants, seize quantities of

12   cocaine, heroin, currency, marijuana and as a result, these

13   individuals have since been convicted.

14        Q.    As a result of your -- well, let me digress for just a

15   second.  Over what course of time have you been receiving information

16   from the person you've identified as CS-1?

17        A.    Over, at least over one year.

18        Q.    Okay.  How about as to the other confidential source?  Did

19   you have a particular way of referring to him or her?

20        A.    As CS-2.

21        Q.    Okay.  And how about that individual?  Did that individual

22   have any kind of track record with you for providing information?

23        A.    CS-2 was able to provide information in reference to

24   narcotic distributors in the Baltimore area, which I was able to

25   corroborate and know to be true.  So did not have the lengthy track

1  record CS-1 did.  But the information that I was able to corroborate

2  was truthful.

3      Q.  You earlier referred to an affidavit for a search warrant

4  you did.  Is that correct?

5      A.  Yes.

6      Q.  Is there more detail as to these individuals the

7  confidential sources and track records with you over the course of

8  time?

9      A.  Yes.

10      Q.  Did you have an opinion based on your prior dealings with

11  these individuals about whether or not they had provided or could be

12  relied on to provide accurate information?

13      MR. NEEDLEMAN:   Objection.

14      THE COURT:   Overruled.

15      A.  Yes.

16      Q.  And what was your opinion in that regard?

17      A.  They were reliable.

18      Q.  Once you received this information, what if anything did you

19  do with it investigatively?

20      A.  During the week starting the 16th of May, 2007 began

21  observation in the area of the 1500 block of Barclay Street.

22      Q.  And why were you in the 1500 block of Barclay Street?

23      A.  That was the area given by the confidential informants as

24  the area where a male they knew as Tim who I later identified as

25  Mr. Claridy was operating a heroin distribution.

1    Q.    You pointed while you were making your testimony there and

2  gestured toward defense counsel's table.  Do you see Mr. Claridy here

3  in the courtroom today?

4    A.    Yes.  He's wearing a white t-shirt right there.

5         MR. JACKSON:    For the record identifying the defendant,

6  Timothy Claridy as the --

7         THE COURT:    The record will so reflect.

8         MR. JACKSON:    Thank you, Your Honor.

9    Q.    How is it that you identified Mr. Claridy as the individual

10  that they knew only as Tim?

11    A.    Through photos.  Those photos, I was able to obtain arrest

12  photos of Mr. Claridy and they were shown to my confidential sources

13  and they identified that photo as the person they knew as Tim.

14    Q.    Now where you had left off in your chronology of events, you

15  indicated that sometime during May, you were led to the 1500 block of

16  Federal in Baltimore.  Is that correct?

17    A.    That's correct.

18    Q.    What if anything of investigative work did you observe

19  there?

20    A.    While making observations, I observed Mr. Claridy operating

21  a Porsche Cayenne.  He entered the block on the 16th on at least five

22  occasions.  While making observations, I observed individuals approach

23  Mr. Claridy and hand-to-hand transactions occurred between Mr. Claridy

24  and the two.  After the transactions occurred, they left the area.

25  That area I know to be a high drug trafficking area.  It's considered

1    an open air drug market --

2              MR. NEEDLEMAN:    Objection.

3              THE COURT:    Overruled.

4        A.    -- by the Baltimore Police Department.

5        Q.    Well, how do you know that?

6        A.    It's been identified through arrests and targeting by the

7    Baltimore Police Department specifically during my tenure with the

8    police department.

9        Q.    Okay.  Now have you ever been allowed to testify as an

10   expert as to narcotics investigations?

11       A.    Yes, I have.

12       Q.    In what courts have you been allowed to do that?

13       A.    In Juvenile, District, Circuit Courts of Baltimore City and

14   District Court of Baltimore County, Circuit Court of Baltimore County,

15   in federal courts of New York, Maryland.

16       Q.    Okay.  Now you've indicated in your testimony that you saw

17   hand-to-hand transactions taking place between Mr. Claridy and others.

18   Is that correct?

19       A.    That is correct.

20       Q.    Do you have an opinion based on your training or your

21   experience in narcotics investigations as to what if any significance

22   these hand-to-hand transactions had?

23       A.    They were narcotics transactions.

24             MR. NEEDLEMAN:    Objection.

25             MR. BATES:    Objection.

1        THE COURT:    Overruled.

2        Q.    What made you think that?

3        A.    Based on the informant information that I received that I

4    believed to be reliable --

5        MR. NEEDLEMAN:    I would object to that, Your Honor.

6        THE COURT:    Your objection is noted and it's overruled,

7    Mr. Needleman.

8        Q.    You may continue.

9        THE COURT:    The testimony is quite clear and he's testified

10    as to the reliability of confidential informants.  He's testified as

11    to the information he received and he's testified as to five occasions

12    observing what based on his experience in a high drug trafficking area

13    he clearly observed hand-to-hand drug transactions.  Your objection is

14    noted and it's overruled.  You may continue, Mr. Jackson.

15        Q.    Detective Gladstone, where you left off in your testimony,

16    you indicated that you saw transactions between Mr. Claridy and

17    unidentified others.  Did you identify -- excuse me.  Is that where

18    your investigation ended?

19        A.    No, it did not.

20        Q.    Can you tell the Court and for the benefit of the record

21    what happened after you made those observations?

22        A.    I also identified an individual, Adrian Norris, who was

23    operating a black Acura.  On two occasions Mr. Claridy met with him

24    and after meeting with him, Mr. Claridy met with individuals again,

25    conducted hand-to-hand transactions with them.  We were able to follow

1    Mr. Norris to a location in Essex, 1037 North Maryland Avenue --

2    Marlyn Avenue and --

3        Q.    Would you spell Marlyn for the record?

4        A.    M-A-R-L-Y-N.

5        Q.    Thank you.

6        A.    And he was observed to enter with a key.  After being inside

7    for a brief time, exited and then left that location and met with

8    Mr. Claridy in northeast Baltimore in the area of Fairdel Avenue which

9    is near Walther Avenue and Northern Parkway by Glenmount Elementary

10   School.  During that meeting, Mr. Claridy exited his Porsche, got into

11   the black Honda Accord for a period of time, a couple of minutes, got

12   back out and the two left the area.  They did not enter any apartments

13   and it's that location where they stopped was the parking lot of an

14   apartment building.

15       Q.    What if any significance did this observation have for you

16   as a narcotics investigator?

17       A.    Once again I believe it was a narcotics transaction.

18             MR. BATES:   Objection, Your Honor.

19             THE COURT:   Overruled.

20       Q.    And for the record, Fairdel, is that F-A-I-R-D-E-L?

21       A.    That's correct.

22       Q.    I always try to keep the court reporters happy with the

23   spelling.  When did you make this observation?

24       A.    That was on the 16th.

25       Q.    The same day that you saw these other observations down in

1    the Federal Street area?

2         A.    Yes.

3         Q.    Was that the only day that you made any observations in

4    relation to this investigation?

5         A.    No.  On the 17th of May, we made observations again in the

6    1500 block of Barclay Street.

7         Q.    And can you tell the Court what you saw at that time?

8         A.    Observed activity at that time.  Specifically, Mr. Claridy

9    meeting with Flora Jones.  She was observed to enter in a Town and

10   Country minivan on two separate occasions.  They met, handed something

11   to each other.  At which time Ms. Jones left the area.  On another

12   occasion Mr. Claridy was again observed to meet with Adrian Norris in

13   the Acura.  An exchange was made between those two.  Mr. Norris left

14   the area, drove into another area, high drug trafficking area in the

15   area -- if I can refer to my notes?

16             MR. JACKSON:   May he, Your Honor?

17             THE COURT:   Yes.  Certainly.

18             MR. JACKSON:   Thank you, Your Honor.

19        A.    2400 block of Brentwood Avenue, near Brentwood and Guilford

20   I believe.  While Mr. Norris was there, he was observed to meet with

21   numerous individuals, conduct hand-to-hand transactions with them

22   which I believed to be narcotic transactions.  He then left the area

23   and drove to 1037 North Marlin Avenue and entered with a key.

24   Mr. Claridy was observed again to meet with Ms. Jones in the evening

25   of the 17th and after meeting, Ms. Jones left in the Town and Country.

1    She drove to an area in southeast Baltimore with a female, dropped the

2    female off.  Drove back to the 1500 block of Barclay, stayed for a

3    brief period and then she was followed to the unit block of Stemmers

4    Run in Essex, Maryland.  Following her, she ran through a stop sign

5    and ran a red light during while we were following her.

6    Q.    Does that type of driving pattern have any significance for

7    you as a narcotics investigator?

8    A.    Yes, it does.

9    Q.    And what is the significance of that?

10    A.    It's used to detect surveillance.  Someone drives through a

11    light and they're the only person that goes through it, they then are

12    able to look in their rearview mirror and see if anyone else drives

13    through that light and it allows them to know if they're being

14    followed.  Counter surveillance.

15    Q.    In your narrative, you indicated or your testimony I should

16    say, you indicated that you followed, she, Ms. Jones was eventually

17    followed to the unit block of Stemmers Run Road.  Were you part of the

18    surveillance team at that time?

19    A.    Yes, I was.

20    Q.    And did you observe what she did when she arrived there?

21    A.    Yes.  When she arrived there, she walked past the residence

22    of 69 Stemmers Run Road.  We had a detective, Detective William

23    Bearde, was on foot in the area and she made eye contact with

24    Detective Bearde.  She walked past 69 Stemmers Run and just stood in

25    the area, didn't go to any residence.  Detective Bearde was advised to

18

1  leave the area.  Upon Detective Bearde walking out of sight, Ms. Jones

2  walked to 69 Stemmers Run Road and began knocking on the door and she

3  was scanning the area.  She was knocking on the door.  After a period

4  of time, she then removed a key from her person, opened the door and

5  went inside and shut the door.  We continued surveillance until lights

6  went off and then at which time we terminated surveillance.

7       Q.     Was Ms. Jones the only individual that you or your unit

8  observed have association with the Stemmers Run Road address?

9       A.     No, it's not.

10      Q.     What other individual under investigation had any

11  relationship to it that you observed?

12      A.     Mr. Claridy.

13      Q.     And what was that?  How did you ascertain that?

14      A.     On two separate occasions, I observed Mr. Claridy exit 69

15  Stemmers Run Road.  And on one occasion, he went to his vehicle, sat

16  inside for a period of time, moved the vehicle, like reparked it, got

17  out and went back into Stemmers Run with a key, unlocked the door and

18  went inside.  I can refer to my notes what day that was.  That was the

19  18th.  And then again on the 21st, Mr. Claridy and Ms. Jones both

20  exited 69 Stemmers Run Road.  He walked with Ms. Jones to the Town and

21  Country van, talked to her for a period of time.  She drove away.  He

22  reparked his Porsche Cayenne again and then went back to 69 Stemmers

23  Run, opened the door and went inside.  And then finally, on the 22nd,

24  I observed Mr. Claridy leave 69 Stemmers Run Road, enter the Porsche

25  and that ended up leading to a stop.

1    Q.    You indicated that on the 22nd, you observed him in and

2    around 69 Stemmers Run and on the 21st, you observed him in or around

3    Stemmers Run.  Did anything occur significantly in between those two

4    dates regarding advancing your investigation through search warrants?

5    A.    On the 21st, I applied for and received a search and seizure

6    warrant for 69 Stemmers Run Road, 1037 Marlyn Avenue, the Porsche

7    Cayenne, the Acura, and the minivan.

8    Q.    Now did you make application for those search warrants?

9    A.    Yes, I did.

10    Q.    And in those search warrants, did you outline what your

11    expertise was as a narcotics officer or narcotics detective I should

12    say?

13    A.    Yes, I did.

14    MR. JACKSON:    And, Your Honor, I believe as an exhibit to

15    the Government's motions response, it has put in there the copies of

16    the search warrants and the affidavits.

17    THE COURT:    Yes.  The Government's response to the

18    defendants' pretrial motions reflects that Exhibit A is the search and

19    seizure warrant signed by a judge of the Circuit Court or District

20    Court of Maryland for Baltimore City.

21    MR. JACKSON:    I believe it was district court.

22    THE COURT:    Then there's an application for a search warrant

23    and this was I think to Judge Chipparelli of the District Court of

24    Maryland for Baltimore City.  And then also there is a search and

25    seizure warrant for 69 Stemmers Run Road.  There is an application for

1  a search and seizure warrant for a green Porsche, Maryland

2  registration 77464CA.  There's the affidavit, background of the

3  affiant, Detective Gladstone and then there is his affidavit which has

4  been filed.  Then there's an Exhibit A, property to be seized during

5  the execution of a search warrant on the 69 Stemmers Run.  Then

6  Exhibit B is a case that you've attached.  I think they're the

7  exhibits to your response, Mr. Jackson.

8         MR. JACKSON:   I would ask that Exhibit A be incorporated for

9  purposes of this --

10         THE COURT:   Yes.  It will be so incorporated.  Madam Clerk,

11  make sure they're part of the record here.  But they are already

12  attached to the Government's response to the pretrial motions.

13         MR. JACKSON:   Thank you, Your Honor.

14      Q.   All right.  Let me direct your attention then, detective, to

15  May 22, 2007.  Once you had obtained these search and seizure warrants

16  for the variety of residences and automobiles that you listed, what if

17  any action did you take in reference to that?

18      A.   We began surveillance on 69 Stemmers Run Road.

19      Q.   And about what time of day was that?

20      A.   It was early in the morning.  I know at least by 7 a.m.

21      Q.   And were you alone in doing this?

22      A.   No, I was not.

23      Q.   Who was with you?

24      A.   At that time it was Special Agent Malone, Drug Enforcement

25  Administration, Special Agent Biniek, Sergeant Geho, Detective William

1  Bearde.

2       Q.    Sergeant -- excuse me if I may.  Sergeant Geho and Detective

3  Bearde, are they members of the Baltimore City Police Department?

4       A.    Yes, they are.

5       Q.    And can you spell Sergeant Geho's last name for the benefit

6  of the record?

7       A.    G-E-H-O.

8       Q.    I'm sorry.  I interrupted you.  You indicated I think that

9  Sergeant Geho and Detective Bearde were with you.  Any other members

10  of your unit with you?

11       A.    No.  We had advised Baltimore County that we were going to

12  be doing surveillance and possibly executing some search warrants and

13  they were on call.

14       Q.    Okay.  And as part of your task force team, are there

15  officers from Baltimore County or any of the surrounding subdivisions

16  in your unit?

17       A.    Yes, there is.

18       Q.    Where is the Stemmers Run Road residence located?  Is that

19  in Baltimore City, Baltimore County, Anne Arundel County?

20       A.    Baltimore County.

21       Q.    And you are not a Baltimore County Police officer.  Is that

22  correct?

23       A.    That's correct.

24       Q.    You indicated that Baltimore County, you said Baltimore

25  County had been contacted.  Do you mean Baltimore County Police

1    Department?

2    A.    Yes.  Baltimore County Police Department.  Yes.

3    Q.    Did there come a time that day that you arrested the

4    defendant, Mr. Claridy?

5    A.    Yes.

6    Q.    Can you describe the circumstances that led up to that?

7    A.    Mr. Claridy was observed to leave 69 Stemmers Run Road.  He

8    entered the Porsche Cayenne and then drove from the area.  He was

9    followed into east Baltimore where he was eventually stopped near

10   Sinclair Lane and Erdman Avenue.

11   Q.    If you would for the benefit of the record again, if one

12   were traveling from Stemmers Run Road to the area where he was

13   ultimately stopped, he being Mr. Claridy, would that be in the

14   direction toward the Federal Street area or would that be away from

15   it?

16   A.    That would be toward the Federal Street area.

17         MR. BATES:   Objection, Your Honor.

18         THE COURT:   Overruled.

19   Q.    You may continue.

20   A.    As he began to get closer to the Federal Street area, I made

21   the decision to stop him and after stopping him and asked him to exit

22   the vehicle, I immediately advised him of his rights per Miranda

23   versus Arizona on a yellow card I carry.

24   Q.    Do you have that yellow card with you today?

25   A.    Yes, I do.

1       Q.      Can you for the benefit of the record outline what you read

2    to Mr. Claridy at that time?

3       A.      Yes.  Before we ask you any questions, you must understand

4    you have the right to remain silent.  Anything you say can be used

5    against you in court.  You have the right to talk to a lawyer for

6    advice before we ask you any questions and have a lawyer with you

7    during questioning.  If you cannot afford a lawyer, one will be

8    appointed for you before any questioning if you wish.  Do you

9    understand?  Mr. Claridy acknowledged that he did.  And I asked him if

10   he was willing to answer some questions and he said he was.

11      Q.      Did you use any physical force at the time, you or anybody

12   else with you at that time when talking to Mr. Claridy?

13      A.      No.

14      Q.      Had any promises been made to Mr. Claridy?

15      A.      No.

16      Q.      Did Mr. Claridy indicate a comprehension of those rights?

17      A.      Yes, he did.

18      Q.      And how so?  How did he do that?

19      A.      He relayed that he understood his rights and that he was

20   willing to answer questions.

21      Q.      Did there come a time that you actually asked him any

22   questions?

23      A.      Yes.

24      Q.      About what did you ask him?

25      A.      Well, specifically, he was the first one to ask the

1    question.  He asked me what he was being stopped for.

2           Q.     And what did you respond?

3           A.     I told him he was being stopped for the vehicle tags.  They

4    were not showing a listing with the Motor Vehicle Administration.

5           Q.     Was that true?

6           A.     The tags not showing a listing with Motor Vehicle

7    Administration was true.  But it was not for that.  The stop was for

8    the search and seizure warrant.

9           Q.     So you had already gotten the search warrant for that car

10   prior to the stop of Mr. Claridy?

11          A.     Yes, it was.

12          Q.     What happened after you answered that question?

13          A.     I asked him, I asked Mr. Claridy where he was coming from

14   and he related from his Uncle Bo's house and he described Uncle Bo as

15   the individual who owned the Porsche and --

16          Q.     Was he driving that vehicle when you stopped him?

17          A.     Yes.

18          Q.     Okay.

19          A.     And I asked him -- he told me he had driven from Moravia

20   Road.  And I asked him do you mean Adrian Norris?  And he said yes.

21   And I said, I specifically said do you mean 1037 Marlyn Avenue?  And

22   he said yeah.  That's it.  I made a mistake.  That's where I'm coming

23   from.

24          Q.     And do you know whether that was truthful or not?

25          A.     I know that was --

1      MR. NEEDLEMAN:   Objection.

2      MR. BATES:   Objection.

3      THE COURT:   Overruled.

4      A.    I know that was not truthful.

5      Q.    How do you know that?

6      A.    Because we had followed him directly from Stemmers Run to

7      the location where we stopped him.

8      Q.    Was there anybody else occupying the car with Mr. Claridy at

9      that time?

10      A.    No, he was alone.

11      Q.    After he gave you that information, what if anything did you

12      do?

13      A.    Again I asked him if he -- refer to my notes.  I asked him

14      for consent to search of his vehicle.  I did that to gauge his

15      reaction --

16      Q.    Um-hum.

17      A.    -- and --

18      Q.    And what was his response to that?

19      A.    He related I couldn't search his vehicle and he became

20      nervous.

21      MR. BATES:   Objection.

22      THE COURT:   I'm sorry.  The response was what?

23      THE WITNESS:   He related no, I could not search it and he

24      became nervous, Your Honor.

25      THE COURT:   All right.

1          MR. BATES:   Objection, Your Honor.

2          THE COURT:   All right.  Overruled.

3     Q.    How did he manifest that he was nervous?  What led you to

4  your conclusion of that?

5     A.    I could just -- his actions.  He went from being calm to

6  being fidgety.  After asking him for consent, he -- when I talked to

7  him previously whenever I asked him a question, he answered it and it

8  was a calm answer.  After asking for permission and not getting it and

9  then telling him I was going to check the vehicle anyway, he told me

10  it wasn't right and, you know, I searched the vehicle.

11     Q.    What if anything did you find in the vehicle?

12     A.    I found $7,999 in a rest in the rear seat.  It's the

13  fold-down armrest.

14     Q.    Anything else?

15     A.    At that time, no.  That and -- refer to my notes.  At that

16  time it was just the money.

17     Q.    Was Mr. Claridy searched?

18     A.    Yes, he was.

19     Q.    And what if anything was found on him?

20     A.    There was nothing of significance on Mr. Claridy.

21     Q.    Did that end your conversation with Mr. Claridy?

22     A.    No, it did not.

23     Q.    What happened next, sir?

24     A.    Detective Jendrek asked Mr. Claridy where he got the money

25  from.  He related he got it from some strip clubs.  He named the strip

1  clubs to Detective Jendrek.  I asked him if he had been into any other

2  addresses that day in Essex and he related no, he had not been to any

3  other address other than 1037 Marlyn Avenue.  I asked him if he knew

4  anything about 69 Stemmers Run Road and he stated adamantly that he

5  did not know anything about 69 Stemmers Run Road, didn't know anyone

6  that lived there or had never been there.  He told me he lived with

7  his mother -- I mean his aunt at 3517 Lindale Avenue.  At that point,

8  Mr. Claridy was placed in my vehicle.  The Porsche Cayenne was

9  transported to the Eastern District which is I'd say about a quarter

10  of a mile away to a half a mile away from the stop and secured and we

11  began making notifications to execute the search and seizure warrant.

12      Q.      When you say you began to make notifications, what do you

13  mean by that?

14      A.      Called Baltimore County to let them know we had stopped

15  Mr. Claridy and we would be executing at 69 Stemmers Run as well as

16  Marlyn Avenue.

17      Q.      Detective, you indicated that Mr. Claridy was placed under

18  arrest.  The interrogation, the questioning of him that you just

19  described, did that take place at a police station?  Whereabouts did

20  that happen?

21      A.      That was right at the stop.  I mean it didn't stop there.  I

22  spoke to him again once he was in the vehicle with me at the Eastern

23  District.

24      Q.      Okay.  So from where this car was stopped, you went to the

25  Eastern District?

1    A.    Yes.

2    Q.    And for the record that's a Baltimore City Police station.

3    Is that correct?

4    A.    That is correct.

5    Q.    And you indicated that your conversation with him didn't

6    stop.  What other conversation did you have with him at that time?

7    A.    Since he had denied 69 Stemmers Run Road, I told him what

8    was occurring.  I told him that he was being stopped as part of a

9    narcotics investigation.  I told him I was with the federal task force

10   and that we had search warrants for 69 Stemmers Run Road, 1037 and I

11   had seen him and Flora Jones earlier --

12   Q.    1037 being the Marlyn Avenue address?

13   A.    Yes.

14   Q.    Okay.

15   A.    And as well as for the and as well as having search warrants

16   for the vehicles including the Porsche Cayenne.  Mr. Claridy again

17   denied 69 Stemmers Run Road and I told him that I had seen him earlier

18   with keys and I knew that, you know, he stayed there.  Not

19   immediately, but after a few minutes, he told me that he did stay at

20   69 Stemmers Run Road and that there was a key on the same ring for the

21   Porsche that opened the door to 69 Stemmers Run Road and I asked him

22   if he had any drugs or guns or any large amounts of money in there and

23   he told me he had a gun at that location.  Based on that --

24   Q.    Did you ever have the opportunity to test out whether in

25   fact that key that he indicated was on his ring actually fit the lock

1    at 69 Stemmers Run?

2         A.    Yes, I did.

3         Q.    And what happened when you put that key in that lock?

4         A.    It activated the lock and we made entry.

5         Q.    You indicated I think in your testimony that he indicated,

6    he, Mr. Claridy, indicated that there was a gun at that location.

7    Anything else did he indicate to you in relation to that location?

8         A.    Well, he related that it was in the bedroom closet.

9         Q.    Okay.  It being the gun?

10        A.    Yes.  The handgun is in the closet.  So upon making entry,

11   he was secured on the first floor and we began preparing the search

12   warrant, executing the search warrant and Mr. Claridy related to Agent

13   Malone that he had a gun and some heroin, a hundred grams of heroin

14   upstairs in the closet.  I came down specifically and asked him if he

15   was ready, willing to cooperate.  He related to me that telling me

16   where the location of the drugs and the gun was the only cooperation

17   he was going to get from me and that would be it because he wasn't

18   telling on anyone.

19        Q.    Did there come a time that you in fact as part of a team or

20   individually searched 69 Stemmers Run?

21        A.    Yes.

22        Q.    Okay.  And what if anything of evidentiary value did you

23   find?

24        A.    We found a, in that closet, front, second floor closet

25   underneath a hat was a Crown Royal bag that contained tan powder which

1   was field tested at the time found to be heroin and then further

2   analyzed and contained heroin hydrochloride as well as a .357 handgun.

3   We recovered scales or a scale and paperwork as well as a bag, a small

4   bag of marijuana and the paperwork was in the name of Mr. Claridy as

5   well as Ms. Jones.

6           MR. JACKSON:   Begging the Court's indulgence for just a

7   moment.

8           (Pause.)

9      Q.    Detective, digressing a little bit back to the nature of

10   your as you called it, HIDTA Task Force, you indicated that you were

11   designated as a task force officer.  Is that correct?

12      A.    Yes, it is.

13      Q.    Do you lose your designation as a Baltimore City detective

14   through your powers as a Baltimore City detective when you get

15   cross-designated --

16      A.    No, I do not.

17      Q.    -- as a task force officer?  During the course of your

18   tenure with the HIDTA Task Force, approximately how many arrests did

19   you participate in related to narcotics violations?

20      A.    Hundreds.

21      Q.    Approximately how many of those if you know would you say

22   get prosecuted on the Maryland side rather than the federal side?

23      A.    The majority of those.  During that period of time I would

24   say 90% would be state side.

25      Q.    In this particular case, prior to the arrest and seeking the

1    search warrants, had there been any, had you reached out to any

2    federal prosecutor or any other federal authorities to try to get this

3    case prosecuted as you, before you did any of these seizures, before

4    you did any of these warrants?

5                    MR. NEEDLEMAN:    Objection.

6                    THE COURT:    Overruled.

7                    MR. BATES:    Objection, Your Honor.

8                    THE COURT:    Overruled.

9         A.    No, I had not.  It was just a normal type of investigation

10   that I conducted.

11        Q.    Okay.  And you also indicated that there came a time where

12   Baltimore County Police Department was notified as to the search at 69

13   Stemmers Run.  Is that correct?

14        A.    That is correct.

15        Q.    Did anyone in fact respond from Baltimore County in regard

16   to that?

17        A.    Yes.

18        Q.    Do you remember who?

19        A.    Sergeant Barbado and a squad of detectives.  Some coming to

20   our location.  Some going to Marlyn Avenue.

21        Q.    Is Marlyn Avenue also in Baltimore County?

22        A.    Yes.  It's in Essex also.

23                    MR. JACKSON:    Your Honor, I have no further questions of

24   this witness.

25                    THE COURT:    Thank you, Mr. Jackson.  Mr. Bates or

1    Mr. Needleman, whoever wants to go first.

2              MR. NEEDLEMAN:    Thank you, judge.

3                      CROSS-EXAMINATION

4              BY MR. NEEDLEMAN:

5       Q.    Good morning, sir.

6       A.    Good morning.

7       Q.    Now let me get these dates straight.  Is it your testimony

8    that you started your surveillance would be on May 16, 2007 on the

9    1500 block of Barclay.  Is that correct?

10      A.    That's what I remember.  Yes.

11      Q.    Well, we're here today in court.  You got that big file with

12   you.  I don't want -- is that true, sir?

13      A.    That's the day I did my initial reports.

14      Q.    Okay.  And as asked to you by Mr. Jackson, you have 15 years

15   of experience and you have written and have been either the author or

16   the co-affiant on many search and seizure warrants.  Isn't that

17   correct?

18      A.    Yes.  I have been --

19      Q.    Judge, I'm sorry.  Prior to May 16, 2007.  Is that correct?

20      A.    Yes, I have.

21      Q.    Okay.  Let me ask you.  There is a difference in terms, is

22   there not, between CRI and a CS.  Isn't that correct?

23      A.    CRI?

24      Q.    Um-hum.  Well, let me ask you directly.  A confidential

25   reliable informant could be abbreviated by CRI.  Isn't that correct?

1    A.    That would be on the authors of the --

2    Q.    Right.

3    A.    Whatever way he wanted to -- so I myself have never used

4  CRI.

5    Q.    Okay.

6    A.    So but how you described it, it's possible.

7    Q.    All right.  Thank you.  And a CS could be a confidential

8  source.  Couldn't that be true?

9    A.    Yes.

10    Q.    Okay.  And you told Judge Bennett here today that CS-1 and

11  CS-2 had track records with you.  Is that correct?

12    A.    I related that CS Number 1 did.  I don't recall specifically

13  CS-2.

14    Q.    Okay.  And let me ask you this, sir.  You did not at least

15  in the affidavit you prepared for Judge Charles Chipparelli, you did

16  not designate any of these two informants with a number you had given

17  to him -- sorry, judge -- to it.  Had you?

18    A.    No, I did not.

19    Q.    Okay.  Now in that file you have today, did you bring any

20  dossier to show any kind of experience and expert, experience or any

21  information you have gotten from CS-1 prior to that?

22         MR. JACKSON:    Your Honor, I am going to object to this.  I

23  think if where we're going with this is to get behind the warrant --

24         MR. NEEDLEMAN:    No.

25         MR. JACKSON:    -- then it has to be, we shouldn't be going

1    there.  There's been no testimony that we've taken a statement from

2    Ms. Jones nor do we intend to adduce any evidence of a statement from

3    Ms. Jones.  The only evidence that pertains to Ms. Jones would be that

4    relate to any search and seizure warrant or any search and seizures

5    are from the warrant.  There was no warrantless arrest of her with a

6    search incident to arrest which we got fruits of the evidence from

7    her.  The only evidence that would be adduced against Ms. Jones comes

8    from the actual execution of the search and seizure warrant and so

9    therefore, I think this line of questioning is improper unless there's

10   been a Franks showing that allows --

11           THE COURT:    Unless there's been a showing of Franks v.

12   Delaware in terms of willful misrepresentation?

13           MR. JACKSON:    Exactly, Your Honor.

14           THE COURT:    Mr. Needleman, where are you going with this,

15   sir?

16           MR. NEEDLEMAN:    I did file a motion to produce the identity

17   of CS-1, Your Honor.  That's in my papers.

18           THE COURT:    Yes.  But you haven't asked for a Franks hearing

19   nor I gather are you proffering that you're entitled to one.  You're

20   just exploring the reliability of CS-1.  Is that correct?

21           MR. NEEDLEMAN:    And any information it may have divulged

22   prior to May 16, 2007 concerning Flora Jones.

23           THE COURT:    All right.  That's fine then.  The objection is

24   overruled.  You may proceed just as to that limited extent.

25           MR. NEEDLEMAN:    Thank you.

1    Q.    Well, so that His Honor understands, Flora Jones was not

2    arrested on May 22, 2007, was she?

3    A.    No, she was not.

4    Q.    Could you tell His Honor when her arrest occurred?

5    MR. NEEDLEMAN:    Judge, I'm not asking for the exact moment,

6    Your Honor.

7    A.    Mr. Needleman -- we were in contact with Mr. Needleman and

8    he told us she would turn herself in under his discretion.  So that

9    was the date.  I don't know what day it was.

10    Q.    But it was around October or September of 2007.  Isn't that

11    correct?

12    A.    I'm not sure.

13    Q.    Let's just say it's after the summer.  Is that correct?

14    A.    Yes.

15    Q.    Okay.  Now is it your testimony that in your surveillance of

16    the 1500 block of Barclay Avenue, Barclay Street in Baltimore City,

17    you saw Flora Jones one time -- twice.  I'm sorry.  Sorry, Your Honor.

18    Twice.  Is that correct?

19    A.    It was one day.  Yes.

20    Q.    Right.  It was not on the 16th, is that correct, of May?

21    A.    It was the 17th.

22    Q.    The 17th.  And on the 17th, you described in this affidavit

23    to Judge Chipparelli and which you told Judge Bennett here today, your

24    testimony is that you saw Ms. Jones get a black -- I'm sorry, judge --

25    an object, a small object.  Is that correct?

1    A.    No.  I just said, I explained a small object.

2    Q.    Small.  Well, let me ask you this, sir.

3          MR. NEEDLEMAN:    May I just, judge?

4          THE COURT:    Go right ahead.

5    Q.    Would this object be bigger than this 8 1/2 x 11 piece of

6    paper?

7    A.    No.

8    Q.    It would be bigger?

9    A.    It would be smaller.

10   Q.    Smaller.  How about if I fold it in half?  How about --

11   A.    Smaller.

12   Q.    Smaller.  Is that correct?

13   A.    One more time.

14   Q.    One more time.  Okay.  Well, let me bend it this way, Your

15   Honor.  How about this?

16   A.    It would be something in that area concealed by hands.

17   Q.    I understand.  But was it a leather -- what was it?  What

18   was the -- can you tell?

19   A.    I don't know what it was.  It was a small object.

20   Q.    So in this small object here, sir, did you see a controlled

21   dangerous substance being passed allegedly from Mr. Claridy to Ms.

22   Jones?

23         MR. JACKSON:    Your Honor, I'd object again.  It doesn't seem

24   to have anything to do with what at least was the proffered need for

25   this testimony, that is to do with the identity of the confidential

1 informant. This is all material about the facts of the surveillance.

2          MR. NEEDLEMAN: Can I back it up then, judge --

3          THE COURT: Yes.

4          MR. NEEDLEMAN: -- before you rule?

5          THE COURT: Why don't you step back, Mr. Needleman? I'm

6 going to permit you a little bit more latitude, but you need to focus

7 on the reliability of the Confidential Informant Number 1, Mr.

8 Needleman.

9          MR. NEEDLEMAN: All right.

10     Q. CS-1 says to you at some time that Ms. Jones would take

11 United States currency from Mr. Claridy. Isn't that correct?

12     A. That's correct.

13     Q. That's it. That's what it says concerning Ms. Jones. Is

14 that correct?

15     A. I'd have to review.

16     Q. Well -- go ahead.

17     A. That's correct.

18     Q. Okay.

19          MR. NEEDLEMAN: And in this size piece of paper, Your Honor,

20 I'm going to say is six inches by three inches.

21     Q. Did you see any currency in this size object? Did you see

22 any currency inside when it was passed allegedly?

23     A. Where I was sitting, like I said, it was just an object

24 passed from -- so I could not be specific what it was.

25     Q. And prior to that, did you see Mr. Claridy stuffing any

1   money into this object and then giving it to Ms. Jones? Yes or no.

2       A.    I don't know. You're talking about an object. I don't know

3   what object you're talking about.

4       Q.    Well, the object that was passed allegedly between

5   Mr. Claridy --

6       A.    It could have been a stack of folded money folded over.

7       Q.    Okay. Now you do know that Ms. Jones' mother lives on that

8   street on Barclay Street. Isn't that correct?

9       A.    That's correct.

10      Q.    Okay. Because the second time you say that you saw Ms.

11   Jones or she stayed a while, but she had no interaction with

12   Mr. Claridy. Isn't that correct?

13      A.    Let me refer to my notes.

14      Q.    Well --

15      A.    No. The second time again there were two occasions where

16   she met with Mr. Claridy and then left the area after --

17      Q.    But there was no interaction which is --

18      A.    On those two occasions, there were and then on the third

19   occasion which is about 10 p.m., they just met and I didn't see a

20   transaction on that occasion.

21      Q.    All I'm asking you, sir, because I'm just reading from your

22   warrant.

23            MR. NEEDLEMAN:   It's the last question on this area, Your

24   Honor.

25      Q.    On one occasion you saw an object being passed. Is that

1 correct?  You described the object.  We have it here in court in

2 assimilation.

3      A.    If I can refer back?

4      Q.    Yes, you can.

5      A.    It was a total of three occasions.

6      Q.    Okay.  We got that.  One at 10 p.m.  No interaction.  One

7 where an object was being passed the size of this piece of paper.

8 Could you tell us what happened on the third alleged interaction?

9      A.    It was the same.  A hand-to-hand transaction, just giving

10 one object to another.

11      Q.    Okay.  And is that what you told Judge Chipparelli?

12      A.    It says -- if I can read?

13      Q.    Sure.

14      A.    On 5-17-2007, your affiant observed a female later

15 identified as Flora Lynette Jones, F/B, 8-19-1982 meet with Claridy in

16 the 1500 block of Barclay Street.  Jones was given an object by

17 Claridy.  Jones left the area.  This was repeated on two more

18 occasions.

19      Q.    Now on the first time that Ms. Jones left the area, did you

20 follow her on the first time?

21      A.    No, I did not.

22      Q.    Did you follow her on the second time?

23      A.    No.

24      Q.    Did you follow her on the third time?

25      A.    Yes.

1    Q.    Okay.  So we can clear this up, when I brought Ms. Jones to

2  this courthouse, were there any statements taken from her?

3    A.    No.

4    Q.    Did you ever take any statements from her?

5    A.    No.

6          MR. NEEDLEMAN:    Therefore, judge, I did file a motion, but I

7  think it's moot at this point, sir.

8          THE COURT:    All right.

9    Q.    Sir, let's go back.  I want to direct your attention from on

10  the 21st of May, the 21st, 2007, did you see or anyone using the

11  police team theory, anyone in your police team, HIDTA 54 or Baltimore

12  County, Baltimore City see Flora Jones enter 69 Stemmers Run Road?

13          MR. JACKSON:    Your Honor, I am going to object again.  I

14  don't see where this gets to, has any bearing on whether the

15  Government should disclose the identity of the confidential source of

16  information.  It might have a lot to do with whether we had probable

17  cause to arrest her at that time which we didn't, not -- we may have

18  had probable cause, but she was not in fact arrested at that time.

19  May have something to do with a variety of issues.  But it seems to me

20  it has nothing do with whether the Government should disclose

21  confidential informant --

22          THE COURT:    Well, but it does relate, does it not,

23  Mr. Jackson to the nexus of any drug activity and 69 Stemmers Run?

24          MR. NEEDLEMAN:    Exactly.

25          MR. JACKSON:    Well, Your Honor, it may.  But we're kind of

41

1    stuck with whatever nexus is articulated in the four corners of the

2    warrant, the search warrant and the Court would not be allowed to go

3    beyond the four corners of the warrant unless there was a Franks

4    showing, that is a --

5              THE COURT:    I understand.

6              MR. JACKSON:    -- a misrepresentation.

7              THE COURT:    I'm going to let him continue a little bit

8    further on this.  It's overruled.  Go ahead.  You're not going to go

9    much further, Mr. Needleman.

10             MR. NEEDLEMAN:    Yes, sir.  And I appreciate it.

11             THE COURT:    There's no basis for a Franks hearing or there's

12   no, absolutely no indication of willful misrepresentations and there's

13   no basis for a Franks v. Delaware hearing.  But I'll permit you to

14   inquire just as to the events of May 21st a little further.  Go ahead.

15             MR. NEEDLEMAN:    Yes, sir.

16        Q.    On the -- do you want me to repeat that, detective, sir?

17        A.    Yes, please.

18        Q.    On 5-21-07 --

19        A.    Yes.

20        Q.    -- did you see Ms. Jones go into from whatever source they

21   arrived 69 Stemmers Run Road in Essex, Maryland?

22        A.    Go into?

23        Q.    Enter.

24        A.    I'm not sure.  I know she exited.

25        Q.    She exited.  On 5-21?

1    A.    Yes.

2    Q.    Okay.  And what time was that?

3    A.    10:30.  I'm sorry.  11:15.

4    Q.    That's in the a.m.

5    A.    Yes.

6    Q.    Okay.  Now you said that you executed or you were armed with

7    a search and seizure warrant to enter those premises on 5-22-07.  Is

8    that correct?

9    A.    That's correct.

10   Q.    And you went there in the early morning hours.  7 something?

11   A.    Yes.

12   Q.    Okay.  Did you see, A, Ms. Jones leave those premises or the

13   minivan, the Chrysler minivan parked there?

14   A.    On the 22nd?

15   Q.    Yes.

16   A.    I don't recall.

17   Q.    Okay.  Well, had you recalled that fact, do you think you

18   might have recorded that in some DEA-6 or something of that nature so

19   we could give those facts to His Honor?

20   A.    I don't believe so.

21   Q.    You don't believe you would have written that down?

22   A.    I might have.  I'm not saying specifically.

23   Q.    You did enter those premises on the 22nd of May, 2007.  Is

24   that correct?

25   A.    That is correct.

1    Q.    Was Ms. Jones there?

2    A.    No, she wasn't.

3    Q.    During any time when you stopped Mr. Claridy on Sinclair

4    Lane, did you see him make any phone calls or anything of that nature?

5    Did you permit him to do that?

6    A.    No.

7    Q.    Okay.  And obviously, you didn't tell Mr. Claridy you were

8    going to stop him on Sinclair Lane.  Is that correct?

9    A.    That's correct.

10   Q.    CS-1, was it ever with you and I direct your attention to

11   the 16th or 17th day of May, 2007 on the 1500 block of Barclay Street?

12   A.    I don't understand.

13   Q.    Well --

14   A.    What was it --

15   Q.    Was it ever with you?

16   A.    Was it in my car like --

17   Q.    Yes.

18          (Counsel and the witness began to speak simultaneously

19   and the court reporter interrupted.)

20          MR. NEEDLEMAN:    I apologize.  I wasn't prepared to answer

21   the officer's questions, Your Honor.  But I will.

22   Q.    Was it ever in your car or with another police officer where

23   it eyeballed Flora Jones?  Did it ever do that?

24   A.    No.

25   Q.    Okay.  So is it your testimony that it just said Flora to

1  you?

2  A.    Yes.  And described Flora.

3  Q.    Do you have that information -- I see you're going through

4  your DEA-6s.  I'm asking you do you have any information concerning

5  what CS-1 ever gave you that you ever wrote down in long hand?

6  A.    No.

7  Q.    One last series of questions.  I mean was it in May of 2007

8  a federal informant?

9  A.    Which?  Who?  Which --

10  Q.    CS-1.

11  A.    CS-1 was a federal informant.

12  Q.    Okay.  And contacted you at 222 St. Paul Street?

13  A.    No.  By phone.

14  Q.    By phone.  Your testimony is that Ms. Jones left the area on

15  5-17 and you followed her in your car.  Is that correct?

16  A.    I don't know if it was -- there were a group of cars.  Mine

17  being one.  Yes.

18  Q.    Well, sir, you told Judge Bennett that you saw Ms. Jones go

19  through a stop sign, one stop sign.  Is that correct?

20  A.    That's correct.  I saw one stop sign.

21  Q.    What intersection was that?

22  A.    That was on Barclay.

23  Q.    On Barclay?

24  A.    Yes.

25  Q.    Barclay and where?

1    A.    Between Barclay and North Avenue.

2    Q.    Sir, you got Barclay Street which is bordered on Oliver --

3    A.    And it goes up to North Avenue and then you would make a

4    right turn. Her direction of travel, right turn on North Avenue down

5    to Aisquith Street, south on Aisquith into the southeast.

6    Q.    Well, wouldn't you stay on, just understanding, you wouldn't

7    stay on north to Sinclair Lane and then over to Edison Highway back up

8    on Monument Street?

9    A.    You would on the second part. But the initial surveillance

10   we talked about was in southeast Baltimore. I thought that was where

11   you were talking about.

12   Q.    You're saying in this ten-or-so mile following of Ms. Jones,

13   she went through a stop sign and one automatic signal. Is that

14   correct?

15   A.    That's correct.

16         MR. JACKSON:    Your Honor, objection to the -- I don't think

17   he ever testified as to the --

18         MR. NEEDLEMAN:    Yes, he did.

19         MR. JACKSON:    He did. I missed -- I apologize, Your Honor.

20         THE COURT:    Overruled.

21   A.    During my observations, I specifically saw a stop sign and a

22   location on Milton Avenue at Federal Street.

23   Q.    Okay. So nothing was done in Baltimore County. Is that

24   correct? No camera surveillance or anything like that?

25   A.    No because where she lives at, as soon as you get off 695,

1   you are right at the address.  There's not a lot of

2   countersurveillance that can be done on the highway.

3        Q.    All right.  Let me ask you this.  You've seen Flora Jones

4   stop her car, park the car and then continue on?  Did you see her do

5   that?

6        A.    Yes.  She did that in southeast.

7        Q.    Yeah.  But she let someone off.  Is that correct?

8        A.    She let them off and then she stayed in the block.  It was

9   just part of the surveillance.  I can't be specific on -- I'll let you

10  go.

11       Q.    Okay.  How many u-turns did she make?

12            MR. JACKSON:    Your Honor, again I'm going to object.  What

13  if any relevancy this has, I've already articulated, this has to do

14  with confidential informants, I don't know.

15            THE COURT:    That's sustained.  Mr. Needleman, at some point

16  in time --

17            MR. NEEDLEMAN:    I'll move on.

18            THE COURT:    Stop and move on, sir.

19       Q.    When Ms. Jones got out of her car, you say Detective Bearde

20  was on foot.  Is that correct?

21       A.    Yes.

22       Q.    Okay.  Tell us what object Ms. Jones was carrying.

23            MR. JACKSON:    Objection, Your Honor.

24            THE COURT:    Sustained.  Mr. Needleman, we have the four

25  corners of the affidavit.  I've allowed you great latitude on the

1    matter of the reliability of the confidential informant.  But I mean

2    if it's just going to, we're going to have a deposition here, just to

3    try to go beyond the four corners of the affidavit and try to make

4    this a Franks hearing, you're going to have to make a proffer to me

5    about where you think there's any willful misrepresentation, sir.

6              MR. NEEDLEMAN:    But, Your Honor, when the Government gets

7    into the four corners of the warrant and then uses it in direct and

8    asks you to rely on it, surely --

9              THE COURT:    I'm giving you a great latitude on this, but

10   it's clear to me you're just going to keep going until I stop you.  So

11   I mean it's, I mean at some point in time, I mean it's, there's

12   absolutely nothing that you've proffered to me that indicates you're

13   entitled to a Franks hearing is the point.  So we're not going to turn

14   this into a Franks v. Delaware hearing.  I'm trying to give you great

15   latitude on it, but I would hope you rein it in and stay focused on

16   what you've represented was your area of inquiry.

17             MR. NEEDLEMAN:    I'm just trying to --

18        Q.    When it gave information, CS-1, did you write down how old,

19   how stale this information was?

20        A.    I don't understand.

21        Q.    Well, do you have anything that we could show Judge Bennett

22   that you received any information from any CS-1 concerning Flora Jones

23   besides your typed DEA-6 report?

24        A.    Yes, Your Honor.  The affidavit.  Prior to the execution of

25   doing any enforcement action, I noted in there my actions of Flora

1   Jones.

2      Q.    All right. No. What I'm asking your handwriting when you

3   received this information over the phone, surely you wrote it down.

4      A.    I did in --

5      Q.    Do you have it with you?

6      A.    -- the DEA-6.

7      Q.    Do you have it with you, your rough notes, what you wrote

8   down?

9      A.    No, I do not.

10      Q.    Did you destroy them?

11      A.    I don't know where they are.

12      Q.    You don't know where they are?

13      A.    No.

14      Q.    Wouldn't they be in that file?

15      A.    They would be in a notebook I had at the time.

16      Q.    And I assume that's lost.

17      A.    I don't know where it is.

18      MR. NEEDLEMAN:   Nothing further, judge.

19      THE COURT:   All right. Thank you. Mr. Bates?

20      MR. BATES:   Yes. Thank you, Your Honor. Your Honor, before

21   I start, I actually have three exhibits that I would like to --

22      THE COURT:   Yeah. Certainly.

23      MR. BATES:   They've already been premarked, Your Honor.

24      THE COURT:   All right. Thank you.

25      MR. BATES:   I have copies for the Court and I have three

1  copies actually.

2          THE COURT:   All right.  Thank you, Mr. Bates.  They'll be

3  marked as Defendant's Exhibits 1, 2 and 3.

4          MR. BATES:   Yes, Your Honor.  They've been previously

5  marked.

6          THE COURT:   Thank you.

7                    CROSS-EXAMINATION

8          BY MR. BATES:

9      Q.    Good morning, Detective Gladstone.

10     A.    Good morning.

11     Q.    Let's turn our attention to the dates of the observations.

12     A.    Okay.

13     Q.    On May 16, '07, you didn't stop any of the alleged

14  individuals that you saw Mr. Claridy giving items to?

15     A.    No, I did not.

16     Q.    You never knew what was in any of these bags that

17  Mr. Claridy allegedly gave to these individuals?

18     A.    My experience, I believe I knew.

19          THE COURT:   Keep your voice up if you will, please --

20          THE WITNESS:   I'm sorry.

21     A.    On my experience and informant information.

22     Q.    But you did not know.

23     A.    I did not.

24     Q.    And do you have any written notes that detail the

25  individuals that received these items?

1    A.    I do not.

2    Q.    Were they in cars?

3    A.    On foot.

4    Q.    Do you know if they, what they were wearing, where they

5    walked to?

6    A.    I do not.

7    Q.    So you didn't write search and seizure warrants to the

8    locations they may have walked to?

9    A.    I did not.

10   Q.    Do you know if Mr. Claridy ever got out of his vehicle in

11   the 1500 block of Barclay Avenue?

12   A.    Yes, he did.

13   Q.    And did you see him walk to 1513 Barclay Avenue?

14   A.    I don't recall the address.

15   Q.    So you do know, I believe you stated in testimony that

16   Ms. Jones' mother lived at 1513 Barclay.  Correct?

17   A.    I'm not sure of the address.  I know she lives in the block.

18   Q.    So once you got this information from your C.I. and he's a

19   federal C.I.  Correct?

20   A.    There's two informants.

21   Q.    Your two informants.  They're both federal informants.

22   Correct?

23   A.    No.

24   Q.    Go back a couple of questions.  When Mr. Needleman asked you

25   was your C.I. a federal C.I. and your response was yes?

1    A.    Yes.

2    Q.    So this was a federal C.I.  Correct?

3    A.    Yes.  One informant was registered as a Baltimore City and a

4    federal informant.  Both cross.

5    Q.    And when you received this information, who's in your group

6    that you share this information with?

7    A.    My sergeant.

8    Q.    And is your sergeant a Baltimore City officer as well as

9    cross-designated HIDTA officer?

10   A.    Yes.

11   Q.    Who is the federal agent within your group?

12   A.    We are all designated as deputized federal agents.

13   Q.    And you view yourself as a federal agent.  Correct?

14   A.    No.  I have the powers.  I'm the Baltimore City Police

15   Department.  I'm a detective.  So I have the powers as an agent.  But

16   I also have, I keep my regular, you know, local abilities.

17   Q.    Do you have a federal agent?  What about Agent Malone?

18   A.    Yes.  He's in the group.

19   Q.    He's in the group.

20   A.    Um-hum.

21   Q.    Is Agent Malone also a Baltimore City police officer?

22   A.    No.  He's a member of the Drug Enforcement Administration.

23   Q.    So he is a federal agent.  Correct?

24   A.    Yes.

25   Q.    And the reports that you have written on, they're Defense

1      Exhibits Number 1 and 2, they are DEA reports.  Correct?

2           A.      That is correct.

3           Q.      And the DEA agency, what is a DEA agency?  What does that

4      mean, DEA?

5           A.      Drug Enforcement Administration.

6           Q.      And that's a federal agency?

7           A.      Yes.

8           Q.      So when you went back to your office, you had this

9      information, you had these observations from your C.I.s, you then

10     looked on the computer and pulled the background information of

11     Mr. Claridy.  Correct?

12          A.      That is correct.

13          Q.      And at that point in time, you realized this was going to be

14     a federal investigation.  Correct?

15          A.      I don't understand.

16          Q.      Once you had the information, the observations you had made

17     in reference to Mr. Claridy, you pulled Mr. Claridy's background

18     information, any record he may or may not have had and then the

19     information you received from your confidential informants, say CS-1

20     and CS-2, at that point in time, you realized it was going to be a

21     federal investigation?

22          A.      No.  I only do narcotic investigations.  They aren't

23     subcategorized as federal or local.  They're just narcotic

24     investigations.

25          Q.      So you've never used the term federal investigation, have

1    you?

2          A.    Yes.

3          Q.    So this here is a federal narcotic investigation?

4          A.    It can be a federal.  It can be a local.  It had state

5    search and seizure warrants.  It was conducted by local law

6    enforcement agencies.  So it's local and it's what HIDTA is about.  It

7    is a joint effort between state and local.  So there is no -- a

8    federal investigation would be federal officers.  Not local.  You're

9    trying to make a federal and local.  It's not a difference.

10         Q.    Excuse me.  There are federal officers in this.  Correct?

11   Agent Malone.  Correct?

12         A.    Not in the beginning investigation.  It was just myself and

13   Sergeant Geho.

14         Q.    Agent Malone was involved in this investigation.  Correct?

15         A.    Yes.

16         Q.    You wrote your report on DEA forms.  Correct?

17         A.    That's correct.

18         Q.    You are cross-designated as a federal officer.  Correct?

19         A.    Yes.

20         Q.    And you received your information from a federal C.I.,

21   confidential source, a confidential informant.  Correct?

22         A.    Yes.  Part of it.  Yes.

23         Q.    Let me ask you this.  Where is the physical location of your

24   office, HIDTA 54?  It's not in the Baltimore City Police Department,

25   is it?

1    A.    No.

2    Q.    It's in a totally different location.  Correct?

3    A.    That is correct.

4    Q.    It's separate, away from Baltimore City Police Department?

5    A.    That is correct.

6    Q.    And when you went to have this warrant signed, who went with

7  you?

8    A.    Myself.

9    Q.    You were by yourself?

10    A.    Yes.

11    Q.    And where did you go to have this warrant signed by Judge

12  Chipparelli?

13    A.    I'm not sure.  It was after hours.  I'm not sure of the

14  location.  It wasn't in the courthouse.

15    Q.    So most likely you had to go to Judge Chipparelli's

16  location, his residence or if he was out, then wherever he was.

17  Correct?

18    A.    That's correct.

19    Q.    And you picked up the phone and you called Judge Chipparelli

20  and you told him you had a warrant that you need him to sign?

21    A.    I don't -- call a court commissioner and the court

22  commissioner assigns a judge.

23    Q.    So you didn't write any of that information in your notes,

24  did you?

25    A.    What information?

1      Q.     About the court commissioner and going to Judge Chipparelli

2  or any of that, did you?

3      A.     No.

4      Q.     Now let's go ahead and look at the stop on 5-22.

5      A.     Yes.

6      Q.     You said you watched my client leave the Stemmers Run

7  location.  Correct?

8      A.     Yes, sir.

9      Q.     And he had an object in his hand when he left?  A bag?

10     A.     No.

11     Q.     Do you remember if he had a bag or an object in his hand?

12     A.     I don't recall seeing an object.

13     Q.     He got in his vehicle and when he was driving, you had a

14  warrant at that time in point to stop the vehicle, to search the

15  vehicle, correct, when you first saw him?

16     A.     Yes.

17     Q.     However, you didn't stop him at that time in point, did you?

18     A.     No.

19     Q.     You said he was headed toward Barclay Avenue.  Correct?

20     A.     It was my belief.

21     Q.     Your belief.  You didn't stop him on Barclay Avenue, did

22  you?

23     A.     No.

24     Q.     Matter of fact, you stopped him before he reached Barclay

25  Avenue?

1       A.      Yes.

2       Q.      You asked him to get out of the vehicle.  Correct?

3       A.      Correct.

4       Q.      And when he got out of the vehicle, you searched it and the

5   vehicle.  Correct?

6       A.      No.  I advised him of his rights per Miranda v. Arizona.

7       Q.      Right.  Once you advised him of his rights, did you give him

8   any form to fill out or sign?

9       A.      No.

10      Q.      So he never signed saying that he was advised of his rights.

11  Correct?

12      A.      That's correct.

13      Q.      And so once he gets out of the vehicle, you searched the

14  vehicle even though he said don't search it, he didn't give you the

15  authority to search it, but you had a warrant.  So you searched

16  anyway.  Correct?

17      A.      Yes.

18      Q.      Once you searched the vehicle, you didn't find anything.

19  Correct?

20      A.      I found something I thought --

21      Q.      You found cash.  You found money.  You did not find any

22  contraband, any CDS.  Correct?

23      A.      No, no CDS.

24      Q.      Now was he under arrest at that point in time?

25      A.      Yes.

1	Q.	And once he was under arrest, you then drove to Eastern

2	District Police Station.  Correct?

3	A.	Yes, sir.

4	Q.	You didn't take him to Central Booking.  Correct?

5	A.	That is correct.

6	Q.	You didn't even take him inside Eastern District Police

7	Station.  Correct?

8	A.	That is correct.

9	Q.	And at that point in time, you said he was already advised

10	of his rights.  But he didn't sign his Miranda rights, did he?

11	A.	No.

12	Q.	Now you didn't go inside of Eastern District and said hey,

13	look, Officer Jones, Officer Smith, can I borrow a copy of a Miranda

14	form.  Correct?

15	A.	That's correct.

16	Q.	Now you're 30 feet from that door, but you didn't do that.

17	Correct?

18	A.	That is correct.

19	Q.	Now this is a decision you made.  Correct?

20	A.	Yes.

21	Q.	Now when he was advised of his Miranda rights, you didn't

22	record it, did you?

23	A.	No.

24	Q.	You didn't take any notes and you didn't sign anything.

25	Correct?

1       A.      Correct.

2       Q.      Now how many officers stopped Mr. Claridy?

3       A.      Five.

4       Q.      Five officers.  So who was with you when you stopped

5   Mr. Claridy?

6       A.      Myself, Sergeant Geho, Detective Jendrek, Agent Malone and

7   maybe Agent Biniek.

8       Q.      And at that point in time, none of the five of you decided

9   to get the Miranda form to have Mr. Claridy sign.  Correct?

10      A.      That is correct.

11      Q.      And as you're sitting there in Eastern District in the

12  parking lot at that point in time, you did advise Mr. Claridy if I'm

13  not mistaken, that he was the target of a federal drug investigation.

14  Correct?

15      A.      Correct.

16      Q.      Those are the exact words you told Mr. Claridy.  Correct?

17      A.      I don't know if it was the exact words.  It was in that

18  text.  I didn't quote.  I just believe I said I related.

19      Q.      Do me a favor.  If you look at Defense Exhibit Number 2, if

20  you'd look at the second page?  And if you can go down to Number 4?

21  There are two number 4's.  At the second number 4 and it starts

22  Claridy was transported to the parking lot.

23      A.      I might have the wrong --

24      Q.      The one with your expertise.  Right there.

25      A.      Okay.

1    Q.    The second page.

2    A.    And number 4 you said?

3    Q.    Yes.  Okay.  It says Claridy was transported to the parking

4    lot.  That's where it says that.  Correct?

5    A.    Yes.

6    Q.    And then it says TFO Gladstone related.  Could you read that

7    sentence, please?

8    A.    You're saying 4, TF --

9    Q.    It says TFO Gladstone related to Claridy --

10   A.    Oh, okay.  I'm sorry.  I was reading the wrong 4.

11   Q.    Okay.

12   A.    "At this time TFO Gladstone related to Claridy that he was a

13   target of a federal investigation and search and seizure warrants for

14   numerous vehicles and residences."

15   Q.    Go back one because actually, you left out a word.

16   A.    "At this time TFO Gladstone related to Claridy that he was a

17   target of a federal drug investigation and that search warrants had

18   been obtained for numerous vehicles and residences."

19   Q.    Now this was before you had ever found any drugs.  Correct?

20   A.    That is correct.

21   Q.    So before you ever found any drugs, you knew that

22   Mr. Claridy was the target of a federal drug investigation.  Correct?

23   A.    I still don't understand what the federal drug -- he was a

24   target of a narcotics investigation.

25   Q.    But if you don't understand it, those are your words.  You

1    wrote that federal drug investigation.

2         A.    I used that to show Mr. Claridy --

3         Q.    That he was the target of a federal drug -- that this is a

4    federal investigation.  That's why you used it.

5              MR. JACKSON:    Objection, Your Honor.  If he could answer the

6    question.

7              THE COURT:    Overruled.

8         A.    I did it to show him the seriousness of the situation.

9         Q.    Now after you tell Mr. Claridy that, you then decide to take

10   Mr. Claridy with you to 69 Stemmers Run Road.  Correct.

11        A.    That is correct.

12        Q.    He never was taken to Central Booking.  Correct?

13        A.    That is correct.

14        Q.    You didn't leave him in Eastern District with the other

15   officers in a holding cell, did you?

16        A.    No.

17        Q.    You took him to 69 Stemmers Run Road?

18        A.    That is correct.

19        Q.    When you did this around what, 12:45 or so, would you say?

20        A.    In that timeframe.

21        Q.    Let's say between 12 and 1.

22        A.    If I could look through my notes?

23        Q.    Okay.

24        A.    Yes, sir.

25        Q.    So you took Mr. Claridy to 69 Stemmers Run Road.  And at

1    that point in time there was no guns and no drugs had been found at

2    that point in time.  Correct?

3         A.    That's correct.

4         Q.    Once you got to 69 Stemmers Run Road, who were the

5    individuals that were with you on this raid team?

6         A.    Myself -- I can't be specific because there were officers

7    with us who made entry and then we had additional officers from

8    Baltimore County arrive and people from my location went to Marlyn

9    Avenue.

10        Q.    Do me a favor.  Will you look through your notes and see

11   where in your notes it documents who participated in the search of 69

12   Stemmers Run Road?

13        A.    Okay.  It would be TFO Geho, Special Agent Malone, TFO

14   Jendrek, TFO Bearde.  I have TFO Blackwell, TFO Daniel and there were

15   Baltimore County officers also.

16        Q.    And where do you see that?

17        A.    That's my recollection.

18        Q.    From your recollection.  It's not in your notes.  Correct?

19        A.    That's correct.

20        Q.    Now let's go ahead and talk about once you're at that

21   location, it's your testimony here that before the search began if I'm

22   not mistaken that Mr. Claridy advised Special Agent Bernard Malone,

23   the federal agent, that law enforcement would find a handgun and a

24   hundred grams of heroin upstairs in the bedroom closet.  Correct?

25        A.    I'm not sure exactly if it was during the search, if it was

1   prior, but he made the statements.

2       Q.      Well you hadn't found the gun or the drugs until he made --

3   at that point in time.  Correct?

4       A.      I'm not sure.  I was upstairs and I came downstairs and --

5       Q.      So before you went upstairs, Mr. Claridy had never told you

6   anything about a gun or drugs.  Correct?

7       A.      No.  He had told me he had a gun upstairs in the closet.  He

8   had made no reference to me about narcotics.

9       Q.      Could you look in your notes and tell me where you see that?

10      A.      There is a statement of -- it says summary report,

11  statements of Timothy Claridy and it said in paragraph 2 --

12      Q.      Yes.

13      A.      I'm sorry.  Paragraph 4, the second 4, it said "Claridy

14  related that he had a handgun in the residence, in the bedroom closet

15  of 69 Stemmers Run Road."

16      Q.      Does it say that he related that to you?

17      A.      If you read how everything worked out.  I had talked to him

18  and then he had given those, he advised me of this.  So it was myself.

19      Q.      Excuse me.  Does it say directly that Claridy told me,

20  Officer Gladstone, that there was a gun in the closet?  Does it say

21  that, detective?

22      A.      Yes.

23      Q.      It does?

24      A.      Yes.

25      Q.      Do you interpret it as that or does it say that?

1    A.    Well, I wrote it.  So that's what it says.

2    Q.    That's what it means to you.

3    A.    Well, I can read it.  You can take from it exactly what I

4    take from it.

5    Q.    Hold up.  Before we go there, I want you to look at Defense

6    Exhibit Number 2, the other, the same report that you were looking at.

7    Right?

8    A.    Yes.

9    Q.    And turn to the third page.

10    A.    Okay.

11    Q.    And if you go down to Number 14?  You see that?

12    A.    Yes.

13    Q.    And it says what?  During the execution?

14    A.    "Of the search warrant, Claridy advised Special Agent

15    Bernard Malone, the law enforcement, find a handgun and a hundred

16    grams of heroin upstairs in the bedroom closet."

17    Q.    And that's the federal agent.  Correct?

18    A.    Yes.  He is a special agent with the Drug Enforcement

19    Administration.

20    Q.    And before the handgun was ever found, he gave that

21    information to Agent Malone.  Correct?

22    A.    Before he had asserted the handgun to me and then he

23    asserted the handgun and the hundred grams to Agent Malone.

24    Q.    Now you didn't write that information in this report,

25    correct, the information about you being told that?

1      A.    I would have to look.  I didn't write it in that report.

2    Correct.

3      Q.    Now before he gave that statement to Agent Malone, once

4    again there was no signed Mirandi.  Correct?

5      A.    There was no signed Miranda.  Correct.

6      Q.    Now as you were conducting this search, is that when

7    Baltimore County arrived?

8      A.    Baltimore County arrived during the execution of the search

9    warrant.  Yes.

10      Q.    But once again, we don't have any notes to say that.

11    Correct?

12      A.    Correct.

13      Q.    Now once you found that evidence, you didn't take

14    Mr. Claridy to jail at that point in time.  Correct?

15      A.    I don't understand.

16      Q.    Once you found the evidence at 69 Stemmers Run Road, you

17    actually took Mr. Claridy to another location as well.  Correct?

18      A.    Yes.

19      Q.    And that's 1037 Marlyn Avenue.  Correct?

20      A.    He never went inside.  He was just outside.

21      Q.    But you took him to that physical location.  Correct?

22      A.    I took him, yes, to the thousand block of Marlyn.

23      Q.    Before you actually went into 1037 Marlyn Avenue, you

24    actually went to another address.  Correct?  You actually went to the

25    wrong house.  Correct?

1    A.    I don't understand.

2    Q.    Once you're on Marlyn Avenue, you went to the wrong house.

3    You did not go to the exact 1037 Marlyn Avenue.  You actually knocked

4    on the wrong door.  Correct?

5    A.    That is correct.

6    Q.    So you went to the wrong house the first time.  Correct?

7    A.    I was in the rear alley.

8    Q.    In the rear alley.  Now this is the same house that you said

9    you also followed Mr. Claridy to previously.  Correct?

10    A.    Not Mr. Claridy.  Mr. Norris.

11    Q.    But you followed someone there to that location before and

12    you still went to the wrong location.  Correct?

13    A.    Yes.  I followed him to the front door where there's a

14    number on the front.

15    Q.    None of that is documented in any of your notes.  Correct?

16    A.    In the warrant I believe it says he went to 1037 and entered

17    with a key.

18    Q.    Let's back up.  Now in your notes, you don't ever talk about

19    taking Mr. Claridy to 1037 Marlyn Avenue.  Correct?

20    A.    That's correct.

21    Q.    You don't ever talk about in your notes that you

22    accidentally went to the wrong location at first on Marlyn Avenue.

23    Correct?

24    A.    That's correct.

25    Q.    However, if I'm not mistaken, on your notes and if you could

1    actually turn to what I have as Defense Exhibit Number 1?

2          A.    You just have to explain which one it is.

3          Q.    That's the one with, it has Report Of Investigation at the

4    top and it has Norris at the bottom.

5          A.    Is it Report, Execution at 1037 Marlyn Avenue?

6          Q.    Yes, sir.

7          A.    Okay.

8          Q.    If you'll do me a favor?  Go down to the details portion,

9    Section 2.

10         A.    Okay.

11         Q.    It's on the front page.  It's right in front of you.

12         A.    Yes.

13         Q.    Section 2, it says raid team.  It says raid team consisted

14   of TFO -- could you repeat that?

15         A.    Geho, Biniek, Daniel, Blackwell, Wilson, Osbourne, Bearde

16   and members of the Baltimore County Police.

17         Q.    Now you put this information in this report for 1037 Marlyn

18   Avenue.  But you didn't put any of this information in a report for 69

19   Stemmers Run.  Correct?

20         A.    That's correct.

21         Q.    Now the evidence that was seized at 69 Stemmers Run, that

22   evidence was not taken to Baltimore County, the police station,

23   correct or --

24         A.    I'm not sure where the handgun went to.  That went to the

25   Baltimore Police Department.  And the other objects went to the Drug

1   Enforcement Administration.

2       Q.    Matter of fact, the BDO drop safe and you took it there.

3   Correct?

4       A.    Yes.

5       Q.    And that's a federal department.  Correct?

6       A.    That's an office.  Yes.

7       Q.    As well as the money was held on the BDO, with the BDO and

8   eventually taken to Wachovia Bank where the currency was processed and

9   transferred to the U.S. marshals.  Correct?

10      A.    That is correct.

11      Q.    So all the items that were recovered were basically taken

12  for the most part to the federal authorities.  Correct?

13      A.    That's correct.

14      Q.    And Mr. Claridy, all the items that were found were found in

15  Baltimore County.  Correct?

16      A.    That is correct.

17      Q.    And I guess you had Mr. Claridy for about six hours.  Around

18  12 and then around 6:36 if I'm not mistaken he was taken to Central

19  Booking.  Correct?

20      A.    I'm not sure.

21      MR. BATES:    May I approach the witness, Your Honor?

22      THE COURT:    Certainly.

23      MR. BATES:    I've already produced this as Defense Exhibit

24  Number 3 and I do have a copy of it.

25      Q.    Now I've presented you with what's been previously marked as

1    Defense Exhibit Number 3, Agent Gladstone.  You took Mr. Claridy

2    straight to Central Booking, Baltimore City Detention Center.

3    Correct?

4            A.    I don't recall.  He might have been at the Baltimore

5    District Office of the Drug Enforcement Administration while we

6    processed the evidence.

7            Q.    While you processed the evidence.

8            A.    And processed, actually we processed him, too.

9            Q.    So you basically had him in your custody for five or more,

10   six hours and he never signed a Miranda form.  Correct?

11           A.    That's correct.

12           Q.    And Defense Exhibit Number 3, it shows actually that he was

13   viewed as a federal detainee and received by Baltimore City Central

14   Booking, the jail in Baltimore City, not Baltimore County around 8:36.

15   Correct?

16           A.    That's correct.

17           Q.    That's 8:36 -- I mean excuse me.  6:36, 18:36 which would be

18   6:36 p.m.  Correct?

19           A.    That's correct.

20           Q.    And if I'm not mistaken the next morning, he was and that

21   report does say that he was released to DEA Agent Keith Gladstone

22   around 8:35 in the morning.  Correct?

23           A.    That is correct.

24           Q.    And if I'm also not mistaken, the next day you actually had

25   written a warrant, I mean not a warrant, a charging document and in

1  the charging document, you talk about task force of the Drug

2  Enforcement Administration.  Correct?

3       A.    Yes.  It gave my, my credentials.

4            MR. BATES:    At this point in time, I have no further

5  questions, Your Honor.

6            THE COURT:    Thank you, Mr. Bates.  Any redirect on this,

7  Mr. Jackson?

8            MR. JACKSON:    Your Honor, just very briefly.

9                    REDIRECT EXAMINATION

10           BY MR. JACKSON:

11      Q.    Are there or are there not Baltimore County Police

12  detectives on your task force?

13      A.    Yes, there are.

14      Q.    And were there Baltimore County Police detectives on your

15  task force at the time of this investigation?

16      A.    Carla Horton is a police detective.

17      Q.    Horton.  H-O-R-T-O-N?

18      A.    Yes.

19      Q.    And was she a member of the task force, your squad at that

20  task force?

21      A.    Yes, she was.

22      Q.    And did she participate fully in this investigation as well?

23      A.    I'm not sure if she was present at the time.

24      Q.    Well, I'm not talking present at the execution of a specific

25  search warrant, but present during the course of the investigation at

1  all.

2      A.    Yes.

3      Q.    Thank you.

4            MR. JACKSON:    No further questions.

5            THE COURT:    All right.  Thank you.  Why don't we -- any

6  other further witnesses to be proffered by the Government, Mr.

7  Jackson?

8            MR. JACKSON:    None, Your Honor.

9            THE COURT:    Any witnesses to be proffered by the defense?

10           MR. BATES:    None, Your Honor, on behalf of Mr. Claridy.

11           THE COURT:    Mr. Needleman?

12           MR. NEEDLEMAN:    No, sir.

13           THE COURT:    So basically we're ready now for just legal

14  argument on the papers and issues raised.  Is that correct, counsel?

15           MR. JACKSON:    Yes, Your Honor.

16           THE COURT:    Mr. Bates and Mr. Needleman, is that correct in

17  terms --

18           MR. NEEDLEMAN:    That's correct, sir.

19           MR. BATES:    Court's indulgence a brief moment.  I do have

20  one witness, Your Honor.  I need to just speak with my client --

21           THE COURT:    All right.  We can take a break then.  We're

22  going to take, the staff needs a break here.  We'll take about a

23  ten-or-fifteen minute recess this morning and let's take our

24  ten-minute morning recess and you can certainly let me know.  I'm just

25  trying to gauge scheduling now.  As I understand it, Detective

1  Gladstone has another -- it's his day off.  Is that correct?

2              MR. JACKSON:    It's his Christmas vacation, Your Honor.

3              THE COURT:    It's his Christmas vacation.  Well, you spend

4  your Christmas vacation like I do then, Detective Gladstone, here at

5  the courthouse.  But does he need to stay here, Mr. Jackson, from the

6  point of view of the Government?

7              MR. JACKSON:    Not in the Government's eyes, no.

8              THE COURT:    Mr. Bates or Mr. Needleman, do you think

9  Detective Gladstone needs to stay here any further?

10              MR. BATES:    I actually have one issue I did forget about,

11  Your Honor.  The Government raised in reference to the standing in

12  reference to the vehicle.  I don't know if that's still an issue any

13  longer.

14              MR. JACKSON:    I will stipulate to the standing.

15              THE COURT:    All right.  Okay.

16              MR. BATES:    There's no issue then.

17              THE COURT:    Then good.  Then Detective Gladstone then is

18  free to leave.  Is that correct?

19              MR. BATES:    Yes, Your Honor.

20              THE COURT:    All right.  Thank you very much, Detective

21  Gladstone.  Do you have a cell phone with you?

22              DETECTIVE GLADSTONE:    Yes, Your Honor.

23              THE COURT:    Just make sure Mr. Jackson has it in case for

24  some reason we need to have you come back.  I don't think we will.

25  But in case we do.  So he can find you.

1      DETECTIVE GLADSTONE:   I will be in the immediate area, Your
2  Honor.
3      THE COURT:   Okay.  That's good.  We'll take a ten-minute
4  recess.
5      (Recess.)
6      THE COURT:   All right.  Counsel, you all may be seated for a
7  moment.  Let me just tell you how I think we ought to proceed with
8  this is we have the pending motions and legal arguments to be
9  presented and what I would propose to do unless anyone has any
10  objections is to address the search warrant issue with respect to the
11  search that was executed at 69 Stemmers Run Road.  Is that lane or
12  road?
13      MR. NEEDLEMAN:   Road, sir.
14      THE COURT:   It's Stemmers Run Road.  Address that secondly.
15  Let's first address the issues.  Now Mr -- the other issues apart from
16  that.  Suppression of statements.  Now Mr. Needleman, you don't have
17  any motion for a suppression of statements.  You're not contending
18  that your client made any statements.
19      MR. NEEDLEMAN:   The Government has not provided me with
20  any.  I know of none.  So therefore, I can't --
21      THE COURT:   All right.  And with respect to the standing,
22  Mr. Jackson, the Government is not challenging the standing of either
23  defendant with respect to challenging 69 Stemmers Run Road.  Is that
24  correct?
25      MR. JACKSON:   That's correct, Your Honor.

1     THE COURT:   All right.  So standing is not an issue here in

2   this case.  And with respect to the search warrants, we'll address

3   those issues in a moment.  Let's first get to the issue, then it seems

4   to me that with respect to the, we should address the issue of the

5   reliability of the confidential informants and a motion as to the

6   identity of the confidential informants that's still pending and then

7   the matter of the suppression of statements, the motion filed by

8   Mr. Bates on behalf of Mr. Claridy.  Does that seem a workable

9   approach to counsel?

10     MR. BATES:   Yes, Your Honor.

11     THE COURT:   All right.  Okay.  Then let's first get to the

12   matter of the identity of the confidential informants.  That is your

13   motion.  Is that correct, Mr. Needleman?

14     MR. NEEDLEMAN:   It is, sir.

15     THE COURT:   And Mr. Bates, but you have adopted that motion

16   as well?

17     MR. BATES:   Yes, we have, Your Honor.

18     THE COURT:   All right.  Okay.  But who would propose to be

19   heard?  Mr. Needleman, I'll be glad to hear from you on that first of

20   all.

21     MR. NEEDLEMAN:   May it please the Court, Your Honor.

22     THE COURT:   All right.

23     MR. NEEDLEMAN:   And I know that and it's been said to me by

24   His Honor.  I am couching my argument to you and I will be confined to

25   the four corners.  But that is really --

1  THE COURT:   We're going to address the matter of the

2  reliability in a moment.  But just in terms of the identity of the

3  confidential informants and the analysis we have to undergo under

4  Roviero, the Supreme Court opinion.  Let me hear from you first on

5  that.

6  MR. NEEDLEMAN:   Thank you, sir.  I am asking that you

7  require the Government to produce to Mr. Bates and I their identity

8  because obviously, judge, the evidence that you heard and what

9  Detective Gladstone put in the affidavit for Judge Chipparelli to

10  review and sign or not sign, this informant is not a tipster.  This

11  informant is an integral part of what allegedly it says concerning

12  Ms. Jones and Mr. Claridy.  In other words, it says it was present.

13  Doesn't say when.  Doesn't give a day, a month, a year.  But it was

14  present.  So thousands -- judge, that's the term, Your Honor.

15  Thousands of dollars that Mr. Claridy allegedly gave Ms. Jones and

16  here we have, Your Honor, lo and behold, the police then with five,

17  six men.  The Government only produces one for this hearing.  They go

18  to this location.  The location where it's been established to you

19  that Ms. Jones' mother lives on the same block.  And after all of five

20  day -- and I don't know if they were there five days.  I don't think

21  they were.  But after this investigation, Ms. Jones goes up to

22  Mr. Claridy on one day, one day, judge, and there's some

23  interreaction.  Now I know I can't nitpick pursuant to United States

24  v. Ventresca.  But, judge, I read it and it only says on one occasion

25  did Mr. Claridy allegedly give an object this size.  I'm sorry, Your

1    Honor.  This size.

2              THE COURT:    You're holding a piece of paper six inches by

3    three inches long.

4              MR. NEEDLEMAN:    That's what Mr. Jackson and I have

5    designated it to be.  This size to Ms. Jones who then leaves the area.

6    Now it doesn't say it went to Stemmers Road, judge.  It just said left

7    the area.

8              THE COURT:    Let me just stay focused.  What I want to do is

9    focus -- the standard that I have to apply here, Mr. Needleman, is in

10   Roviero v. United States.  Essentially there's a balancing test that

11   the Supreme Court established in that 1957 opinion and it's still the

12   test we look at and the Fourth Circuit in United States v. Gray at 47

13   F.3rd 1359, a Fourth Circuit opinion in 1995 has analyzed essentially

14   the matter of the issue of the informant's identity.  In Roviero, the

15   balancing test is the public interest in protecting the flow of

16   information against the individual's right to prepare his defense.

17   The Fourth Circuit has specifically held in the Gray case in 1995 that

18   an informant's identity must be revealed if the informant's identity

19   is relevant and helpful to the defense or is essential to fundamental

20   requirements of fairness.  Where the informant is used only for the

21   purposes of obtaining a search warrant and not in connection with the

22   offense charged, the informant's identity need not be disclosed.

23             MR. NEEDLEMAN:    Yes, sir.

24             THE COURT:    Now that's the Fourth Circuit case law and so

25   you're seeking to have the identity of the confidential informant in

1  connection with your challenge on the search warrant.  Correct?

2            MR. NEEDLEMAN:   Yes.

3            THE COURT:   So the Fourth Circuit case law is pretty --

4            MR. NEEDLEMAN:   Pretty clear.

5            THE COURT:   -- hard on that, pretty strong interpretation of

6  Roviero in terms of your right or the necessity of your obtaining the

7  identity of the confidential informant.  Let me ask you if you would

8  address the importance or need to know the name of the confidential

9  informant in terms of preparing your defense.

10            MR. NEEDLEMAN:   Yes, sir.  May I be as bold as to tell you I

11  don't believe there's a CS-1, number one.

12            THE COURT:   I'm sorry.  You don't what?

13            MR. NEEDLEMAN:   I don't believe there's a CS-1, number one.

14  Number two --

15            THE COURT:   Let me make sure I understand.  You're alleging

16  that CS Number 1 does not exist.  Is that what you're saying?

17            MR. NEEDLEMAN:   No.  I don't believe so, sir.

18            THE COURT:   Well, then you're essentially alleging that the

19  police officer created CS-1 and lied in his submission to the Court?

20            MR. NEEDLEMAN:   Well, judge, you're asking -- may I just

21  go -- there could be a CS-1, but not as to Flora Jones.  Judge, this

22  person would come into this courtroom and point right to it and said I

23  was there on this, this and this.  It's more than a tipster.  It's

24  just not someone --

25            THE COURT:   What's your basis for saying you don't believe

1  there's a CS-1, the Confidential Source Number 1 --

2  　　　　　MR. NEEDLEMAN:　　An officer shows up and says he lost his

3  notes.  You know, judge, just he lost the pad that he wrote the

4  information down while he's sitting in his office.

5  　　　　　THE COURT:　　Well, Mr. Needleman, I understand that.  I mean

6  I'm going to give you the opportunity to argue here, but I don't

7  really think that -- it's a little bit troubling to me that you would

8  make and I have a great deal of respect for you and you're a very

9  experienced lawyer here at the bar of this court, to suggest that

10  someone has manufactured a confidential source is somewhat troubling

11  to me.  I consider that to be a fairly bold allegation, Mr. Needleman.

12  　　　　　MR. NEEDLEMAN:　　Well, in regards to Flora Jones getting

13  thousands of dollars, that's my allegation.  Thousands of dollars.

14  There could very well be a CS-1.  But that's my information that I

15  have after the hearing and the information provided on discovery.  In

16  other words, it's just a -- CS-1 says something, but okay.  And on one

17  occasion, Your Honor, out of the five days that they go into this, Ms.

18  Jones, whose mother lives on the block, is seen having three hours

19  apart, three interactions.  One time nothing occurred --

20  　　　　　THE COURT:　　We'll go into the matter of reliability.  We

21  will get there in a moment.  I need you to address first of all the

22  matter of the issue of the identity of the confidential informant.

23  　　　　　MR. NEEDLEMAN:　　The identity that I could and of course,

24  there is always the security issue which has not been broached yet.

25  But if in fact --

1          THE COURT:    Do you think that's a minor issue in this day

2     and age, Mr. Needleman?

3          MR. NEEDLEMAN:    No, I don't.

4          THE COURT:    I mean we have a huge problem in the Baltimore

5     metropolitan area.  You're well aware of it.  We've had the Dawson

6     family be burned out of their home and murdered within the last four

7     years.  We have issues of what's called the snitch video in which

8     people are accused of being snitches if they cooperate with the

9     Government.  So do you think it's a minor issue to have --

10         MR. NEEDLEMAN:    No, sir.

11         THE COURT:    -- the confidentiality of sources?

12         MR. NEEDLEMAN:    No, I don't.

13         THE COURT:    All right.

14         MR. NEEDLEMAN:    But that's why the balancing test is always

15    a primary concern that any judge especially have the ability under

16    Roviero to make an ex parte viewing before a judge orders the

17    divulging of someone to determine if in fact the security level

18    outweighs the, you know, the probability that it will be useful at

19    trial and I agree that's the Jones case.  I mean I'm very well aware

20    of that.  And I realize, but I have to do the best I can for my

21    client, Your Honor.  I'm just asking this Court to consider --

22         THE COURT:    I don't see any reason to, there's no basis for

23    me -- on that theory, on every search warrant involving every

24    confidential informant, the Court would have to conduct an ex parte

25    review.  I see no basis to contend that CS-1 doesn't exist and there's

1  reference that in the affidavit in question to the confidential source

2  seeing thousands of dollars from heroin street shops given by Claridy

3  to Flora to stash in an unknown location during May 2007.  Now it

4  doesn't say whether it's 2,000, 3,000 or how many thousands.

5  Thousands is just plural of one thousand.  With respect to your motion

6  number 36, which was and I will deem it to have been adopted by

7  Defendant Claridy, with respect to the matter of the identity of the

8  confidential informant, that's not the entire context of the motion.

9  But there's just no basis under the Roviero opinion of the Supreme

10  Court or the Gray opinion under the Fourth Circuit that the Court

11  should order the identity of the confidential informant.  So to that

12  extent, it will be denied.

13             Now with respect to the matter of the reliability of the

14  confidential informant, you certainly now can continue on that, Mr.

15  Needleman, because I think that's really the thrust of what you're

16  saying in terms of whether or not it's reliable and then I'll hear

17  from Mr. Bates on that as well in terms of reliability of the

18  confidential informant.  You may continue.

19             MR. NEEDLEMAN:    Your Honor, and I would ask, of course,

20  going into the Illinois v. Gates analysis, the officer in this

21  courtroom today, the detective testified that it has a longstanding

22  history with this person.  But there is no -- he just said it and

23  there's no way to cross-examine that.  How do you cross-examine

24  whether in fact it's true when it lost its -- it doesn't have --

25             THE COURT:    Was not there inquiry in terms of the number of

1 | cases that he's utilized this confidential informant and information
2 | he's received?
3 |       MR. NEEDLEMAN:   That's what he said.  Yes.
4 |       THE COURT:   Yeah.  And he said it's borne fruit, correct, in
5 | terms of other cases?
6 |       MR. NEEDLEMAN:   But if you bear out the Gates, what
7 | Detective Marter did in Illinois is quite pales, this case pales to
8 | that information that I think the Supreme Court said is the benchmark
9 | of the information where it said that the anonymous letter is not good
10 | enough.  But when Detective Marter goes through the condominiums and
11 | sees Lance and Sue Gates do exactly --
12 |       THE COURT:   You're referring to Gates v. Illinois, the
13 | Supreme Court opinion.
14 |       MR. NEEDLEMAN:   I am, sir.  I am, sir.  And where it says
15 | that, you know, Lance Gates would fly to Florida.  Sue would drive the
16 | station wagon.  When they get there, they'd switch.  She'd fly back
17 | and he'd load up the station wagon and drive it back.  Detective
18 | Marter then enlists the services of DEA in Florida, watches the entire
19 | scenario.  They call him, said they're coming back.  And sure enough,
20 | he's waiting there at the condominiums in Peora and sees Lance unload
21 | the car.  Now that is great police work.  That is probable cause.
22 | That's the totality of the circumstances.  In this case, CS-1 says
23 | that -- judge, you know, I'm asking that when you establish probable
24 | cause, there shouldn't be a timeout.  I mean on the 16th, we know that
25 | Flora Jones is not present.  So therefore, would not one then conclude

1    that on the 16th, Flora Jones did not help Mr. Claridy because no

2    money was taken.  On the 17th, he only saw an object one time and in

3    this little piece of paper, judge, if there's -- I can't conceive how

4    thousands of dollars could be thrust into this.  He doesn't even know

5    what the object was to be honest with you.  And of course, you

6    sustained the objection.  But finally at 10:00 at night, I asked him

7    did they see, you know, Ms. Jones carrying this object and you

8    sustained it.  But there's just no reason to believe what CS-1 said

9    meets the benchmark of probable cause as established in the Gates

10   case.  It doesn't exist especially when you add to the mix, to the

11   recipe that my client's mother lived on that street.  That's it.  So

12   one day, there is a out of the five, Your Honor.  I'm going from the

13   16th to the 21st because really on the 22nd, the warrant is executed.

14   But what I tried to establish, on the 21st going into the 22nd, you

15   know, my client, there's no information she was even there.  Surely

16   she wasn't there when the warrant was executed.  They did say that.

17   And here is what is troubling to me, sir.  On Sinclair Lane, if it's

18   true in fact that Ms. Jones is hiding the money, it seems to me

19   allegedly money is in a car.  And Flora Jones never touched it.  Never

20   delivered it.  Never gave it.  Never transported it.  So therefore,

21   one would have to conclude that CS information, CS-1 information is

22   somewhat tainted.  And therefore, the reliability of that information

23   it seems to me that if the money is being stashed at 69 Stemmers Run

24   Road, Mr. Claridy is coming from there.  And therefore, that's not a

25   place for it to be in fact stored or anything because there's no

1  information that Flora Jones ever put it there or put it in the car or

2  that she was even at Stemmers Run Road on the 22nd day, the day of

3  fruition. The day that the warrant is being executed, that's when

4  exactly when it's not done. And it doesn't ring true. Just the

5  opposite of Gates. Everything Detective Marter testified, it rang

6  true and therefore, Your Honor, I don't think there is any

7  reliability. Judge, this could very well be as Judge Robert M. Bell

8  has written many times, the Chief Judge of the Court of Appeals of

9  this state in state court, the subject of rumor, conjecture, spite and

10  malice. You know, this could be the product of getting even with

11  someone. There's just not enough here for a substantial basis finding

12  that, A, CS-1 was reliable and Judge Chipparelli should have signed

13  that warrant just based on that --

14          THE COURT:   I was looking to make sure I had this correct.

15          MR. NEEDLEMAN:   Yes, sir.

16          THE COURT:   I was referring to my notes in Illinois v.

17  Gates. Illinois v. Gates in 1983, Supreme Court specifically did away

18  with the prior two-prong test and the language I was looking for which

19  I found here is that in terms of assessing the reliability of an

20  informant, an information from an informant, the Supreme Court

21  abandoned some hard test rule in Illinois v. Gates in favor of what it

22  called a totality of the circumstances. Is that correct?

23          MR. NEEDLEMAN:   Yes, sir. They did away with Aguilar and

24  Spinelli, Your Honor.

25          THE COURT:   Yes. All right. Well, thank you, Mr.

1  Needleman.  Let me hear from Mr. Bates on this and also on the matter

2  of the reliability of confidential informants.  Mr. Bates?

3              MR. BATES:    Very briefly, Your Honor.  Looking at the

4  reliability aspect, I would like the Court in looking at the totality

5  of the circumstances to look at what Detective Gladstone the

6  information he gave us.  Never had any license plates.  Never was able

7  to identify.  Could not come in here and say that Mr. Claridy or Ms.

8  Jones met with this particular, a black male about 5'4, 150 pounds

9  walking into 1520 Barclay Avenue.  You never heard any of that.  It

10 was all generalization, generalization, generalization, Your Honor.

11 Looking at Gates, they talk about the totality of the circumstances.

12 You have to sit down and look at everything, the larger picture.  When

13 you look at the larger picture with Detective Gladstone, you're left

14 with too many blank --

15             THE COURT:    Was the information later corroborated,

16 Mr. Bates?

17             MR. BATES:    I don't necessarily feel it was, Your Honor.

18             THE COURT:    I mean we basically have a situation in terms of

19 observing the information from the confidential informant.  The Fourth

20 Circuit in a case interpreting Illinois v. Gates, United States v.

21 Hodge at 354 F.3rd. 305, a Fourth Circuit opinion in 2004, the Fourth

22 Circuit spoke to the matter of information on an informant and the

23 fact that the information is later corroborated and here we have a

24 situation, do we not, where there is, the officers don't just take the

25 information of the confidential informant and act on it.  They conduct

surveillance on Barclay Street.  They observe what in their line of

experience clearly appears to be hand-to-hand drug transactions just

like the informant said being conducted by Mr. Claridy at that

location.  So isn't there corroboration that they ultimately get or

obtain?

MR. BATES:    Your Honor, I would say there's corroboration at

the surface level.  However, I would ask for us to go a little deeper,

to look at the type of corroboration the officer has.  The officer

basically says nothing more than what the C.I. said.  That he saw

hand-to-hand drug transactions, but he can't give us any information.

The officer didn't know if they were actually drugs, if money was

given by either party.  He didn't know any of that.  He believed that

there was something going on.  But the officer never attempted to have

any purchases, any undercover buys.  He didn't arrest anybody leaving

from the scene to totally corroborate what he felt was more or less an

assumption of something else possibly going on, Your Honor.  So when

you look at the corroboration, yes, the corroboration, but it's the

same level of corroboration I think that the C.I. had.  He sees

individuals talking.  He sees individuals giving something from one

hand to another, but he doesn't have any notes who these individuals

are, where they walked to, what they did, how they dressed, what they

wore.  Did they drive into the neighborhood?  Did they walk into a

location, Your Honor?  He doesn't have any of that.  He doesn't do one

single buy-bust, not one single arrest --

THE COURT:    Well, as to that, but isn't as to the matter of

1    a buy-bust, Mr. Bates, let me ask you that.  Let me ask you this.
2    Clearly, there have been cases in terms of the common sensical
3    approach of law enforcement to have a buy-bust immediately then affect
4    the drug investigation, does it not?  I mean it's easy to say they
5    said to have one buy-bust.  But whenever there's an investigation of
6    drug trafficking and they're trying to gauge the scope of it and
7    particularly if they think someone is engaged in a conspiracy of any
8    significance, one buy-bust is easy to suggest in a courtroom.  But the
9    minute there's a buy-bust, it totally then ends that investigation,
10   does it not, in terms of the involvement of law enforcement authority?
11            MR. BATES:   Well, not necessarily, Your Honor.  If he would
12   have arrested a lower individual "from this drug scheme", if he had
13   arrested an individual, had the local officers arrest an individual,
14   they could have then brought that individual in, spoken to that
15   individual, tried to talk to him, gained some information.  There
16   weren't any arrests, Your Honor.  If there's just going to be one
17   arrest to close down the drug shops or the drug organizations, then I
18   would proffer to the Court based on all the drug arrests they make
19   daily in Baltimore City, that there shouldn't be any drug selling
20   because Lord knows, if they arrest enough at the grass roots level,
21   Your Honor, we're looking at the higher level and that's what I
22   believe Officer Gladstone was talking about here.  Now if they didn't
23   do anything other than basically sit in a car and make observations,
24   but how do they corroborate these observations to the Court?  They
25   don't sit down and tell the Court they had three cameras, the pole

1  cameras in that neighborhood.  We took the tapes from the pole

2  cameras.  They don't do any of that, Your Honor.

3              THE COURT:    All right.  Well, thank you, Mr. Bates, on that

4  because I want to get on to these other issues.  With respect to the

5  issue of the reliability of the confidential informants and that

6  portion of the motion filed by Mr. Needleman and adopted by Mr. Bates,

7  the case of Illinois v. Gates aptly noted by Mr. Needleman at 462 U.S.

8  213, a 1983 opinion does specifically address that probable cause may

9  be established through information from any reliable source or

10  sources.  And in 1983, in that opinion the Supreme Court did abandon

11  its prior two-prong test for assessing the reliability of information

12  from in favor of a totality of the circumstances test and indeed the

13  Supreme Court reiterated that in a case out of Maryland, Maryland v.

14  Pringle which reference was made to that totality of the circumstances

15  test in 2003 in a case obviously arising out of here, the State of

16  Maryland.  The Fourth Circuit, United States Court of Appeals for the

17  Fourth Circuit has essentially had a series of cases where it has

18  upheld search warrants based on an informant's tip.  For example,

19  where the information was corroborated, United States v. Hodge, 354

20  F.3rd. 305, a 2004 Fourth Circuit opinion.  Furthermore, United States

21  v. Miller, 925 F.2nd. 695, the reliability of an informant's

22  information may be inferred from factual circumstances even if the

23  affidavit otherwise fails to assert the informant's reliability and

24  the factual circumstances are here specific information as to open air

25  drug dealing by the defendant, Timothy Claridy, the reference to an

individual named Bo and another individual named Flora.  Observations

there on Barclay Street as has been testified to by Detective

Gladstone, surveillance observing what clearly appears to be a series

of hand-to-hand transactions, people coming up, exchanging items and

then leaving and it has all the indicia of open air drug dealing.  So

based upon that authority, the matter of the reliability of the

confidential informant to establish probable cause has clearly been

established with respect to the reliability.  So I think once we get

to that, then there is the reliability of the confidential informant,

we get to the issue of the matter of the arrest of the defendant.  And

as I understand it, Mr. Bates, you're essentially challenging the

validity of the Miranda warnings.  Correct?

           MR. BATES:   Correct, Your Honor.

           THE COURT:    There aren't any statements that are alleged to

have been given prior to Miranda warnings.  Correct?

           MR. BATES:   Correct, Your Honor.

           THE COURT:   All right.  And so the issue you're then

addressing is, one, are you asserting that Miranda warnings were not

in fact given or are you just challenging the nature of the Miranda

warnings?

           MR. BATES:    I'm challenging the nature of the Miranda

warnings.

           THE COURT:   All right.  Okay.  So I'll be glad to hear from

you on that, sir.  Having determined that the confidential informants

were reliable and that there's probable cause established by the

1  reliability of the informants, if you'll address that now, please.

2  And I think then once we deal with the statements, then we have the

3  search warrant on 69 Stemmers Run.  Correct?

4          MR. BATES:   Yes, sir.

5          THE COURT:   All right.  Go right ahead, Mr. Bates.

6          MR. BATES:   Very briefly, Your Honor.  I feel the Government

7  has not proved by the preponderance of the evidence the statement was

8  voluntary in reference to Fifth Amendment of the Constitution, Your

9  Honor.  What bothers me most of all here, Your Honor, you have the

10  officer saying that we gave him oral Miranda warnings.  Okay.  But

11  then they take him right there to Eastern District police station.

12  They never have him sign the Miranda form whatsoever.  He never signs

13  the form.

14          THE COURT:   Is the thrust of your argument then that they

15  didn't in fact give him Miranda warnings or would it have made a

16  difference?  If they gave him the Miranda warnings orally, is it fatal

17  that they don't then have him also sign the form?  There's nothing

18  that requires them to have him also sign the form, is it?

19          MR. BATES:   There is nothing that makes them do that, Your

20  Honor.  However --

21          THE COURT:   I mean that doesn't render it constitutionally

22  defective.  If they do give an individual Miranda warnings and then

23  they perhaps for whatever reason don't have an individual sign the

24  card, that doesn't render it constitutionally defective, does it?

25          MR. BATES:   It doesn't, Your Honor.

1           THE COURT:   Okay.

2           MR. BATES:   However, I would just ask that the Court look at

3   basically almost the totality of the circumstances within this

4   argument as well, Your Honor.  That you're there at the police

5   station.  You don't have him sign the form and then when you take him

6   to 69 Stemmers Run Road, that's when he makes the statement that

7   basically totally inculpates him and makes him, i.e., the gun and the

8   drugs are sitting there in the closet, Your Honor.  I think the

9   Government has to do a little bit more than just sit there and say,

10  oh, well, we gave him the warning.  But then you take him around for

11  five or six hours at every single location.

12          THE COURT:   What is the constitutional defect of that?  If

13  he's given his, if he's given his Miranda warnings, your contention is

14  that even if he's given the Miranda warnings orally, that the length

15  of the period of detention renders it somehow constitutionally

16  defective?

17          MR. BATES:   That's what I would like it to be, Your Honor.

18  Yes, I do recognize that.  However, I do recognize also that it does

19  not necessarily render it defective.  However, I think when the Court

20  looks at the time that he was taken around, you look at the simple

21  fact that he was never ever given the written Miranda warnings, you

22  look at the experience of these police officers, I ask the Court to

23  also wonder was he actually given the Miranda and if he was given

24  Miranda, did he really understand everything that was going on?  I

25  think when the Court looks at that, Your Honor, that we do have issues

1     with Miranda.

2           THE COURT:   Well, let me ask you this, Mr. -- I'm trying to

3     stay with you on this argument, Mr. Bates.  Do you have any cases or

4     authority that suggests that once someone is given the Miranda

5     warnings that there is some period or length at which time he or she

6     should no longer be interrogated?

7           MR. BATES:   No, Your Honor.

8           THE COURT:   All right.  Because I mean the point is is that

9     people are given Miranda warnings in many cases.  They're taken to a

10     station house.  They're given the Miranda warnings.  Your point is

11     well taken.  Most times, there's a card of some sort that's signed, a

12     form that's signed.  Indeed as to your defense exhibit, Defendant's

13     Exhibit 1 for purposes of today's hearing, you have the form signed by

14     Adrian Norris where he in fact did sign the form, the Miranda warnings

15     form and we don't have that with respect to Mr. Claridy.  But unless

16     you expect the Court to or asking the Court to make a factual

17     determination that the police officers lied as to not giving Miranda

18     warnings, the question becomes the length of the interrogation and

19     many times people are given Miranda warnings and they sit in the

20     station house for four or five hours and they're given a bathroom

21     break and they're questioned at length and so here the facts

22     apparently are that Mr. Claridy was driven around to different

23     locations before he was ultimately then released to what is known to

24     be his federal custody in terms of the evidence you've presented.  But

25     I don't know that that length of time renders it invalid.  Do you have

1  any cases on that?

2    MR. BATES:   None, Your Honor.  And Your Honor, we would
3  submit.

4    THE COURT:   All right.  Well, thank you very much, Mr.
5  Bates, on that.  As to the matter of the suppression of statements,
6  Mr. Claridy's motion to suppress tangible evidence, derivative
7  evidence and statements, seeking the suppression of all evidence
8  seized and statements made prior to, during and after Mr. Claridy's
9  arrest, that's paper number 24, with respect to that particular issue,
10  the Court finds that there's no basis for me to disbelieve Detective
11  Gladstone.  I think he testified candidly that he provided Miranda
12  warnings, but he did not have a form be signed and the Court certainly
13  notes Defendant's Exhibit 1 that was produced that reflects that
14  another individual under investigation on or about that time, May the
15  22nd of 2007 did in fact sign a form, a form, looks like a Form 89
16  with the Baltimore City Police Department noting his advice of his
17  Miranda warnings.  That was not signed by Mr. Claridy.  I find
18  Detective Gladstone to be credible and I make a factual finding that
19  he did orally give Mr. Claridy his Miranda warnings.  So there was
20  probable cause based upon the information from the informant with
21  respect to and I want to make sure that my finding is clear on this.
22  It just occurs to me that the, there is information from a
23  confidential informant which is reliable with respect to drug dealing.
24  There was essentially Miranda warnings given to the defendant with
25  respect to comments he made as to the location of items in the home.

1   And the Miranda warnings having been given, there is no indication of

2   the will of this defendant being overborne and his capacity for

3   self-determination being critically impaired and I see no basis for

4   suppressing statements he made after having been appropriately given

5   his Miranda warnings.  And for that reason and clearly, with respect

6   to any searches incident to the arrest, I really don't -- there's no

7   evidence taken from his person.  Correct, Mr. Bates?

8                MR. BATES:   Correct, Your Honor.

9                THE COURT:    Except for, well, there's the cash in the car.

10  Yes.

11               MR. BATES:   And the key.

12               THE COURT:    And the key.  Right.  And the key would be

13  admissible.  There's a search incident to a valid arrest.  And under

14  Michigan v. DeFillipo, 443 U.S. 31, a 1979 opinion and essentially the

15  search incident to a lawful arrest.  Any evidence seized or statements

16  made particularly as to Miranda warnings, I see no basis to suppress

17  any evidence or derivative evidence or statements with respect to his

18  arrest.  So for those reasons and for the reasons stated for the

19  record, Madam Clerk, paper number 24 will be denied.  That is

20  Mr. Claridy's motion, paper number 24.  Ms. Jones' motion, paper

21  number 36, has been denied in part thus far with respect to the

22  disclosure of the identity of the confidential informant.  I think we

23  are now to the issue of the search of 69 Stemmers Run Road and the

24  motion to suppress the evidence seized in terms of an attack upon the

25  execution of the search warrant.  And I'll be glad to hear from you,

1   Mr. Bates or Mr. Needleman first and then we'll hear from the

2   Government.  Essentially, it seems to me that the first issue to

3   address is the matter of the compliance or alleged lack of compliance

4   with Rule 41 of the Federal Rules of Criminal Procedure and I'll be

5   glad to hear from you on that, Mr. Bates.

6               MR. BATES:   Yes.  Thank you, Your Honor.

7               THE COURT:   Your argument, first of all, is is that it was

8   definitely a federal warrant and it was essentially it was a request

9   by a federal law enforcement officer and under Rule 41(b), a

10  magistrate judge with authority in this district or if none is

11  reasonably available, a judge of the state court of record in the

12  district has authority to issue a warrant and you are essentially

13  contending that the search was federal or that was the intent and that

14  there was failure to comply with Rule 41.  That's your argument.

15  Correct?

16              MR. BATES:   That is correct, Your Honor.

17              THE COURT:   All right.  If you'll address that and then

18  address the other constitutional aspects as well, please?

19              MR. BATES:   Yes, I will.  Thank you, Your Honor.

20              THE COURT:   All right.

21              MR. BATES:   Your Honor, we can see from the very beginning

22  of Detective Gladstone's testimony, he talked about his C.I. was a

23  federal C.I.  Then we need to sit down and look that in reference to

24  Detective Gladstone's expertise, he says his organized crime division,

25  specifically D.E.A., HIDTA Group 54.  That is a joint task force both

1    state and federal.  We have seen actually I think in the Eleventh

2    Circuit there's a case that talks about an officer and we cite it in

3    our brief, United States v. Whelan, 420 F.3d 1062, Ninth Circuit, 2005

4    case, Your Honor.  And then it basically talks about special

5    deputization when an individual is a special deputy and we would argue

6    HIDTA and the officer, I mean Detective Gladstone has this federal

7    backing.  He's a federal officer, Your Honor.  Your Honor, then we can

8    see and to me it's so important to look at the evidence that we, the

9    exhibits we introduced.  We can see Detective Gladstone in his own

10   handwriting writes, he tells Mr. Claridy before they find any drugs,

11   before they find a handgun or anything, that you are a subject of a

12   federal drug investigation.  The Detective Gladstone knew this.  He

13   wanted to go ahead and move to that direction.  We also can tell from

14   Detective Gladstone's answering the questions, that he never went and

15   spoke to any other judges.  That he only went to one state judge, Your

16   Honor.  But he did not attempt to find other judges on the federal

17   level to try to sign the search and seizure warrant, Your Honor.  You

18   can also see and to me, it's very important, we look at the case law

19   with Special Agent Malone.  Now the law talks about the role of a

20   federal agent.  We can see that Detective Gladstone writes his reports

21   on D.E.A. reports.  Detective Gladstone seems to do every single thing

22   within this particular case, federal, federal, federal.  Whether it's

23   the federal C.I., whether it's his designation, whether it's him

24   telling Mr. Claridy he's the target of a federal investigation.  And

25   now he has a federal agent, Agent Malone, there at 69 Stemmers Run

1    Road and at that point in time that Mr. Claridy makes his statements,

2    inculpatory statements to Special Agent Malone.  And this is before

3    they find the evidence, Your Honor.  That right there is extremely

4    significant to me as well because that's definitely without even

5    looking at Detective Gladstone, that to me triggers the federal

6    involvement right there.  And once again, they go to the location that

7    Mr. Claridy allegedly says the drugs and the gun are in the closet.

8    They go into the closet and they find the gun and the drugs.  Also to

9    me what's very important to look at, Your Honor, this took place in

10   Baltimore City -- I mean Baltimore County, not Baltimore City.  Now

11   Detective Gladstone it appears started the search before Baltimore

12   County was ever there.  He starts the search before Baltimore County

13   local authorities are there.  Therefore, he's operating on his or

14   Officer Malone's federal authority.  If that's the case, Your Honor,

15   once again we can see this be triggered as a federal investigation.

16            Now Detective Gladstone says Baltimore County later arrived,

17   but he doesn't know who the officers were or anything like that and he

18   doesn't talk about any of that in his notes.  It's very specific it

19   appears to me, understanding and dealing and knowing who the local

20   officers were and which again we can see definitely Federal Agent

21   Malone, Your Honor.  When you look at all of that, then the next thing

22   we need to look at is what happens to evidence.  The evidence that was

23   seized was not given to Baltimore County on a state level.  It was

24   immediately taken to the BDO and that right there once again shows the

25   federal involvement, the federal involvement.  The money was taken,

1    the drugs were taken there as well.  Mr. Claridy is not taken to
2    Baltimore County Police Station.  He is taken past Baltimore County
3    into Baltimore City.  Once he's in Baltimore City, if you look at
4    Defense Exhibit Number 3, Your Honor, you can see that he was taken to
5    Baltimore City Detention Center, Central Booking and he was viewed as
6    a federal detainee.  Federal, federal, federal, federal, Your Honor.
7    When you have all this participation on the federal side, then it's
8    obvious that this should be, this is and should be viewed as a federal
9    investigation, Your Honor.  He even tells Mr. Claridy that he is a
10   target of a federal investigation.  Once you have that and we've
11   triggered the Rule 41, Your Honor, is this a ministerial violation or
12   a constitutional violation, Your Honor?  We don't believe at all it's
13   a ministerial violation.  We believe that it's a constitutional
14   violation in nature because, Your Honor, we see a deliberate disregard
15   of the requirements of the Federal Rules of Criminal Procedure 41(b).
16   How do --
17            THE COURT:    But do those requirements take it to a
18   constitutional level?
19            MR. BATES:    No, Your Honor.
20            THE COURT:    I mean the query is let's assume that the Court
21   accepts all those points and let's assume that it clearly is a federal
22   investigation.  If that's the case, does it take to a constitutional
23   violation if there's not a compliance with Rule 41(b) because the
24   Tenth Circuit case in Bookout, United States v. Bookout at 810 F.2nd.
25   965, essentially, it appears to stand for the proposition that you

1  then go to the matter of a constitutional analysis.  In other words,

2  must not you show some prejudice to your client --

3      MR. BATES:   That's just --

4      THE COURT:    Let's assume that it's a federal warrant.  Let's

5  assume that Detective Gladstone did not comply with Rule 41(b) and did

6  not in any way check out the lack of availability of a federal

7  magistrate judge and chose to go to a Baltimore City District Court

8  judge.  And I hold Judge Chipparelli in high regard.  He's a very fine

9  judge.  But I understand the argument you're making is that he should

10  have been over here at the federal courthouse.  Does that amount to a

11  constitutional violation?

12      MR. BATES:   No, Your Honor.  It doesn't.  However, I do

13  believe it amounts to a deliberate disregard of the rule itself.

14      THE COURT:    All right.  And what should be the penalty for

15  that?

16      MR. BATES:   It does say, Your Honor, in --

17      THE COURT:    But is suppression of the evidence the

18  appropriate remedy or penalty for that if there's a, if there's a

19  little bit of judge shopping or forum shopping going on by the

20  detective?

21      MR. BATES:    Your Honor, in United States v. Simmons and it's

22  206 F.3d. 392, it does say when there is evidence of intentional and

23  deliberate disregard of a provision of the rule, it talks about

24  suppression is mandated, Your Honor.  That's the case I believe that

25  we did cite in our brief --

1      THE COURT:   Hold on one second.  I think I might have that

2   right here.  Well, in the Simmons case, that's the Fourth Circuit

3   case, 2000 case.  Correct?

4      MR. BATES:   2000 and --

5      THE COURT:   It's 2006 --

6      MR. BATES:   2000.  Yes, sir.

7      THE COURT:   It's 2006 Federal Reporter 3rd at 392.

8      MR. BATES:   Yes, sir.

9      THE COURT:   I have that opinion right here with me and I'm

10  looking here at page, at page 401 of that opinion.  206 F.3rd. at 401,

11  the Fourth Circuit noted that the Defendant Simmons also challenged

12  the search conducted.  The Fourth Circuit rejected his arguments that

13  the search violated his constitutional rights.  However, the Fourth

14  Circuit remanded it for further proceedings concerning Simmons' claim

15  that the search team violated the Federal Rule of Criminal Procedure

16  41(d) when it failed to leave at the time of the search a copy of the

17  warrant or a receipt for the property taken.  And that was the remedy

18  that -- the Fourth Circuit found no constitutional violation, but they

19  did remand it back for further factual finding on that.

20      MR. BATES:   Yes, sir.

21      THE COURT:   All right.  Do you know what the end result was

22  with that?

23      MR. BATES:   Your Honor, I believe that they said that that

24  was a ministerial violation if I'm not mistaken, Your Honor.

25      THE COURT:   It didn't amount to a constitutional violation.

| | |
|---|---|
| 1 | MR. BATES:    It did not.  However -- |
| 2 | THE COURT:    And it didn't cause suppression of the evidence, |
| 3 | did it? |
| 4 | MR. BATES:    Not as to ministerial.  However, Your Honor, it |
| 5 | does say, it says -- and may I read to the Court?  It says -- |
| 6 | THE COURT:    What page are you on? |
| 7 | MR. BATES:    Your Honor, with me it says page 13 or 14 on my |
| 8 | printout. |
| 9 | THE COURT:    You got the Westlaw printout. |
| 10 | MR. BATES:    I do apologize, Your Honor. |
| 11 | THE COURT:    That's all right.  My clerk will find that |
| 12 | humorous because that drives me crazy.  So I always have them print |
| 13 | out -- |
| 14 | MR. BATES:    Number 18. |
| 15 | THE COURT:    -- the Westlaw.  That's why I do that. |
| 16 | MR. BATES:    It appears Number 18.  It appears Number 18. |
| 17 | THE COURT:    It's Footnote 18.  Let me see if I can find it |
| 18 | here. |
| 19 | MR. BATES:    Headnote 18. |
| 20 | THE COURT:    Headnote 18.  All right.  I'm at Headnote 18. |
| 21 | Go ahead, Mr. Bates. |
| 22 | MR. BATES:    If you'd go down to the bottom, Your Honor -- |
| 23 | THE COURT:    Yes. |
| 24 | MR. BATES:    -- where it talks about non-constitutional |
| 25 | violations -- |

1          THE COURT:   Yes.

2          MR. BATES:   -- of Rule 41.  Of Rule 41 warrants suppression

3    only when a defendant is prejudiced by the violation.  And then it

4    talks about Smith and then it also says or when there is evidence of

5    an intentional and deliberate disregard of a provision in the rule.

6    Your Honor, my argument, our argument is that there was an intentional

7    deliberate disregard of the rule because they knew they were supposed

8    to have come to a federal court, a judge of competent jurisdiction and

9    they deliberately did not go to that judge.  They deliberately went to

10   the state court judge, Your Honor.  And because they deliberately went

11   and did that, then our argument is that suppression is mandated here,

12   Your Honor.

13         THE COURT:   Well, but didn't they say -- I'm looking at the

14   language here.  Non-constitutional violations of Rule 41, which a

15   ministerial violation would be, warrants suppression only when the

16   defendant is prejudiced by the violation or when there is evidence of

17   intentional and deliberate disregard of a provision in the rule.  And

18   your argument is is because of evidence of a deliberate violation of

19   the rule, that there should be suppression.

20         MR. BATES:   Yes, Your Honor.  It's not ministerial.  We feel

21   it's deliberate.  They deliberately went on their own accord and they

22   deliberately on their own advice went and found Judge Chipparelli.

23   Federal, federal, federal, federal, federal, state.  Federal, federal,

24   federal, federal, federal, federal.  Now I'm sure that a federal judge

25   is going to ask certain questions in reference to the background of

1   the search and seizure warrant that a state judge may not look at in

2   reference to certain things that may transpire and evidence that is

3   needed looking at issues on the federal level, Your Honor.  Everything

4   is federal, federal, federal, federal, federal, state.  What I'm

5   saying, Your Honor, it's a deliberate disregard and they really cannot

6   have it both ways, Your Honor.  What they're doing is they are judge

7   or forum shopping and that is not what this rule is about.  This is

8   the heart and the crux of the entire rule itself.  This without a

9   doubt is a deliberate disregard for the rule.

10             THE COURT:   All right.  Now Mr. Bates, let me -- are you

11  challenging -- in other words, your argument is you're not challenging

12  the four corners of the search warrant, per se and the lack of

13  probable cause within the search warrant that was presented to Judge

14  Chipparelli.  Your point is is that regardless of the sufficient

15  probable cause within the four corners of the warrant, that it was a

16  deliberate violation of Rule 41.  That it is not just ministerial.

17  That there's essentially judge shopping going on here and it was

18  clearly violative of Rule 41(b).  On that basis, the evidence should

19  be suppressed.  Is that essentially your argument?

20             MR. BATES:   Yes, sir.

21             THE COURT:   All right.  Thank you very much, Mr. Bates.

22  Mr. Needleman, will be glad to hear from you.

23             MR. NEEDLEMAN:   Your Honor, I adopt Mr. Bates' argument,

24  sir, in total.

25             THE COURT:   All right.  And that's your position as well is

1  that you're not attacking the four corners of the probable cause of

2  the warrant set forth before Judge Chipparelli, but you're focusing

3  upon an intentional and deliberate disregard for the provisions of

4  Rule 41(b) in terms of not going to a federal magistrate judge, not

5  showing any unavailability and just going directly to a state judge.

6  Correct?

7          MR. NEEDLEMAN:   I echo brother counsel's remarks.  It would

8  take the entire teeth out of the argument.  Why have that rule?

9          THE COURT:   All right.  I understand.  But that's your

10 basis?

11         MR. NEEDLEMAN:   Yes, sir.

12         THE COURT:   All right.  Okay.  Because the reason that's

13 important is because for the Court's ruling, the question becomes

14 whether or not it is ministerial even if it's deliberate.  And the

15 precise issue is is that secondarily is there prejudice to the

16 defendant in terms of a constitutional violation because of a

17 deficiency of the warrant itself that would be violative of the Fourth

18 Amendment and warrant suppression and the issue is very much

19 crystallized here in terms of there being what counsel contend is a

20 deliberate disregard for a provision of the rule, essentially judge

21 shopping and that that in and of itself should amount to a

22 constitutional violation under the Fourth Circuit opinion in United

23 States v. Simmons at 206 F.3rd. 392 and warrants suppression.

24 Mr. Jackson, I'll be glad to hear from you.

25         MR. JACKSON:   Your Honor --

1    THE COURT:   Let me just cut right to the core and help you

2  out a little bit.  Tell my why there wasn't judge shopping here,

3  Mr. Jackson.  It seems perfectly clear to me that there isn't a

4  scintilla of doubt that this is a federal investigation.  The points

5  Mr. Bates raised, I'd love for you to address because seriatim this is

6  a federal investigation from start to finish.  The defendant is listed

7  as a federal detainee when he's arrested.  It's the HIDTA Task Force

8  that's involved.  Detective Gladstone clearly said that he advised

9  Mr. Claridy that it was a federal drug investigation and essentially

10  asked if he wanted to cooperate and let him know that the feds were

11  involved which clearly has an implication of a perhaps the -- in light

12  of the great awareness of people on the street in terms of the

13  seriousness of federal offenses being involved and the federal

14  sentencing guidelines and whathaveyou, it seems clear to me that this

15  is a federal investigation.  But if you think there are facts I'm

16  overlooking, please tell me before I make that finding because this

17  helps crystallize it.  It clearly was a federal investigation that I

18  can see.

19    MR. JACKSON:   Well, it certainly was an investigation that

20  involved federal personnel, both in the form of deputized local

21  officers and special agents of the Drug Enforcement Administration.

22  I'll happily stipulate to that.  First of all, I don't see where Rule

23  41 demands what Mr. Bates and Mr. Needleman says it does.  What it

24  describes is what people can, what individuals can apply for search

25  warrants and what form of judicial officers can approve them and

1  authorize them and issue them. It doesn't say federal agents must do

2  something. Indeed, Maryland law indicates --

3  THE COURT: Well, I want to get to that point in a minute.

4  But let me just go step-by-step on this because defense counsel have

5  assisted the Court in crystallizing this issue because they are not

6  challenging the four corners of the warrant. They are not contending

7  that there is a lack of probable cause in the warrant. I don't even

8  need to get to Leon and good faith exceptions. They're saying this is

9  a valid warrant in front of a state judge. But they're flat out

10  focusing on Rule 41(b) and the clear requirement under the rule that

11  at the request of a federal law enforcement officer or an attorney for

12  the Government, a magistrate judge with authority in this district,

13  i.e., a federal magistrate judge in the District of Maryland or if

14  none is reasonably available, a judge of the state court of record in

15  the district has authority to issue a warrant to search for and seize

16  a person or property located within the district. That's the wording

17  of the language. There clearly has been no showing of unavailability

18  of a federal magistrate judge and so then the issue becomes whether or

19  not that violation, if that violation amounts to a constitutional

20  violation. So I just want to first -- are you prepared to acknowledge

21  that it's a federal investigation?

22  MR. JACKSON: I'm prepared to acknowledge it's a federal

23  investigation, Your Honor. I'm not prepared to acknowledge that Rule

24  41 demands that federal officers follow Rule 41 before --

25  THE COURT: All right. Well, then good. I'm going to make

1   this finding and then we'll go to the next step legally.  The Court

2   finds that with respect to the nature of the investigation, looking at

3   the unpublished opinion although under Rule 36 of the Rules of United

4   States Court of Appeals for the Fourth Circuit that unpublished

5   opinions are not binding authority in the circuit.  I do find them

6   helpful and I note that there's a case of United States v. McMillion,

7   M-c-M-I-L-L-I-O-N, an opinion by the Fourth Circuit Court of Appeals

8   on April the 6, 2006.  It can be cited as 175 Federal Appendix 588

9   where in a per curium opinion in which the late Judge Widener and

10  Judges Niemeyer and Michael were on the panel, that the precise issue

11  was because the warrant did not issue from the state court of record

12  as required by Rule 41(a) and then there's reference to whether or not

13  the search was federal in nature, the Fourth Circuit agreed with the

14  district court that there was no evidence of federal direction or

15  approval of the search.  Here this is clearly distinguishable.

16  There's clearly evidence of federal direction or approval.  An earlier

17  unpublished opinion by the Fourth Circuit in 2002, United States v.

18  Mannion, M-A-N-N-I-O-N, decided December 19, 2002 which would be cited

19  as 54 Federal Appendix 372.  The Fourth Circuit again in another per

20  curium opinion, again to guide me in my judgment here and there the

21  panel was Judge Motz and Senior Judge Hamilton and former Judge Ludig

22  of the Fourth Circuit and this unpublished opinion noted that the

23  suppression hearing in that case, the transcript established that the

24  federal officials were not the driving force behind the application

25  for the warrant and therefore, the warrant obtained from the state

court judge did not have to comply with Rule 41.  And the test to be applied according to the Fourth Circuit in determining whether a warrant must be obtained in compliance with Rule 41 is whether the warrant application was made at the direction or urging of a federal officer and they note the earlier published opinions of United States v. Williams, 977 F.2nd 866, Fourth Circuit 1992 which quoted the earlier opinion and that actually was written ironically enough by Chief Judge Legg of this court who was sitting with the Fourth Circuit.  Judge Legg authored, I'm fairly certain, Judge Legg, our chief judge of this court authored that opinion and essentially, it is noted whether or not it's at the urging of a federal official.  So that I find as a factual matter so the record is clear here that there was, this was a federal investigation and I'm compelled to do so.  The evidence is abundantly clear that this was at the urging of a federal officer.  Admittedly, Detective Gladstone is a Baltimore City police officer, but he had been cross-designated, was operating under the HIDTA Task Force and the evidence notes not only his reference to it being a federal investigation, it is seen in Defendant's Exhibit Number 2 for purposes of today's hearing at page 2, his direct reference here at the second page of Defendant's Exhibit 2, which is a matter of record where he specifically makes, his own notes reflect that he advised the defendant, Mr. Claridy, that he was a target of a federal drug investigation and then Defendant's Exhibit 3 clearly refers to the defendant being a federal detainee and taken immediately into federal custody.  So the Court makes a factual determination

1   based upon the testimony of the police officer and the exhibits before

2   me that this was a federal investigation and the defendant was a

3   federal detainee.  That doesn't end the inquiry, however.  The inquiry

4   then becomes now, Mr. Jackson, I didn't want to cut you off, but I

5   want to make sure the record is complete on this.  Now the issue is is

6   that I've made a factual finding that it was a federal investigation

7   under the HIDTA Task Force.  That literally as Mr. Bates has aptly

8   noted, everything is federal across the line except for going to a

9   state court judge and so that having been crystallized, the issue now

10  is whether or not it is constitutionally defective and whether or not

11  Rule -- if one doesn't comply with Rule 41(b), that that amounts to a

12  constitutional violation.  So go ahead, sir.

13          MR. JACKSON:    Your Honor, I know I'm not expressing myself

14  well here.  But I don't know that on its face, Rule 41 demands that

15  when a federal officer seeks a search warrant that he has to follow

16  Rule 41.  It doesn't say you can't go get a local warrant under any

17  circumstances.  Just when you're seeking a warrant before a federal

18  magistrate, you have to do X, Y and Z or if one is not available, you

19  have to do X, Y and Z.  So it's not clear on its face to my mind that

20  anybody, a law enforcement officer would know by that that he has to

21  go to a federal magistrate to get a -- that that should be his first

22  stop, a federal magistrate.  All the rules says is that here's the

23  authority, here's who can make application, here's who can issue a

24  warrant, not that a federal agent must first seek a warrant along the

25  lines of Rule 41.  That goes to the deliberativeness aspect, in this

1    case the lack of deliberativeness aspect in this case.  Since the rule

2    itself is less than clear on that, what the Court says is the

3    crystallized point of this, it's reasonable to assume I think that

4    Detective Gladstone, if he was familiar with Rule 41 at all, which is

5    not clear from the evidence.  There's no evidence taken so far that he

6    wasn't as he found him in May of 2007.  That there in fact was a

7    Federal Rule of Criminal Procedure Rule 41 that he could be

8    deliberately avoiding in the first place.  And to compound the

9    problem, Your Honor, is his own testimony that in 90% of the cases,

10   they're taking them not federally, but rather locally.  So it's

11   reasonable to assume that in their own mind, it is okay to pursue

12   conventional state paths to further their investigation because they

13   may be a federal unit of investigation, but in so many of their

14   prosecutions or so many of their cases wind up in state court, that I

15   think it's fair to conjecture, it does not cross their mind that they

16   must in all cases even if they were aware of this rule must follow

17   Rule 41.  And finally, Your Honor, there's Maryland, the Maryland Code

18   which apparently authorizes federal officers to make application and

19   execute search warrants and I direct the Court --

20               THE COURT:    What is the Maryland section of that --

21               MR. JACKSON:    I have a copy of it here and I have a copy for

22   counsel.

23               THE COURT:    All right.

24               MR. JACKSON:    May I approach, Your Honor?

25               THE COURT:    Yes.

1          MR. JACKSON:    It's Maryland Code of Criminal Procedure

2    2-104.

3          THE COURT:    Thank you.

4          MR. JACKSON:    You're welcome.  Specifically, Section B,

5    which is captioned Authority of Federal Law Enforcement Officers.  And

6    if you look at Subsection B(1), it says subject to limitations of

7    paragraph 2, a federal officer may do, may make arrests as set forth

8    below and also execute search and seizure warrants issued under the

9    laws of the state, which seems to confound the Court's interpretation

10   of Rule 41 which seems to restrict what federal law enforcement

11   officers may or may not do vis-a-vis applications for search warrants.

12         THE COURT:    No.  I think in response to that, Mr. Jackson, I

13   understand your argument, but as to this, this means that this state

14   statute means that a federal law enforcement officer may execute and

15   exercise those powers under that rule and also execute arrests and

16   search seizure warrants issued under the laws of the state presumably

17   in terms of taking cases before state courts.  But I don't know that

18   that clearly answers the issue as to Rule 41(b), which is the matter

19   of prosecutions in federal court.

20         MR. JACKSON:    But it goes to the deliberative avoidance test

21   --

22         THE COURT:    Yes.

23         MR. JACKSON:    -- that the Court has here.

24         THE COURT:    I understand.

25         MR. JACKSON:    A layman could interpret that.  Not a layman.

A detective could interpret that. If he's sitting as both a local and a federal agent, he has the ability, the authorization to act in a way that they did in this case. You know, it's fine and good to cite really esoteric law out of, reported law, but I don't know that it necessarily interprets that it trickles down to the officers on such a very fine point as presented by the Court here. What they're having apparently the law says is they have the authority to get search and seizure warrants under Maryland law. It doesn't say and that evidence may be only used in State of Maryland district and circuit courts. It just says you can go get a search warrant and based on their experience, we don't have testimony to this, but the Court knows on its own that many search and seizure warrants, many wiretap affidavits even in support of, in support of narcotics investigations are issued by courts of this locality and commonly come in as evidence in this court. Again, maybe it's incorrect. Maybe it is correct. But the officers knowing that especially officers of this experience not ever having been presented with an impediment along these lines would not have, there's no evidence he deliberately avoided or forum shopped. We never really got into why he sought out Judge Chipparelli instead of whoever the duty magistrate was that day. I believe it's fair to conclude that it was simply a matter of he thought he had the authority to do that. Maryland law seems to hold that up and there's no explicit prohibition in Rule 41 saying so. Certainly case law seems to gloss it that way. But we can't expect the law officers to know that as they're sitting there when it's not plain on the statute

1     or rather in this case the rule and it is plain on the statute

2     apparently that they're able to do what they did.  Deliberative

3     avoidance of the rule in this case simply doesn't lie here when the

4     officers acted in this way and when the law really is structured in

5     the way that it's been outlined here.

6                THE COURT:   All right.  Thank you.  Thank you very much,

7     Mr. Jackson.  Anything further on this, Mr. Bates or Mr. Needleman on

8     this?

9                MR. BATES:   Very briefly, Your Honor.

10               THE COURT:   You would agree, Mr. Bates, that the Court must

11     classify this as deliberate in order to have it amount to a

12     constitutional violation perhaps.  I'm not even sure the case law

13     supports that.  But your argument has been precisely focused that it's

14     more than ministerial.  It was deliberate.  And that it's because of

15     the deliberative nature of the officer's acts that the remedy should

16     be a suppression under the Fourth Amendment.

17               MR. BATES:   Correct, Your Honor.  Also if you do not find as

18     constitutionally, you can find it non-constitutional substantive

19     violation.  A non-constitutional substantive violation, Your Honor.

20     Just very briefly about what Mr. Jackson talked about.  The federal

21     agents --

22               THE COURT:   Was your client prejudiced by this, by the way?

23               MR. BATES:   I believe he was, Your Honor.

24               THE COURT:   How was he prejudiced?

25               MR. BATES:   Because I believe there are questions that a

1  federal judge or federal magistrate would have asked the officer that

2  probably would have allowed the officer to go back and most likely

3  find more information --

4  THE COURT:   Are you suggesting that there's a higher

5  standard here in federal court than in state court?

6  MR. BATES:   I'm not suggesting there's a higher standard

7  whatsoever, Your Honor.  I would probably just say I think there's a

8  higher awareness of the law by the federal bench in some way.

9  THE COURT:   So just in case I bump into Judge Chipparelli

10  over the Christmas break, I just -- we're laughing here in court -- I

11  don't want you on record as saying there's a higher standard.  I mean

12  I'm hard pressed to see where your client -- really, the Fourth

13  Circuit as you've noted in the Simmons case specifically has held that

14  non-constitutional violations of Rule 41 warrant suppression only when

15  a defendant is prejudiced by the violation or when there is evidence

16  of intentional and deliberate disregard of a provision of the rule.

17  And unless you can tell me how he was prejudiced by it, it seems to me

18  my analysis has to be on whether or not there's been intentional and

19  deliberate disregard of the provision.  Now if you think he's

20  prejudiced because the standards are higher in federal court than in

21  state court, you need to put that on the record.

22  MR. BATES:   No, Your Honor.  Not at all, Your Honor.

23  THE COURT:   All right.  You're laughing with me on that.

24  I'll certainly make sure that Judge Chipparelli knows that you've

25  certainly defended his integrity.  And I know Mr. Needleman doesn't

| | |
|---|---|
| 1 | even get close to this question because I know he doesn't even want to |
| 2 | begin to address this. |
| 3 | MR. NEEDLEMAN:   I'll address it. |
| 4 | THE COURT:   Go ahead, Mr. Bates. |
| 5 | MR. BATES:   Your Honor, what I would say in reference to |
| 6 | Mr. Jackson's argument that the officer may not have known, that's |
| 7 | precisely why we have the rule that says the officer or an attorney. |
| 8 | The U.S. Attorney's Office is right across the street.  They knew it |
| 9 | was a federal investigation.  If they have any questions whatsoever, |
| 10 | they can go and ask an attorney who would have knowledge of the rule |
| 11 | itself, Your Honor.  Without a doubt, I find this -- I don't |
| 12 | understand how the Court could possibly not find it's a deliberate |
| 13 | disregard for the rule because they deliberately on their own accord, |
| 14 | they on their own accord went and found the state judge.  And when you |
| 15 | see that, Your Honor, this is exactly the heart and essence of the |
| 16 | rule itself. |
| 17 | THE COURT:   All right.  Thank you, Mr. Bates.  And |
| 18 | apparently, I misspoke because Mr. Needleman is anxious to address |
| 19 | this point.  You don't think there's a higher standard in federal |
| 20 | court than state court.  Do you, Mr. Needleman? |
| 21 | MR. NEEDLEMAN:   Let me answer it this way, sir.  I think |
| 22 | that Magistrate Grimm and Bredar and Gauvey and Gesner, they know |
| 23 | about Lalor and they know about Wilhelm and I think that what we have |
| 24 | here, Your Honor -- |
| 25 | THE COURT:   Well, Lalor and Wilhelm are cases that address |

1 the matter of the nexus --

2      MR. NEEDLEMAN:   I'm going as to the prejudice, I'm going as

3 to the prejudice doctrine.

4      THE COURT:   Yes.

5      MR. NEEDLEMAN:   And what I'm saying is that, judge, you

6 know, we're putting that black cloud on the word, deliberate, as if

7 the detective was mean spirited.  What I would like to attach to it,

8 he never even tried.  Judge, their office is on St. Paul and Lexington

9 Streets.  It's shorter to come here than it is to go find Judge

10 Chipparelli somewhere.  And they didn't even try.  That's the

11 deliberateness of the act.  And I did file a motion to adopt.  I just

12 didn't --

13      THE COURT:   I know.  You've absolutely adopted Mr. Bates'

14 motion without question.

15      MR. NEEDLEMAN:   Yes.  So therefore, it is deliberate.

16      THE COURT:   And for the record whatever that number is, your

17 motion to adopt, Madam Clerk, make sure it's reflected as granted.

18 The motions of respective defense counsel to adopt the motions of the

19 other should be deemed to be granted and I've granted that motion.

20      MR. NEEDLEMAN:   And may I just add on a -- I mean, you know,

21 HIDTA 54 works with Mr. Jackson all the time and you have Agent Bernie

22 Malone there, judge.  He knows what's going on.  You're talking about

23 seasoned, well-trained officers.  And whatever happened that night, I

24 wasn't there.  No one in this courtroom was there.  But there was no

25 attempt to comply with the rule.  Therefore, my English teacher at St.

1  Joe's would tell me that would be deliberate, sir.

2          THE COURT:   All right.  Well, thank you very much.  And I

3  think that since you've referred to St. Joseph's School, that comes

4  from the Latin delibero deliberare I think.  So I make sure the record

5  is clear in that regard, Mr. Needleman.  All right.  I think I have

6  ruled upon all motions except the Defendant Claridy's motion to

7  suppress evidence, paper number 12 and have not finally ruled upon the

8  Defendant Jones' consolidated motion, number 36.  I've denied it as to

9  seeking the identity of confidential informants.  I've denied it in

10  all other regards except for the matter of seeking suppression of the

11  evidence in 69 Stemmers Run Road.  As to that, I'm going to issue a

12  very short written opinion on this.  I think this is important and I'm

13  going to take this under advisement.  I'm going to try to get a

14  written opinion done in the next 48 hours.  This isn't going to

15  linger, but I'm going to just go ahead and I think this is important

16  to clarify and I just want to read through some more of these cases

17  because the issue has been very precisely addressed and it seems to me

18  it's very much crystallized in terms of no real attack upon the four

19  corners of the warrant.  There were some suggestion, some bemusement

20  from which Mr. Bates retreated very quickly with a smile on his face

21  that there was any higher standard here in federal court than in state

22  court.  The warrant itself clearly establishes probable cause in the

23  four corners of the warrant and I would note that it's clearly based

24  upon in terms of case law under the Fourth Circuit, it's pretty much

25  axiomatic that once a search warrant has been issued, review of the

1    probable cause determination by the judicial official is to be shown

2    great deference and the Fourth Circuit has noted that in United States

3    v. Blackwood, 913 F.2nd. 139 in 1990.  It's been noted even more

4    recently in the case of United States v. Robinson, 275 F.3rd. 371, a

5    Fourth Circuit opinion in 2001 in which certiorari was denied by the

6    Supreme Court.  And so it's not for me to conduct a de novo

7    determination of probable cause, but only to determine whether there

8    is substantial evidence in the record supporting the judge's finding

9    to issue the warrant consistent with Illinois v. Gates and I find that

10   there's clearly probable cause to support Judge Chipparelli's issuance

11   of the warrant and clearly, in my opinion, there would be, even if

12   that were not the case, there would be essentially the good faith

13   exception under the Leon case, United States v. Leon at 468 U.S. 897.

14   The issue precisely however is is that the non-compliance or alleged

15   non-compliance of Rule 41(b) and the level of that non-compliance and

16   whether or not it is ministerial and there's really no serious

17   contention that the defendant has been prejudiced by that violation.

18   And I note for the record for the reasons I've summarized here this

19   morning that there has not been any prejudice to this defendant by

20   this violation if there is a violation.  It becomes a question of

21   whether or not, one, there's a violation and, two, whether or not

22   there's evidence that it is intentional or deliberate and if that's

23   the case, then whether or not the remedy would be suppression of the

24   evidence and I'll render an opinion within the next two days on that.

25   In light of the holidays approaching and other matters.  We're going

1    to have a busy week here in my chambers.  But I'll get this done, I'll

2    assure you.  Certainly by Wednesday, I'll get a written opinion out.

3    In light of the other matters that are clearly set forth in the

4    record, I'll just crystallize on that one precise legal issue as to

5    summarizing what are clearly the facts and the factual findings that

6    I've made.

7                    Are there any other further motions to be addressed from the

8    point of view of the Government, Mr. Jackson?

9                    MR. JACKSON:    No.  Thank you, Your Honor.

10                   THE COURT:    Mr. Bates, anything further?

11                   MR. BATES:    None, Your Honor.

12                   THE COURT:    Mr. Needleman?

13                   MR. NEEDLEMAN:    No, sir.

14                   THE COURT:    Well, I want to thank counsel for the quality of

15   their arguments and it's been a pleasure having you all here in court.

16                   (Proceedings concluded.)

17

18   I, LISA K. BANKINS, certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
19

20   _____          _____
     Signature of Court Reporter                          Date
21   Transcriber

22

23   _____
     Typed or Printed Name
24

25

**$**

$7,999 [1] 27/12

**"**

'07 [1] 50/13

**.**

.357 [1] 31/2

**0**

0244 [2] 1/3 3/9
07 [2] 42/18 43/7
08 [1] 2/6

**1**

1/2 [1] 37/5
10 [3] 1/17 39/19 40/6
1005 [1] 1/20
101 [1] 1/22
1037 [14] 16/1 17/23 20/6 25/21 28/3
29/10 29/12 65/19 65/23 66/3 66/16
66/19 67/5 67/17
104 [1] 110/2
1062 [1] 95/3
10:00 [1] 82/6
10:30 [1] 43/3
11 [1] 37/5
11:15 [1] 43/3
12 [4] 5/21 61/21 68/18 116/7
12:45 [1] 61/19
13 [1] 100/7
1359 [1] 76/13
139 [1] 117/3
14 [2] 64/11 100/7
15 [3] 9/7 9/22 33/14
150 [1] 84/8
1500 [11] 10/23 12/21 12/22 13/15 17/6
18/2 33/9 36/16 40/16 44/11 51/11
1513 [2] 51/13 51/16
1520 [1] 84/9
15th [1] 7/11
16 [4] 33/8 33/19 35/22 50/13
16th [8] 12/20 13/21 16/24 36/20 44/11
81/24 82/1 82/13
17 [2] 1/7 45/15
175 [1] 106/8
17th [8] 7/3 17/5 17/25 36/21 36/22 36/22
44/11 82/2
18 [8] 5/10 100/14 100/16 100/16 100/17
100/19 100/20 100/20
18:36 [1] 69/17
18th [1] 19/19
19 [1] 106/18
1957 [1] 76/11
1979 [1] 93/14
1982 [1] 40/15
1983 [3] 83/17 87/8 87/10
1990 [1] 117/3
1992 [1] 107/6
1995 [2] 76/13 76/17

**2**

2,000 [1] 80/4
2-104 [1] 110/2
2000 [3] 99/3 99/4 99/6
2001 [1] 117/5
2002 [2] 106/17 106/18
2003 [1] 87/15
2004 [2] 84/21 87/20
2005 [1] 95/3
2006 [3] 99/5 99/7 106/8
2007 [18] 1/7 5/23 10/15 12/20 21/15
33/8 33/19 35/22 36/2 36/10 40/14 41/10

43/23 44/11 45/7 80/3 92/15 109/6
206 [3] 98/22 99/10 103/23
21 [4] 4/21 5/5 5/7 42/25
21201 [2] 1/15 1/23
21202 [2] 1/18 1/20
213 [1] 87/8
214 [1] 1/17
21st [8] 19/19 20/2 20/5 41/10 41/10
42/14 82/13 82/14
22 [4] 5/23 21/15 36/2 56/4
222 [1] 45/12
22nd [8] 19/23 20/1 43/14 43/23 82/13
82/14 83/2 92/15
24 [4] 5/25 92/9 93/19 93/20
2400 [1] 17/19
275 [1] 117/4

**3**

3,000 [1] 80/4
30 [1] 58/16
305 [2] 84/21 87/20
31 [1] 93/14
33 [1] 2/6
3517 [1] 28/7
354 [2] 84/21 87/19
36 [6] 1/14 6/3 80/6 93/21 106/3 116/8
371 [1] 117/4
372 [1] 106/19
392 [3] 98/22 99/7 103/23
3rd [1] 99/7

**4**

4's [1] 59/21
401 [2] 99/10 99/10
41 [33] 94/4 94/9 94/14 97/11 97/15
97/23 98/5 99/16 101/2 101/2 101/14
102/16 102/18 103/4 104/23 105/10
105/24 105/24 106/12 107/1 107/3
108/11 108/14 108/16 108/25 109/4
109/7 109/17 110/10 110/18 111/23
113/14 117/15
420 [1] 95/3
443 [1] 93/14
462 [1] 87/7
468 [1] 117/13
47 [1] 76/12
48 [1] 116/14

**5**

5'4 [1] 84/8
5-17 [1] 45/15
5-17-2007 [1] 40/14
5-21 [1] 42/25
5-21-07 [1] 42/18
5-22 [1] 56/4
5-22-07 [1] 43/7
50 [1] 2/7
5012 [1] 1/22
54 [6] 9/15 41/11 54/24 94/25 106/19
115/21
588 [1] 106/8
5th [1] 6/4

**6**

69 [46] 5/22 6/5 18/22 18/24 19/2 19/14
19/20 19/22 19/24 20/2 20/6 20/25 21/5
21/18 23/7 28/4 28/5 28/15 29/7 29/10
29/17 29/20 29/21 30/1 30/20 32/12
41/12 41/23 42/21 61/10 61/17 61/25
62/4 62/11 63/15 65/16 67/18 67/21
73/11 73/23 82/23 89/3 90/6 93/23 95/25
116/11
695 [2] 46/25 87/21
6:36 [3] 68/18 69/17 69/18

6s [1] 45/4

**7**

70 [1] 2/6
77464CA [1] 21/2

**8**

8-19-1982 [1] 40/15
810 [1] 97/24
841 [2] 4/21 5/7
846 [1] 5/6
866 [1] 107/6
89 [1] 92/15
897 [1] 117/13
8:35 [1] 69/22
8:36 [2] 69/14 69/17

**9**

90 [2] 31/24 109/9
913 [1] 117/3
922 [1] 5/11
925 [1] 87/21
965 [1] 97/25
977 [1] 107/6
9:30 [1] 1/8

**A**

a.m [3] 1/8 21/20 43/4
abandon [1] 87/10
abandoned [1] 83/21
abbreviated [1] 33/25
abilities [1] 52/16
ability [2] 79/15 111/2
able [10] 10/24 11/11 11/23 11/24 12/1
13/11 15/25 18/12 84/6 112/2
about [52] 6/20 9/22 10/20 11/18 11/21
12/11 21/19 24/24 28/4 28/5 28/9 37/10
37/10 37/15 38/1 39/2 39/3 39/19 46/10
46/11 48/5 52/17 54/6 56/1 62/20 63/6
63/8 64/25 66/18 66/21 68/17 70/1 71/22
72/10 84/8 84/11 86/22 92/14 94/22 95/2
95/4 95/19 96/18 98/23 100/24 101/4
102/7 112/20 112/20 114/23 114/23
115/22
above [1] 118/18
above-entitled [1] 118/18
absolutely [3] 42/12 48/12 115/13
abundantly [1] 107/14
accepts [1] 97/21
accidentally [1] 66/22
accord [4] 16/11 101/21 114/13 114/14
according [1] 107/2
accurate [1] 12/12
accused [1] 79/8
acknowledge [3] 105/20 105/22 105/23
acknowledged [1] 24/9
across [2] 108/8 114/8
act [3] 84/25 111/2 115/11
acted [1] 112/4
action [2] 21/17 48/25
actions [2] 27/5 48/25
activated [1] 30/4
activity [2] 17/8 41/23
acts [1] 112/15
actual [1] 35/8
actually [19] 24/21 29/25 49/21 50/1
60/15 65/17 65/23 65/24 65/24 66/3 67/1
69/8 69/12 69/24 72/10 85/11 90/23 95/1
107/7
Acura [4] 11/2 15/23 17/13 20/7
adamantly [1] 28/4
add [2] 82/10 115/20
additional [1] 62/7
address [26] 8/4 19/8 28/3 29/12 47/1

A

address... [21]  51/14 51/17 65/24 73/10
73/14 73/15 74/2 74/4 75/1 77/8 78/21
87/8 89/1 94/3 94/17 94/18 104/5 114/2
114/3 114/18 114/25
addressed [2]  116/17 118/7
addresses [1]  28/2
addressing [1]  88/18
adduce [3]  35/4
adduced [1]  35/7
Administration [11]  10/11 21/25 25/4 25/7
52/22 53/5 64/19 68/1 69/5 70/2 104/21
admissible [1]  93/13
Admittedly [1]  107/15
adopt [4]  102/23 115/11 115/17 115/18
adopted [4]  74/15 80/6 87/6 115/13
Adrian [4]  15/22 17/12 15/20 91/14
advancing [1]  20/4
advice [3]  24/6 92/16 101/22
advise [1]  59/12
advised [13]  18/25 22/11 23/22 57/6 57/7
57/10 58/9 58/21 62/22 63/18 64/14
104/8 107/22
advisement [1]  116/13
affect [1]  86/3
affiant [1]  21/3 33/16 40/14
affidavit [11]  12/3 21/2 21/3 34/15 36/22
47/25 48/3 48/24 75/9 80/1 87/23
affidavits [2]  20/16 111/12
afford [1]  24/7
after [22]  6/2 13/24 15/21 15/24 16/6
17/25 19/3 23/21 25/12 26/11 27/6 27/8
29/19 36/13 39/16 55/13 61/9 75/19
75/21 78/15 92/8 93/4
again [27]  3/10 3/22 5/13 15/24 16/17
17/5 17/12 17/24 19/19 19/22 23/11
26/13 28/22 29/16 37/23 39/15 41/13
47/12 65/4 65/10 96/6 96/15 96/20 96/24
106/19 106/20 111/15
against [3]  24/5 35/7 76/16
age [1]  79/2
agencies [1]  54/6
agency [4]  10/10 53/3 53/3 53/6
agent [34]  21/24 21/25 30/12 52/11 52/13
52/15 52/17 52/17 52/21 52/23 54/11
54/14 59/6 59/7 62/13 62/22 62/23 64/14
64/17 64/18 64/21 64/23 65/3 69/1 69/21
95/19 95/20 95/25 95/25 96/2 96/20
108/24 111/2 115/21
agents [4]  52/12 104/21 105/1 112/21
ago [1]  10/2
agree [2]  79/19 112/10
agreed [1]  106/13
agreement [1]  7/1
Aguilar [1]  83/23
ahead [12]  37/4 38/16 42/8 42/14 56/4
62/20 89/5 95/13 100/21 108/12 114/4
116/15
air [3]  14/1 87/24 88/5
Aisquith [2]  46/5 46/5
all [87]  4/15 5/3 5/21 6/1 6/5 6/8 6/23 6/25
8/2 8/9 21/14 26/25 27/2 34/7 35/23 38/1
38/9 39/21 41/8 47/3 49/2 49/19 49/24
50/2 52/12 68/11 68/14 71/1 71/5 71/21
72/15 72/20 73/6 73/6 73/21 74/1 74/11
74/18 74/20 74/22 75/19 78/21 79/13
83/25 84/10 86/18 87/3 88/5 88/17 88/23
89/5 89/9 91/8 92/4 92/7 94/7 94/17
94/20 96/21 97/7 97/12 97/21 98/14
99/21 100/11 100/20 102/10 102/21
102/25 103/9 103/12 104/22 105/25
108/22 109/4 109/16 109/23 112/6

113/22 113/23 114/17 115/21 116/2
116/5 116/6 116/10 118/15
allegation [2]  78/11 78/13
alleged [5]  40/8 50/13 88/14 94/3 117/14
allegedly [10]  6/18 37/21 38/22 39/4
50/17 75/11 75/15 75/25 82/19 96/7
alleging [2]  77/15 77/18
alley [2]  66/7 66/8
allowed [5]  14/9 14/12 42/2 47/25 113/2
allows [2]  18/13 35/10
almost [3]  8/7 8/8 90/3
alone [2]  21/21 26/10
along [2]  108/24 111/17
already [7]  4/14 21/11 25/9 47/13 49/23
58/9 68/23
also [28]  5/24 6/6 7/18 9/15 10/7 15/22
20/24 32/11 32/21 32/22 52/16 52/21
62/15 66/9 69/24 84/1 89/17 89/18 90/18
90/23 95/13 95/18 96/8 99/11 101/4
110/8 110/15 112/17
although [1]  106/3
always [4]  16/22 78/24 79/14 100/12
am [8]  9/2 10/5 34/22 41/13 74/24 75/6
81/14 81/14
Amendment [3]  89/8 103/18 112/16
AMERICA [2]  1/3 3/8
amount [4]  98/10 99/25 103/21 112/11
amounts [4]  29/22 98/13 105/19 108/11
analysis [4]  75/3 80/20 98/1 113/18
analyzed [2]  31/2 76/13
and/or [1]  10/15
Anne [1]  22/19
anonymous [1]  81/9
another [13]  7/6 7/12 17/11 17/14 40/10
44/22 65/17 65/24 72/1 85/20 88/1 92/14
106/19
answer [6]  24/10 24/20 27/8 44/20 61/5
114/21
answered [2]  25/12 27/7
answering [1]  95/14
answers [1]  110/18
anxious [1]  114/18
any [107]  9/8 11/7 11/22 14/21 16/12
16/15 17/3 18/6 18/25 19/10 21/17 22/9
22/15 24/3 24/6 24/8 24/11 24/14 24/21
28/1 28/2 29/22 29/22 32/1 32/1 32/2
32/3 32/4 34/16 34/19 34/20 34/20 35/2
35/4 35/4 35/21 38/21 38/22 38/25 41/2
41/4 41/14 41/23 44/3 44/4 45/4 47/13
48/5 48/22 48/22 48/25 50/13 50/16
50/24 53/18 55/23 56/2 57/8 57/21 57/22
58/24 60/19 60/21 65/10 66/15 67/18
70/6 71/5 71/9 72/9 72/12 73/9 73/17
73/18 73/20 79/15 79/22 83/6 84/6 84/9
85/10 85/12 85/14 85/14 85/20 85/23
86/7 86/16 86/19 87/2 87/9 88/14 91/3
92/1 93/6 93/15 93/17 95/10 95/15 96/18
98/6 103/5 108/16 114/9 116/21 117/19
118/7
anybody [4]  24/11 26/8 85/14 108/20
anyone [8]  8/10 18/12 28/5 30/18 32/15
41/10 41/11 73/9
anything [25]  12/18 13/18 20/3 24/4 26/11
27/11 27/14 27/19 28/4 28/5 30/7 30/22
37/24 44/4 46/24 48/21 57/18 58/24 63/6
82/25 86/23 95/11 96/17 112/7 118/10
anyway [2]  27/9 57/16
apart [2]  73/15 78/19
apartment [1]  16/14
apartments [1]  16/12
apologize [3]  44/20 46/19 100/10
apparently [5]  44/24 122/109/18 111/7 112/2
114/18

Appeals [4]  83/8 87/16 106/4 106/7
APPEARANCES [1]  1/12
appears [7]  85/2 88/3 96/11 96/19 97/25
100/16 100/16
Appendix [2]  106/8 106/19
application [7]  20/8 20/22 20/25 106/24
107/4 108/23 109/18
applications [1]  110/11
applied [2]  20/5 107/2
apply [2]  76/9 104/24
appointed [1]  24/8
appreciate [1]  42/10
approach [5]  13/22 68/21 74/9 86/3
109/24
approaching [1]  117/25
appropriate [1]  98/18
appropriately [1]  93/4
approval [2]  106/15 106/16
approve [1]  104/25
approximately [4]  9/14 10/2 31/18 31/21
April [1]  106/8
aptly [2]  87/7 108/7
are [66]  4/5 4/16 4/17 5/7 5/8 5/18 6/8
6/16 6/22 7/19 7/25 9/1 9/24 18/11 21/11
22/3 22/4 22/14 22/21 35/5 35/14 35/19
47/1 49/11 49/12 52/12 53/1 54/10 54/18
59/16 59/21 60/25 70/11 70/11 70/13
79/8 85/21 87/24 88/14 88/18 88/19 90/8
91/9 91/19 91/22 93/23 94/12 95/11 96/7
96/13 100/6 102/6 102/10 104/15 105/5
105/6 105/20 106/5 111/13 112/25 113/4
113/20 114/25 118/13 118/5 118/7
area [40]  9/19 10/23 11/24 12/21 12/23
12/24 13/24 13/25 13/25 15/12 16/8
16/12 17/1 17/11 17/14 17/14 17/14
17/15 17/22 18/1 18/23 18/25 19/1 19/3
23/8 23/12 23/14 23/16 23/20 37/16
39/16 39/23 40/17 40/19 45/14 48/16
73/1 76/5 76/7 79/5
aren't [2]  53/22 88/14
argue [2]  78/6 95/5
argument [19]  71/14 74/24 89/14 90/4
91/3 94/7 94/14 98/9 101/6 101/6 101/11
101/18 102/11 102/19 102/23 103/8
110/13 112/13 114/6
arguments [3]  73/8 99/12 118/15
arising [1]  87/15
Arizona [2]  23/23 57/6
armed [1]  43/6
armrest [1]  27/13
around [11]  20/2 20/2 36/10 61/19 68/17
68/18 69/14 69/22 90/10 90/20 91/22
arrest [23]  6/2 7/25 8/3 13/11 28/18 31/25
35/5 35/6 36/4 41/17 57/24 58/1 85/14
85/24 86/13 86/17 86/20 88/10 92/9 93/6
93/13 93/15 93/18
arrested [6]  23/3 36/2 41/18 86/12 86/13
104/7
arrests [7]  11/11 14/6 31/18 86/16 86/18
110/7 110/15
arrive [1]  62/8
arrived [6]  18/20 18/21 42/21 65/7 65/8
96/16
articulated [2]  42/1 47/13
Arundel [1]  22/19
as [144]
ascertain [1]  19/13
ask [21]  21/8 24/3 24/6 24/24 24/25 33/21
33/24 34/14 37/2 47/3 54/23 77/7 80/19
85/7 86/1 86/1 90/2 90/22 91/2 101/25
114/10
asked [23]  23/21 24/9 24/21 25/1 25/13
25/13 25/19 25/20 26/13 26/13 27/7

## A

asked... [12]  27/24 28/1 28/3 29/21 30/14 33/14 35/18 51/24 57/2 82/6 104/10 113/1
asking [11]  27/6 27/8 36/5 39/21 45/4 49/2 75/6 77/20 79/21 81/23 91/16
asks [1]  48/8
aspect [3]  84/4 108/25 109/1
aspects [1]  94/18
assert [1]  87/23
asserted [2]  64/22 64/23
asserting [1]  88/18
assessing [2]  83/19 87/11
assigned [6]  9/10 9/12 9/15 9/22 10/3 10/7
assignments [1]  9/8
assigns [1]  55/22
assimilation [1]  40/2
Assistant [1]  3/7
assisted [2]  10/25 105/5
association [1]  19/8
assume [7]  49/16 97/20 97/21 98/4 98/5 109/3 109/11
assumption [1]  85/16
assure [1]  118/2
at [150]
attach [1]  115/7
attached [2]  21/6 21/12
attack [2]  93/24 116/18
attacking [1]  103/1
attempt [2]  95/16 115/25
attempted [1]  85/13
attention [5]  10/16 21/14 41/9 44/10 50/11
attorney [4]  3/7 105/11 114/7 114/10
Attorney's [2]  1/13 114/8
aunt [1]  28/7
author [1]  33/15
authored [2]  107/9 107/10
authorities [3]  32/2 68/12 96/13
authority [14]  57/15 86/10 88/6 91/4 94/10 94/12 96/14 105/12 105/15 106/5 108/23 110/5 111/7 111/22
authorization [1]  111/2
authorize [1]  105/1
authorizes [1]  109/18
authors [1]  34/1
automatic [1]  46/13
automobiles [1]  21/16
availability [1]  98/6
available [4]  5/16 94/11 105/14 108/18
Avenue [35]  16/1 16/2 16/8 16/9 17/19 17/23 20/6 23/10 25/21 28/3 28/7 28/16 29/12 32/20 32/21 36/16 46/1 46/3 46/4 46/22 51/11 51/13 56/19 56/21 56/25 62/9 65/19 65/23 66/2 66/3 66/19 66/22 67/5 67/18 84/9
avoidance [2]  110/20 112/3
avoided [1]  111/18
avoiding [1]  109/8
aware [3]  79/5 79/19 109/16
awareness [1]  104/12 113/8
away [1]  19/21 23/14 28/10 28/10 55/4 83/17 83/23
axiomatic [1]  116/25

## B

back [20]  16/12 18/2 19/17 19/22 31/9 38/2 38/5 40/3 41/9 46/7 51/24 53/8 60/15 66/18 72/24 81/16 81/17 81/19 99/19 113/2
background [4]  21/2 53/10 53/17 101/25
backing [1]  95/7
bag [5]  30/25 31/3 31/4 56/9 56/11
bags [1]  50/16
balancing [3]  76/10 76/15 79/14
Balltimore [1]  1/18
Baltimore [84]  1/5 1/15 1/20 1/23 3/12 3/14 5/23 9/4 9/6 9/8 10/3 11/24 13/16 14/4 14/7 14/13 14/14 14/14 16/8 18/1 20/20 20/24 22/3 22/11 22/15 22/19 22/19 22/20 22/21 22/24 22/24 22/25 23/2 23/9 28/14 29/2 31/13 31/14 32/12 32/15 32/21 36/16 41/11 41/12 46/10 46/23 52/3 52/8 52/14 52/21 54/24 55/4 62/8 62/15 65/7 65/8 67/16 67/22 67/25 68/15 69/2 69/4 69/13 69/14 69/14 70/11 70/14 79/4 86/19 92/16 96/10 96/10 96/10 96/11 96/12 96/16 96/23 97/2 97/2 97/3 97/3 97/5 98/7 107/15
Baltimore Police [1]  9/6
Bank [1]  68/8
Bankins [2]  1/21 118/18
bar [1]  78/9
Barbado [1]  32/19
Barclay [25]  10/23 12/21 12/22 17/6 18/2 33/9 36/16 36/16 39/8 40/16 44/11 45/22 45/23 45/25 46/1 46/2 51/11 51/13 51/16 56/19 56/21 56/24 84/9 85/1 88/2
Barocki [1]  6/15
based [13]  12/10 14/20 15/3 15/12 29/23 83/13 86/18 87/18 88/6 92/20 108/1 111/10 116/23
basically [9]  68/11 69/9 71/13 84/18 85/9 86/23 90/3 90/7 95/4
basis [12]  42/11 42/13 77/25 79/22 79/25 80/9 83/11 92/10 93/3 93/16 102/18 103/10
Bates [43]  1/16 1/16 2/7 3/20 3/22 6/20 8/6 32/25 49/19 50/2 50/8 70/6 71/16 72/8 74/8 74/15 75/7 80/17 84/1 84/2 84/16 86/1 87/3 87/6 88/11 89/5 91/3 92/5 93/7 94/1 94/5 100/21 102/10 102/21 104/5 104/23 108/7 112/7 112/10 114/4 114/17 116/20 118/10
Bates' [2]  102/15 115/13
bathroom [1]  91/20
BDO [4]  68/2 68/7 68/7 96/24
be [125]
bear [1]  81/6
Bearde [10]  18/23 18/24 18/25 19/1 22/1 22/3 22/9 47/19 62/14 67/15
bearing [1]  41/14
became [2]  26/19 26/24
because [42]  4/11 4/12 6/18 7/2 26/6 30/17 39/10 39/21 46/25 60/15 62/6 75/8 80/15 82/1 82/13 82/25 86/20 87/4 91/8 96/4 97/14 97/23 100/12 101/7 101/10 101/18 103/12 103/13 103/16 104/5 104/16 105/4 105/5 106/11 109/12 112/14 112/25 113/20 114/1 114/13 114/18 116/17
becomes [5]  91/18 103/13 105/18 108/4 117/20
bedroom [4]  30/8 62/24 63/14 64/16
been [56]  4/19 4/20 5/11 9/5 9/12 9/14 9/22 11/13 11/15 14/6 14/9 14/12 21/4 22/25 24/14 28/1 28/2 28/6 32/1 33/15 33/18 35/1 35/10 35/11 39/6 49/23 50/4 60/18 62/1 68/25 69/4 74/23 75/18 78/24 80/6 86/2 88/2 88/7 88/15 93/1 93/4 93/21 98/10 105/17 107/16 108/9 111/17 112/5 112/13 113/18 116/17 116/25 117/3 117/17 117/19 118/15
before [37]  1/10 4/18 5/19 6/8 7/14 7/19 24/3 24/6 24/8 32/3 32/3 38/4 49/20 56/24 60/19 60/21 62/21 63/5 64/5 64/20 64/22 65/3 65/23 66/11 79/16 91/23 95/10 95/11 96/2 96/11 96/12 103/2 104/16 105/24 108/1 108/17 110/17
began [9]  12/20 19/2 21/18 23/20 28/11 28/12 30/11 44/18 62/21
Begging [1]  31/6
begin [2]  8/18 114/2
beginning [2]  54/12 94/21
behalf [4]  2/4 3/6 71/10 74/8
behind [2]  34/23 106/24
behold [1]  75/16
being [27]  6/4 11/1 16/6 18/13 23/13 25/1 25/3 27/5 27/6 29/8 29/12 30/9 37/21 39/25 40/7 45/17 64/25 79/8 82/23 83/3 85/3 93/2 93/3 103/19 104/13 107/18 107/24
belief [2]  56/20 56/21
believe [25]  6/8 16/17 17/20 20/14 20/21 43/20 43/21 50/18 51/15 59/18 66/16 77/11 77/13 77/17 77/25 82/8 86/22 97/12 97/13 98/13 98/24 99/23 111/20 112/23 112/25
believed [3]  15/4 17/22 85/12
Bell [1]  83/7
below [1]  110/8
bemusement [1]  116/19
bench [1]  113/8
benchmark [2]  81/8 82/9
bend [1]  37/14
benefit [6]  9/16 10/19 15/20 22/5 23/11 24/1
BENNETT [5]  1/10 34/10 36/23 45/18 48/21
Bernard [2]  62/22 64/15
Bernie [1]  115/21
besides [1]  48/23
best [1]  79/20
between [10]  13/23 14/17 15/16 17/13 20/3 33/22 39/4 46/1 54/7 61/21
beyond [2]  42/3 48/3
big [1]  33/11
bigger [2]  37/5 37/8
binding [1]  106/5
Biniek [3]  21/25 59/7 60/17
bit [7]  31/9 38/6 42/7 78/7 90/9 98/19 104/2
black [6]  11/2 15/23 16/11 36/24 84/8 115/6
Blackwell [2]  62/14 67/15
Blackwood [1]  117/3
blank [1]  84/14
block [20]  10/23 12/21 12/22 13/15 13/21 17/6 17/19 18/2 18/3 18/17 33/9 36/16 40/16 44/11 47/8 51/11 51/17 65/22 75/19 78/18
Bo [3]  11/2 25/14 88/1
Bo's [1]  25/14
bold [2]  77/10 78/11
Booking [6]  58/4 61/12 68/19 69/2 69/14 97/5
Bookout [2]  97/24 97/24
bordered [1]  46/2
borne [1]  81/4
borrow [1]  58/13
both [12]  5/7 5/8 7/15 7/16 11/8 19/19 51/21 52/4 94/25 102/6 104/20 111/1
bothers [1]  89/9
bottom [2]  67/4 100/22
break [4]  71/21 71/22 91/21 113/10
Bredar [1]  114/22
Brentwood [2]  17/19 17/19

## B

brief [5]  16/7 18/3 71/19 95/3 98/25
briefly [5]  70/8 84/3 89/6 112/9 112/20
bring [1]  34/19
broached [2]  4/14 78/24
brother [1]  103/7
brought [2]  41/1 86/14
building [1]  16/14
bump [1]  113/9
burned [1]  79/6
bust [6]  85/24 86/1 86/3 86/5 86/8 86/9
busy [1]  118/1
but [104]  4/10 8/7 10/7 12/1 21/11 25/7
29/19 34/6 35/18 36/10 37/17 38/6 39/11
39/17 41/6 41/18 41/19 41/22 41/25
42/13 44/21 46/9 47/7 48/1 48/6 48/9
48/15 50/22 52/15 57/15 58/10 58/16
60/25 63/1 65/10 65/21 66/11 67/18
70/25 72/5 72/25 74/15 74/18 74/25 75/2
75/13 75/21 75/24 77/21 78/6 78/14
78/16 78/25 79/14 79/20 80/9 80/22 81/6
81/10 82/6 82/8 82/14 85/10 85/13 85/17
85/20 85/25 86/5 86/8 86/24 89/10 90/10
91/15 91/24 92/12 95/16 96/17 97/17
98/9 98/17 99/18 101/13 103/2 103/9
104/15 105/4 105/9 107/16 108/4 108/14
109/10 109/13 110/13 110/17 110/20
111/4 111/11 111/15 111/24 112/13
115/24 116/15 117/7 118/1
buy [6]  85/24 86/1 86/3 86/5 86/8 86/9
buy-bust [6]  85/24 86/1 86/3 86/5 86/8
86/9
buys [1]  85/14

## C

C-L-A-R-I-D-Y [1]  3/8
C.I [11]  51/18 51/19 51/25 51/25 52/2
54/20 85/9 85/18 94/22 94/23 95/23
C.I.s [1]  53/9
calendars [1]  7/2
call [4]  3/2 22/13 55/21 81/19
Calling [1]  3/6
calls [2]  8/13 44/4
calm [2]  27/5 27/8
Calvert [2]  1/17 1/20
came [6]  4/12 10/20 11/6 30/14 32/11
63/4
camera [1]  46/24
cameras [3]  86/25 87/1 87/2
can [51]  7/12 8/7 9/16 10/19 15/20 17/7
17/15 19/18 22/5 23/6 24/1 24/4 37/18
38/2 40/3 40/4 40/12 41/1 47/2 54/4 54/4
58/13 59/20 64/3 64/3 71/21 71/24 72/25
79/20 80/14 94/21 95/7 95/9 95/13 95/18
95/20 96/15 96/20 97/4 100/17 104/18
104/24 104/24 104/25 106/8 108/23
108/23 111/10 112/18 113/17 114/10
can't [8]  47/9 62/6 73/20 75/23 82/3 85/10
108/16 111/24
candidly [1]  92/11
cannot [2]  24/7 102/5
capacity [1]  93/2
captioned [1]  110/5
car [14]  25/9 26/8 28/24 44/16 44/22
45/15 47/4 47/4 47/19 81/21 82/19 83/1
86/23 93/9
card [4]  23/23 23/24 89/24 91/11
care [1]  7/23
Carla [1]  70/16
carry [1]  23/23
carrying [2]  47/22 82/7

cars [2]  45/16 51/2
case [54]  3/3 3/7 3/9 4/6 4/19 4/22 5/1
6/22 7/1 8/12 21/6 31/25 32/3 72/23
72/25 74/2 76/17 76/24 77/3 79/19 81/7
81/22 82/10 84/20 87/7 87/13 87/15 95/2
95/4 95/18 95/22 96/14 97/22 97/24
98/24 99/2 99/3 99/3 106/6 106/23 109/1
109/1 111/3 111/23 112/1 112/3 112/12
113/9 113/13 116/24 117/4 117/12
117/13 117/23
cases [13]  81/1 81/5 86/2 87/17 91/3 91/9
92/1 109/9 109/14 109/16 110/17 114/25
116/16
cash [2]  57/21 93/9
cause [18]  41/17 41/18 81/21 81/24 82/9
87/8 88/7 88/25 92/20 100/2 102/13
102/15 103/1 105/7 116/22 117/1 117/7
117/10
Cayenne [1]  10/24 13/21 19/22 20/7 23/8
28/8 29/16
CDS [2]  57/22 57/23
cell [2]  61/15 72/21
Center [2]  69/2 97/5
Central [6]  58/4 61/12 68/18 69/2 69/13
97/5
certain [3]  101/25 102/2 107/9
certainly [15]  7/5 7/7 7/10 7/12 17/17
49/22 68/22 71/24 80/14 92/12 104/19
111/23 113/24 113/25 118/2
certify [1]  118/18
certiorari [1]  117/5
challenge [1]  77/1
challenged [1]  99/11
challenging [8]  73/22 73/23 88/11 88/19
88/21 102/11 102/11 105/6
chambers [1]  118/1
charged [9]  4/20 5/7 5/8 5/10 5/12 5/13
5/15 5/18 76/22
charges [4]  4/22 4/24 4/25 5/4
charging [2]  69/25 70/1
Charles [2]  1/14 34/15
check [2]  27/9 98/6
chief [3]  83/8 107/8 107/10
Chipparelli [17]  20/23 34/15 36/23 40/11
55/12 55/19 56/1 75/9 83/12 98/8 101/22
102/14 103/2 111/19 113/9 113/24
115/10
Chipparelli's [2]  55/15 117/10
chose [1]  98/7
Christmas [4]  72/2 72/3 72/4 113/10
chronology [1]  13/14
Chrysler [1]  43/13
circuit [39]  14/13 14/14 20/19 76/12 76/13
76/17 76/24 77/3 80/10 84/20 84/21
84/22 87/16 87/17 87/20 95/2 95/3 97/24
99/2 99/11 99/12 99/14 99/18 103/22
106/4 106/5 106/7 106/13 106/17 106/19
106/22 107/2 107/6 107/9 111/9 113/13
116/24 117/2 117/5
circumstances [11]  23/6 81/22 83/22 84/5
84/11 87/12 87/14 87/22 87/24 90/3
108/17
cite [3]  95/2 98/25 111/3
cited [2]  106/8 106/18
City [30]  3/14 10/4 14/13 20/20 20/24
22/3 22/19 29/12 31/13 31/14 36/16 41/12
52/3 52/8 52/14 52/21 54/24 55/4 69/2
69/13 69/14 86/19 92/16 96/10 96/10
97/3 97/3 97/5 98/7 107/15
claim [1]  99/14
CLARIDY [122]
Claridy's [6]  5/20 53/17 92/6 92/8 93/20
116/6

clarify [1]  116/16
classify [1]  112/11
clear [14]  15/9 41/1 48/10 77/4 92/21
104/3 104/14 105/10 107/12 107/14
108/19 109/2 109/5 116/5
clearly [22]  15/13 85/2 86/2 88/3 88/7
93/5 97/21 102/18 104/8 104/11 104/17
105/17 106/15 106/16 107/23 110/18
116/22 116/23 117/10 117/11 118/3
118/5
clerk [5]  7/9 21/10 93/19 100/11 115/17
client [8]  56/6 71/20 73/18 79/21 82/15
98/2 112/22 113/12
client's [1]  82/11
close [2]  86/17 114/1
closer [1]  23/20
closet [13]  30/8 30/10 30/14 30/24 30/24
62/24 63/7 63/14 63/20 64/16 90/8 96/7
96/8
cloud [1]  115/6
clubs [2]  27/25 28/1
co [1]  33/16
co-affiant [1]  33/16
cocaine [1]  11/12
Code [6]  4/21 5/5 5/7 5/11 109/17 110/1
come [13]  6/18 10/15 11/4 11/4 23/3
24/21 30/19 72/24 77/22 84/7 101/8
111/14 115/9
comes [2]  35/7 116/3
coming [6]  25/13 25/22 32/19 81/19 82/24
88/4
comments [1]  92/25
commissioner [3]  55/21 55/22 56/1
common [1]  86/2
commonly [1]  111/14
compelled [1]  107/13
competent [1]  101/8
complete [1]  108/5
compliance [7]  94/3 94/3 97/23 107/3
117/14 117/15 117/15
comply [5]  94/14 98/5 107/1 108/11
115/25
compound [1]  109/8
comprehension [1]  24/16
computer [1]  53/10
concealed [1]  37/16
conceive [1]  82/3
concern [1]  79/15
concerning [7]  6/13 35/22 38/13 45/4
48/22 75/11 99/14
conclude [3]  81/25 82/21 111/21
concluded [1]  118/16
conclusion [1]  27/4
condominiums [2]  81/10 81/20
conduct [4]  17/21 79/24 84/25 117/6
conducted [5]  15/25 32/10 54/5 85/3
99/12
conducting [1]  65/6
confidential [49]  6/7 7/19 10/21 11/3 11/8
11/10 11/18 12/7 12/23 13/12 15/10
33/24 34/7 37/25 38/7 41/15 41/21 47/14
48/1 53/19 54/21 54/21 74/5 74/6 74/12
75/3 76/25 77/7 77/8 78/1 78/10 78/22
79/24 80/1 80/8 80/11 80/14 80/18 81/1
84/2 84/19 84/25 87/5 88/7 88/9 88/24
92/23 93/22 116/9
confidentiality [1]  79/11
confined [1]  74/24
confound [1]  110/9
conjecture [2]  83/9 109/15
connection [2]  76/21 77/1
consent [2]  26/14 27/6
consider [2]  78/11 79/21

# C

considered [1] 13/25
consisted [1] 67/13
consistent [2] 9/20 117/9
consolidated [2] 6/3 116/8
conspiracy [3] 5/5 5/8 86/7
Constitution [1] 89/8
constitutional [21] 90/12 94/18 97/12
97/13 97/18 97/22 98/1 98/11 99/13
99/18 99/25 100/24 101/14 103/16
103/22 105/19 108/12 112/12 112/18
112/19 113/14
constitutionally [5] 89/21 89/24 90/15
108/10 112/18
contact [2] 18/23 36/7
contacted [2] 22/25 45/12
contained [2] 30/25 31/2
contend [2] 79/25 103/19
contending [3] 73/17 94/13 105/6
contention [2] 90/13 117/17
context [1] 80/8
continue [7] 15/8 15/14 23/19 42/7 47/4
80/14 80/18
continued [1] 19/5
contraband [1] 57/22
controlled [2] 5/16 37/20
controlling [1] 5/15
conventional [1] 109/12
conversation [3] 27/21 29/5 29/6
convicted [2] 5/11 11/13
cooperate [3] 30/15 79/8 104/10
cooperation [1] 30/16
copies [3] 20/15 49/25 50/1
copy [5] 58/13 68/24 99/16 109/21 109/21
core [1] 104/1
corners [12] 42/1 42/3 47/25 48/3 48/7
74/25 102/12 102/15 103/1 105/6 116/19
116/23
correct [190]
corroborate [4] 11/25 12/1 85/15 86/24
corroborated [3] 84/15 84/23 87/19
corroboration [6] 85/4 85/6 85/8 85/17
85/17 85/18
couching [1] 74/24
could [31] 4/12 4/13 12/11 26/23 27/5
33/25 34/7 36/4 38/24 39/6 40/8 43/19
48/21 60/6 61/5 61/22 63/9 66/25 67/14
77/21 78/14 78/23 82/4 83/7 83/10 84/7
86/14 109/7 110/25 111/1 114/12
couldn't [2] 26/19 34/8
counsel [10] 7/23 44/18 71/14 73/6 74/9
103/19 105/4 109/22 115/18 118/14
counsel's [2] 13/2 103/7
count [7] 5/8 5/8 5/9 5/10 5/14 5/14 5/17
Counter [1] 18/14
countersurveillance [1] 47/2
Country [1] 11/1 17/10 17/25 19/21
County [36] 3/12 14/14 14/14 22/11 22/15
22/19 22/19 22/20 22/21 22/24 22/25
22/25 23/2 28/14 32/12 32/15 32/21
41/12 46/23 62/8 62/15 65/7 65/8 67/16
67/22 68/15 69/14 70/11 70/14 96/10
96/12 96/12 96/16 96/23 97/2 97/2
couple [2] 16/11 51/24
course [8] 4/9 11/15 12/7 31/17 70/25
78/23 80/19 82/5
court [97] 1/1 1/21 4/18 5/20 6/8 6/10
7/14 7/19 10/19 14/14 14/14 15/20 16/22
17/7 20/19 20/20 20/21 20/23 24/5 33/11
40/1 42/2 44/19 49/25 55/21 55/21 56/1
74/21 75/4 76/11 77/19 78/9 79/21 79/24
80/10 80/10 81/8 81/13 83/8 83/9 83/17
83/20 84/4 86/18 86/24 86/25 87/10
87/13 87/16 90/2 90/19 90/22 90/25
91/16 91/16 92/10 92/12 94/11 97/20
98/7 100/5 101/8 101/10 105/5 105/14
106/1 106/4 106/7 106/11 106/14 107/1
107/8 107/10 107/25 108/9 109/2 109/14
109/19 110/19 110/23 111/6 111/11
111/15 112/10 113/5 113/5 113/10
113/20 113/21 114/12 114/20 114/20
116/21 116/22 117/6 118/15 118/20
Court's [4] 31/6 71/19 103/13 110/9
courthouse [4] 41/2 55/14 72/5 98/10
courtroom [5] 13/3 77/22 80/21 86/8
115/24
courts [6] 14/12 14/13 14/15 110/17
111/9 111/14
crazy [1] 100/12
created [1] 77/19
credentials [1] 70/3
credible [1] 92/18
CRI [4] 33/22 33/23 33/25 34/4
crime [2] 5/11 9/10 94/24
Criminal [6] 1/3 94/4 97/15 99/15 109/7
110/1
critically [1] 93/3
cross [10] 31/15 33/3 50/7 52/4 52/9
54/18 80/23 80/23 107/16 109/15
cross-designated [4] 31/15 52/9 54/18
107/16
CROSS-EXAMINATION [2] 33/3 50/7
cross-examine [2] 80/23 80/23
Crown [1] 30/25
crux [1] 102/8
crystallize [2] 104/17 118/4
crystallized [4] 103/19 108/9 109/3
116/18
crystallizing [1] 105/5
CS [37] 11/9 11/16 11/20 11/23 12/1
33/22 34/7 34/10 34/11 34/12 34/13
34/21 35/17 35/20 38/10 44/10 45/5
45/10 45/11 48/18 48/22 53/19 53/20
77/11 77/13 77/16 77/19 77/21 78/1
78/14 78/16 79/25 81/22 82/8 82/21
82/21 83/12
CS-1 [27] 11/9 11/16 12/1 34/10 34/21
35/17 35/20 38/10 44/10 45/5 45/10
45/11 48/18 48/22 53/19 77/11 77/13
77/19 77/21 78/1 78/14 78/16 79/25
81/22 82/8 82/21 83/12
CS-2 [5] 11/20 11/23 34/11 34/13 53/20
curium [2] 106/9 106/20
currency [1] 11/12 38/11 38/21 38/22 68/8
currently [2] 9/1 10/3
custody [3] 69/9 91/24 107/25
cut [2] 104/1 108/4
CX [1] 2/3

# D

D.E.A [2] 94/25 95/21
daily [1] 86/19
dangerous [1] 37/21
Daniel [2] 62/14 67/15
date [3] 7/1 36/9 118/20
dates [3] 20/4 33/7 50/11
Dawson [1] 79/5
day [23] 4/11 16/25 17/3 19/18 21/19
23/3 28/2 33/13 36/9 36/19 44/11 69/24
72/1 75/13 75/20 75/22 75/22 79/1 82/12
83/2 83/2 83/3 111/20
days [3] 75/20 78/17 117/24
de [1] 117/6
DEA [11] 43/18 45/4 48/23 49/6 53/1 53/3
53/3 53/4 54/16 69/21 81/18

DEA-6 [3] 43/18 48/23 49/6
DEA-6s [1] 45/4
deal [5] 7/5 7/22 8/4 78/8 89/2
dealing [4] 87/25 88/5 92/23 96/19
dealings [1] 12/10
December [3] 1/7 6/4 106/18
decide [1] 61/9
decided [3] 8/7 59/8 106/18
decision [2] 23/21 58/19
deem [1] 80/6
deemed [1] 115/19
deeper [1] 85/7
defect [1] 90/12
defective [5] 89/22 89/24 90/16 90/19
108/10
defendant [24] 5/20 5/23 6/3 13/5 23/4
73/23 80/7 87/25 88/10 92/24 93/2 99/11
101/3 101/16 103/16 104/6 107/22
107/24 108/2 113/15 116/6 116/8 117/17
117/19
Defendant's [6] 50/3 91/12 92/13 107/18
107/20 107/23
defendants [7] 1/8 1/16 4/20 5/18 5/18
7/1 7/15
defendants' [1] 20/18
defended [1] 113/25
defense [19] 3/19 4/13 7/2 13/2 52/25
59/19 64/5 67/1 68/23 69/1 69/12 71/9
76/16 76/19 77/9 91/12 97/4 105/4
115/18
deference [1] 117/2
deficiency [1] 103/17
DeFilippo [1] 93/14
definitely [3] 94/8 96/4 96/20
Delaware [3] 35/12 42/13 48/14
deliberare [1] 116/4
deliberate [23] 97/14 98/13 98/23 101/5
101/7 101/17 101/18 101/21 102/5 102/9
102/16 103/3 103/14 103/20 112/11
112/14 113/16 113/19 114/12 115/6
115/15 116/1 117/22
deliberately [8] 101/9 101/9 101/10
101/21 101/22 109/8 111/18 114/13
deliberateness [1] 115/11
deliberative [3] 110/20 112/2 112/15
deliberativeness [2] 108/25 109/1
delibero [1] 116/4
delivered [1] 82/20
demands [1] 104/23 105/24 108/14
denied [8] 29/7 29/17 80/12 93/19 93/21
116/8 116/9 117/5
department [19] 3/12 3/14 9/4 9/6 9/9
10/4 14/4 14/7 14/8 22/3 23/1 23/2 32/12
52/15 54/24 55/4 67/25 68/5 92/16
deposition [1] 48/2
deputization [1] 95/5
deputized [10] 10/12 52/12 104/20
deputy [1] 95/5
derivative [3] 5/25 92/6 93/17
describe [1] 23/6
described [7] 11/9 25/14 28/19 34/6 36/22
40/1 45/2
describes [1] 104/24
designate [1] 34/16
designated [7] 31/11 31/15 52/9 52/12
54/18 76/5 107/16
designation [2] 31/13 95/23
destroy [1] 49/10
detail [2] 12/6 50/24
details [1] 67/8
detainee [5] 69/13 97/6 104/7 107/24
108/3
detect [1] 18/10

**D**

detective [66]  2/5 3/15 3/17 4/11 8/13 8/15 8/24 15/15 18/22 18/22 18/24 18/25 19/1 20/11 21/3 21/14 21/25 22/2 22/9 27/24 28/1 28/17 31/9 31/13 31/14 42/16 47/19 50/9 52/15 59/6 63/21 70/16 71/25 72/4 72/9 72/17 72/20 75/9 80/21 81/7 81/10 81/17 83/5 84/5 84/13 88/2 92/10 92/18 94/22 94/24 95/6 95/9 95/12 95/14 95/20 95/21 96/5 96/11 96/16 98/5 98/20 104/8 107/15 109/4 111/1 115/7
detectives [3]  32/19 70/12 70/14
detention [3]  69/2 90/15 97/5
determination [5]  91/17 93/3 107/25 117/1 117/7
determine [2]  79/17 117/7
determined [1]  88/24
determining [1]  107/2
did [141]
didn't [39]  18/25 28/5 28/21 29/5 39/19 41/17 44/7 50/13 51/7 55/23 56/17 56/21 57/14 57/18 58/4 58/6 58/10 58/12 58/16 58/21 58/24 58/24 59/18 61/14 64/24 65/1 65/13 67/18 85/11 85/12 85/14 86/22 89/15 99/25 100/2 101/13 108/4 115/10 115/22
difference [3]  33/21 54/9 89/16
different [2]  55/2 91/22
digress [1]  11/14
digressing [1]  31/9
direct [7]  8/22 21/14 41/9 44/10 48/7 107/19 109/19
direction [6]  23/14 46/4 95/13 106/14 106/16 107/4
directly [4]  26/6 33/24 63/19 103/5
disbelieve [1]  92/10
disclose [2]  41/15 41/20
disclosed [1]  76/22
disclosure [2]  6/6 93/22
discovery [1]  78/15
discretion [1]  36/8
disregard [13]  97/14 98/13 98/23 101/5 101/7 101/17 102/5 102/9 103/3 103/20 113/16 113/19 114/13
distinguishable [1]  106/15
distribute [4]  4/23 5/5 5/6 5/9
distribution [2]  12/25 12/25
distributors [1]  11/24
district [27]  1/1 1/1 1/11 14/13 14/14 20/19 20/21 20/23 28/9 28/23 28/25 58/2 58/6 58/12 59/11 61/14 69/5 89/11 94/10 94/12 98/7 105/12 105/13 105/15 105/16 106/14 111/9
division [3]  1/2 9/10 94/24
divulged [1]  35/21
divulging [1]  79/17
do [101]  4/12 7/22 7/22 9/8 12/19 13/2 14/5 14/12 14/20 22/25 23/24 23/25 24/8 24/18 25/20 25/21 25/24 26/5 26/12 28/12 31/13 31/16 32/18 35/2 37/24 37/25 39/7 41/16 41/19 41/20 42/16 43/17 44/5 44/23 45/3 45/4 47/4 47/13 48/21 49/5 49/7 49/9 50/24 51/1 51/4 51/6 51/10 51/15 52/17 53/22 56/11 58/16 59/19 62/10 62/16 62/25 67/8 68/24 71/19 72/4 72/8 72/21 72/25 73/9 76/8 79/1 79/9 79/20 80/23 81/11 84/24 85/23 86/23 86/24 87/2 89/19 89/22 90/9 90/18 90/18 90/25 91/3 91/25 95/21 97/16 97/17 98/12 99/21 100/10 100/15 105/1 106/5 107/13 108/18 108/19 110/7 110/11 111/22 112/2 112/17 114/20

doctrine [1]  115/3
document [2]  69/25 70/1
documented [1]  66/15
documents [1]  62/11
does [26]  18/6 18/8 41/22 41/22 53/3 63/16 63/19 63/20 63/23 63/25 69/21 72/5 74/8 77/16 86/4 86/10 87/8 89/24 90/18 97/22 98/10 98/16 98/22 100/5 104/23 109/15
doesn't [27]  37/23 75/13 75/13 76/6 79/25 80/4 80/24 82/4 82/10 83/4 85/20 85/23 85/23 89/21 89/24 89/25 96/17 96/18 98/12 105/1 108/3 108/11 108/16 111/8 112/3 113/25 114/1
doing [4]  21/21 22/12 48/25 102/6
dollars [5]  75/15 78/13 78/13 80/2 82/4
don't [71]  6/25 7/23 33/12 34/12 36/9 37/19 38/5 39/2 39/2 41/14 43/16 43/20 43/21 44/12 45/16 46/16 47/14 48/20 49/11 49/12 49/17 51/14 53/15 55/21 56/12 57/14 59/17 60/23 60/25 65/10 65/15 66/1 66/18 66/21 69/4 71/5 72/12 72/24 73/16 75/20 75/20 77/11 77/12 77/13 77/17 77/25 78/6 79/12 79/22 83/6 84/17 84/24 86/25 87/2 89/17 89/23 90/5 91/15 91/25 93/6 97/12 104/22 105/7 108/14 110/7 111/4 111/11 113/11 114/11 114/19
done [5]  46/23 47/2 83/4 116/14 118/1
door [10]  19/2 19/3 19/4 19/5 19/17 19/23 29/21 58/16 66/4 66/13
dossier [1]  34/20
doubt [3]  102/9 104/4 114/11
down [19]  16/25 27/13 30/14 43/21 45/5 46/4 48/18 49/3 49/8 59/20 64/11 67/8 78/4 84/12 86/17 86/25 94/23 100/22 111/5
downstairs [1]  63/4
dressed [1]  85/21
drive [3]  81/15 81/17 85/22
driven [2]  25/19 91/22
drives [3]  18/10 18/12 100/12
driving [5]  10/24 18/6 25/16 56/13 106/24
drop [1]  68/2
dropped [1]  18/1
drove [9]  11/1 11/2 17/14 17/23 18/1 18/2 19/21 23/8 58/1
drug [38]  9/10 9/19 10/11 13/25 14/1 15/12 15/13 17/14 21/24 41/23 52/22 53/5 59/13 60/17 60/20 62/3 61/1 61/3 64/18 67/25 69/5 70/1 85/2 85/10 86/4 86/6 86/12 86/17 86/18 86/19 86/19 87/25 88/5 92/23 95/12 104/9 104/21 107/23
drugs [13]  29/22 30/16 60/19 60/21 62/1 63/2 63/6 85/11 90/8 95/10 96/7 96/8 97/1
during [19]  6/2 10/15 12/20 13/15 14/7 16/10 18/5 21/4 24/7 31/17 31/23 44/3 46/21 62/25 64/13 65/8 70/25 80/3 92/8
duties [1]  10/13
duty [1]  111/20
DX [1]  2/3

**E**

each [1]  17/11
earlier [6]  12/3 29/11 29/17 106/16 107/5 107/7
early [2]  21/20 43/10
east [1]  23/9
Eastern [9]  28/9 28/22 28/25 58/1 58/6 58/12 59/11 61/14 89/11

easy [2]  86/4 86/8
echo [1]  103/7
Edison [1]  46/7
effort [1]  54/7
either [4]  11/7 33/15 73/22 85/12
Elementary [1]  16/9
Eleventh [1]  95/1
else [6]  18/12 24/12 26/8 27/14 30/7 85/16
employed [2]  9/1 9/5
end [4]  10/1 27/21 99/21 108/3
ended [2]  15/18 19/25
ends [1]  86/9
enforcement [23]  9/11 9/20 10/11 21/24 48/25 52/22 53/5 54/6 62/23 64/15 64/18 68/1 69/5 70/2 86/3 86/10 94/9 104/21 105/11 108/20 110/5 110/10 110/14
engaged [1]  86/7
English [1]  115/25
enlists [1]  81/18
enough [5]  81/10 81/19 83/11 86/20 107/7
enter [8]  16/6 16/12 17/9 19/24 41/12 42/23 43/7 43/23
entered [4]  13/21 17/23 23/8 66/16
entire [4]  80/8 81/18 102/8 103/8
entitled [3]  35/19 48/13 118/18
entry [3]  30/4 30/10 62/7
Erdman [1]  23/10
esoteric [1]  111/4
especially [3]  79/15 82/10 111/16
ESQUIRE [3]  1/13 1/16 1/19
essence [1]  114/15
essential [1]  76/19
essentially [18]  4/22 76/10 76/13 77/18 87/17 88/11 92/24 93/14 94/2 94/8 94/12 97/25 102/17 102/19 103/20 104/9 107/10 117/12
Essex [5]  16/1 18/4 28/2 32/22 42/21
establish [1]  81/23 82/14 88/7
established [7]  75/18 76/11 82/9 87/9 88/8 88/25 106/23
establishes [1]  116/22
even [21]  57/14 58/6 82/4 82/15 83/2 83/10 87/22 90/14 96/4 97/9 103/14 105/7 109/16 111/13 112/12 114/1 114/1 115/8 115/10 117/3 117/1
evening [1]  17/24
events [2]  13/14 42/14
eventually [3]  18/16 23/9 68/8
ever [20]  14/9 29/24 41/4 44/10 44/15 44/22 44/23 45/5 45/5 46/17 51/10 60/19 60/21 64/20 66/18 66/21 83/1 90/21 96/12 111/16
every [4]  79/23 79/23 90/11 95/21
everything [6]  63/17 83/5 84/12 90/24 102/3 108/8
evidence [55]  5/21 5/24 5/25 6/1 6/5 7/21 8/10 35/2 35/3 35/6 35/7 65/13 65/16 67/21 67/22 69/6 69/7 75/8 89/7 91/24 92/6 92/7 92/7 93/7 93/15 93/17 93/17 93/24 95/8 96/3 96/22 96/22 98/17 98/22 100/2 101/4 101/16 101/18 102/2 102/18 106/14 106/16 107/14 107/17 109/5 109/5 111/8 111/14 111/18 113/15 116/7 116/11 117/8 117/22 117/24
evidentiary [2]  4/10 30/22
ex [2]  79/16 79/24
exact [4]  36/5 59/16 59/17 66/3
exactly [7]  35/13 41/24 62/25 64/3 81/11 83/4 114/15
EXAMINATION [4]  8/22 33/3 50/7 70/9
examine [2]  80/23 80/23

## E

example [1] 87/18
exceeding [1] 5/12
except [4] 93/9 108/8 116/6 116/10
exception [1] 117/13
exceptions [1] 105/8
exchange [1] 17/13
exchanging [1] 88/4
excuse [5] 15/17 22/2 54/10 63/19 69/17 110/15
execute [5] 28/11 109/19 110/8 110/14 110/15
executed [5] 43/6 73/11 82/13 82/16 83/3
executing [3] 22/12 28/15 30/12
execution [10] 5/22 7/16 21/5 35/8 48/24 64/13 65/8 67/5 70/24 93/25
exercise [1] 110/15
exhibit [18] 20/14 20/18 21/4 21/6 21/8 59/19 64/6 67/1 68/23 69/1 69/12 91/12 91/13 92/13 97/4 107/18 107/20 107/23
exhibits [6] 21/7 49/21 50/3 53/1 95/9 108/1
exist [3] 77/16 79/25 82/10
exit [2] 19/14 23/21
exited [5] 16/7 16/10 19/20 42/24 42/25
expect [2] 91/16 111/24
experience [11] 14/21 15/12 33/15 34/20 34/20 50/18 50/21 85/2 90/22 111/11 111/16
experienced [1] 78/9
expert [2] 14/10 34/20
expertise [3] 20/11 59/24 94/24
explain [1] 67/2
explained [1] 37/1
explicit [1] 111/23
exploring [1] 35/20
expressing [1] 108/13
extent [2] 35/24 80/12
extremely [2] 6/22 96/3
eye [1] 18/23
eyeballed [1] 44/23
eyes [1] 72/7

## F

F-A-I-R-D-E-L [1] 16/20
F-L-O-R-A [1] 3/9
F.2nd [4] 87/21 97/24 107/6 117/3
F.3d [2] 95/3 98/22
F.3rd [6] 76/13 84/21 87/20 99/10 103/23 117/4
F/B [1] 40/15
face [3] 108/14 108/19 116/20
fact [21] 6/23 6/25 29/25 30/19 32/15 41/18 43/17 56/24 68/2 78/25 79/17 80/24 82/18 82/25 84/23 88/19 89/15 90/21 91/14 92/15 109/6
facts [3] 38/1 43/19 91/21 104/15 118/5
factual [9] 87/22 87/24 91/16 92/18 99/19 107/12 107/25 108/6 118/5
failed [1] 99/16
fails [1] 87/23
failure [1] 94/14
fair [2] 109/15 111/20
Fairdel [2] 16/8 16/20
fairly [2] 78/11 107/9
fairness [1] 76/20
faith [2] 105/8 117/12
familiar [1] 109/4
family [1] 79/6
far [2] 93/21 109/5
fatal [1] 89/16
favor [5] 59/19 62/10 67/8 83/21 87/12
federal [168]

federally [1] 109/10
feds [1] 104/10
feel [3] 84/17 89/6 101/20
feet [1] 58/16
felt [1] 85/15
female [3] 18/1 18/2 40/14
few [1] 29/19
fidgety [1] 27/6
field [1] 31/1
fifteen [1] 71/23
Fifth [1] 89/8
file [10] 6/16 7/7 7/11 7/13 33/11 34/19 35/16 41/6 49/14 115/11
filed [8] 4/19 5/19 5/24 5/25 6/4 21/4 74/7 87/6
fill [1] 57/8
finally [4] 19/23 82/6 109/17 116/7
find [24] 27/11 30/23 57/18 57/21 62/23 64/15 72/25 92/17 95/10 95/11 95/16 96/3 96/8 100/11 100/17 106/5 107/12 112/17 112/18 113/3 114/11 114/12 115/9 117/9
finding [8] 83/11 92/18 92/21 99/19 104/16 106/1 108/6 117/8
findings [1] 118/5
finds [2] 92/10 106/2
fine [11] 4/13 4/14 4/15 4/15 8/4 8/5 8/9 35/23 98/8 111/3 111/6
finish [1] 104/6
firearm [1] 5/13
first [29] 4/13 5/8 6/21 7/23 7/25 8/4 8/4 24/25 30/11 33/1 40/19 40/20 56/15 66/6 66/22 73/15 74/3 74/11 74/19 75/4 78/21 94/1 94/2 94/7 104/22 105/20 108/21 108/24 109/8
fit [1] 29/25
five [14] 5/17 13/21 15/11 59/3 59/4 59/8 69/9 75/16 75/19 75/20 78/17 82/12 90/11 91/20
five-count [1] 5/17
flat [1] 105/9
floor [3] 1/14 30/11 30/24
FLORA [27] 1/7 3/8 4/1 4/20 6/3 11/1 17/9 29/11 35/22 36/1 36/17 40/15 41/12 44/23 44/25 45/2 47/3 48/22 48/25 77/21 78/12 80/3 81/25 82/1 82/19 83/1 88/1
Florida [2] 81/15 81/18
flow [1] 76/15
fly [2] 81/15 81/16
focus [2] 38/6 76/9
focused [3] 48/15 76/8 112/13
focusing [1] 103/2 105/10
fold [2] 27/13 37/10
fold-down [1] 27/13
folded [2] 39/6 39/6
follow [8] 7/10 15/25 40/20 40/22 40/24 105/24 108/15 109/16
followed [10] 18/3 18/14 18/16 18/17 23/9 26/6 45/15 66/9 66/11 66/13
following [3] 18/4 18/5 46/12
foot [3] 18/23 47/20 51/3
Footnote [1] 100/17
force [24] 9/15 9/20 9/21 9/24 10/1 10/6 10/13 22/14 24/11 29/9 31/10 31/11 31/17 31/18 70/1 70/12 70/15 70/19 70/20 94/25 104/7 106/24 107/17 108/7
foregoing [1] 118/18
forget [1] 72/10
form [19] 57/8 58/14 59/9 69/10 89/12 89/13 89/17 89/18 90/5 91/12 91/13 91/14 91/15 92/12 92/15 92/15 92/15 104/20 104/25
former [1] 106/21

forms [1] 54/16
forth [3] 103/2 110/7 118/3
forum [3] 98/19 102/7 111/18
found [21] 27/12 27/19 30/24 31/1 57/20 57/21 57/21 60/19 60/21 62/1 63/2 64/20 65/13 65/16 68/14 68/14 83/19 99/18 101/22 109/6 114/14
four [14] 42/1 42/3 47/24 48/3 48/7 74/25 79/6 91/20 102/12 102/15 103/1 105/6 116/18 116/23
Fourth [34] 1/14 76/12 76/13 76/17 76/24 77/3 80/10 84/19 84/21 84/21 87/16 87/17 87/20 99/2 99/11 99/12 99/13 99/18 103/17 103/22 106/4 106/7 106/13 106/17 106/19 106/22 107/2 107/6 107/8 112/16 113/12 116/24 117/2 117/5
Franks [5] 35/10 35/11 35/18 42/3 42/11 42/13 48/4 48/13 48/14
free [1] 72/18
Friday [1] 4/12
front [6] 30/24 66/13 66/14 67/11 67/11 105/9
fruit [1] 81/4
fruition [1] 83/3
fruits [1] 35/6
fully [1] 70/22
fundamental [1] 76/19
further [16] 31/1 32/23 42/8 42/9 42/14 49/18 70/4 71/4 71/6 72/9 99/14 99/19 109/12 112/7 118/7 118/10
Furthermore [1] 87/20

## G

G-E-H-O [1] 22/7
G-L-A-D-S-T-O-N-E [1] 8/20
gained [1] 86/15
Gates [14] 80/20 81/6 81/11 81/12 81/15 82/9 83/5 83/17 83/17 83/21 84/11 84/20 87/7 117/9
gather [1] 35/19
gauge [3] 26/14 71/25 86/6
Gauvey [1] 114/22
gave [13] 26/11 45/5 48/18 50/17 64/20 65/3 70/3 75/15 82/20 84/6 89/10 89/16 90/10
Geho [7] 21/25 22/2 22/9 54/13 59/6 62/13 67/15
Geho's [1] 22/5
generalization [3] 84/10 84/10 84/10
Gesner [1] 114/22
gestured [1] 13/2
get [29] 23/20 30/17 31/14 31/22 32/2 33/7 34/23 36/24 46/25 57/2 59/9 74/3 74/11 78/21 81/16 85/4 87/4 88/8 88/10 105/3 105/8 108/16 108/21 111/7 111/10 114/1 116/13 118/1 118/2
gets [3] 41/14 48/6 57/13
getting [3] 27/8 78/12 83/10
give [13] 7/7 10/24 43/19 48/14 57/7 57/14 75/13 75/25 78/6 85/10 89/15 89/22 92/19
given [23] 12/23 34/16 40/16 63/18 80/2 85/12 88/15 88/19 90/13 90/13 90/14 90/21 90/23 90/23 91/4 91/9 91/10 91/19 91/20 92/24 93/1 93/4 96/23
giving [7] 11/10 39/1 40/9 48/9 50/14 85/19 91/17
glad [8] 7/20 8/9 74/19 88/23 93/25 94/5 102/22 103/24
GLADSTONE [42] 2/5 3/12 3/15 3/17 4/11 8/13 8/20 8/24 15/15 21/3 50/9 60/6 60/9 60/12 60/16 63/20 69/1 69/21 72/1 72/4 72/9 72/17 72/21 75/9 84/5 84/13

## G

GLADSTONE... [16] 86/22 88/3 92/11 92/18 95/6 95/9 95/12 95/20 95/21 96/5 96/11 96/16 98/5 104/8 107/15 109/4
Gladstone's [3] 94/22 94/24 95/14
Glenmount [1] 16/9
gloss [1] 111/24
go [52] 7/25 18/25 33/1 37/4 38/16 41/9 42/2 42/8 42/8 42/14 42/20 42/22 45/8 47/10 48/3 51/24 55/11 55/15 56/4 58/12 59/20 60/15 62/20 64/5 64/11 66/3 67/8 75/17 77/21 78/17 78/20 85/7 89/5 95/13 96/6 96/8 98/1 98/7 100/21 100/22 101/9 105/4 106/1 108/12 108/16 108/21 111/10 113/2 114/4 114/10 115/9 116/15 110/20
goes [6] 18/11 46/3 75/21 81/10 108/25 110/20
going [53] 7/6 7/7 22/11 27/9 30/17 32/20 34/22 34/23 34/25 35/14 38/6 38/20 41/13 42/7 42/8 44/8 45/3 47/12 48/2 48/2 48/4 48/10 48/10 48/13 53/13 53/20 85/13 85/16 86/16 90/24 98/19 101/25 102/17 103/4 103/5 105/25 108/8 115/2 115/2 115/22 116/11 116/13 116/13 116/14 116/15 117/25
good [23] 3/4 3/5 3/10 3/11 3/18 3/20 3/23 4/2 4/4 8/15 8/24 8/25 33/5 33/6 50/9 50/10 72/17 73/3 81/9 105/8 105/25 111/3 117/12
got [17] 16/10 16/11 19/16 27/24 27/25 33/11 35/6 40/6 46/2 47/19 51/10 51/18 56/13 57/4 62/4 100/9 111/19
gotten [2] 25/9 34/21
Government [22] 1/13 2/4 3/6 7/2 7/21 8/13 41/15 41/20 48/6 71/6 72/6 72/11 73/19 73/22 75/7 75/17 79/9 89/6 90/9 94/2 105/12 118/8
Government's [4] 20/15 20/17 21/12 72/7
grams [4] 30/13 62/24 64/16 64/23
granted [3] 115/17 115/19 115/19
grass [1] 86/20
Gray [3] 76/12 76/17 80/10
great [7] 47/25 48/9 48/14 78/8 81/21 104/12 117/2
green [1] 21/1
Grimm [1] 114/22
group [8] 9/15 10/16 45/16 52/5 52/11 52/18 52/19 94/25
guess [1] 68/17
guide [1] 106/20
guidelines [1] 104/14
Guilford [1] 17/19
gun [12] 29/23 30/6 30/9 30/13 30/16 63/2 63/6 63/7 63/20 90/7 96/7 96/8
guns [2] 29/22 62/1

## H

H-I-D-T-A [1] 9/17
H-O-R-T-O-N [1] 70/17
had [73] 11/12 11/12 13/14 14/22 18/22 19/10 21/15 22/11 22/25 24/14 25/9 25/19 26/6 28/1 28/2 28/6 28/14 29/7 29/10 29/11 29/17 29/22 29/23 30/13 32/1 32/1 32/9 34/11 34/16 34/17 39/11 41/16 41/18 43/17 49/15 53/8 53/9 53/16 53/16 53/18 54/4 55/15 55/20 56/9 56/11 56/13 57/15 60/17 60/19 62/1 62/7 63/5 63/7 63/8 63/14 63/17 63/18 64/22 68/17 69/9 69/24 79/5 83/14 84/6 85/18 86/12 86/13 86/25 87/17 107/16 111/21

hadn't [1] 63/2
half [2] 28/10 37/10
Hamilton [1] 106/21
hand [25] 8/16 13/23 13/23 14/17 14/17 14/22 14/22 15/13 15/13 15/25 15/25 17/21 17/21 40/9 40/9 45/5 56/9 56/11 85/2 85/2 85/10 85/10 85/20 88/4 88/4
hand-to-hand [10] 13/23 14/17 14/22 15/13 15/25 17/21 40/9 85/2 85/10 88/4
handed [1] 17/10
handgun [10] 30/10 31/2 62/23 63/14 64/15 64/20 64/22 64/23 67/24 95/11
hands [1] 37/16
handwriting [2] 49/2 95/10
happen [1] 28/20
happened [6] 15/21 25/12 27/23 30/3 40/8 115/23
happens [2] 6/12 96/22
happily [1] 104/22
happy [1] 16/22
hard [3] 77/5 83/21 113/12
has [48] 5/24 20/15 21/3 34/25 41/14 41/20 47/13 47/13 67/3 67/4 72/1 72/23 73/9 73/19 76/13 76/17 78/10 78/24 80/21 83/8 85/8 87/17 87/17 88/2 88/5 88/7 89/7 90/9 93/21 94/12 95/6 95/25 104/11 105/15 105/17 108/7 108/15 108/20 110/23 111/2 112/13 113/13 113/18 116/17 116/25 117/2 117/17 117/19
hat [1] 30/25
have [174]
haven't [1] 35/18
having [10] 5/11 29/15 78/18 88/24 93/1 93/4 108/9 111/6 111/17 118/15
he [227]
he'd [1] 81/17
he's [24] 5/12 13/4 15/9 15/10 15/11 51/18 52/18 52/19 52/22 78/4 81/1 81/2 81/20 90/13 90/13 90/14 95/7 95/24 96/13 97/3 98/8 104/7 111/1 113/19
headed [1] 56/19
Headnote [3] 100/19 100/20 100/20
hear [12] 7/20 8/10 74/19 75/4 80/16 84/1 88/23 93/25 94/1 94/5 102/22 103/24
heard [3] 74/19 75/8 84/9
hearing [16] 1/10 4/6 4/10 4/18 7/12 35/18 42/11 42/13 48/4 48/13 48/14 75/17 78/15 91/13 106/23 107/19
heart [2] 102/8 114/15
held [5] 68/7 76/17 113/13
help [2] 82/1 104/1
helpful [2] 76/19 106/6
helps [1] 104/17
her [19] 11/19 18/4 18/5 19/4 19/21 35/5 35/7 36/4 40/20 40/22 40/24 41/2 41/4 41/17 45/15 46/4 47/4 47/4 47/9 49/19
here [60] 3/9 4/12 6/12 13/2 21/11 33/11 34/10 36/23 37/20 40/1 48/2 54/3 62/21 71/22 72/4 72/5 72/9 74/1 75/16 76/9 78/6 78/9 82/17 83/11 83/19 84/7 84/23 86/22 87/15 87/24 89/9 91/21 98/10 99/2 99/9 99/10 100/18 101/11 101/14 102/17 103/19 104/2 106/15 106/20 107/12 107/20 108/14 109/21 110/23 111/6 112/3 112/5 113/5 113/10 114/24 115/9 116/21 117/18 118/13 118/15
here's [3] 108/22 108/23 108/23
heroin [16] 4/23 5/5 5/6 5/9 5/17 10/23 10/25 11/12 12/25 30/13 30/13 31/1 31/2 62/24 64/16 80/2
herself [2] 6/21 36/8
hey [1] 58/12

hiding [1] 82/18
HIDTA [18] 9/15 9/16 9/18 9/21 10/6 10/13 31/10 31/18 41/11 52/9 54/6 54/24 94/25 95/6 104/7 107/17 108/7 115/21
high [5] 9/19 13/25 15/12 17/14 98/8
higher [8] 86/21 113/4 113/6 113/8 113/11 113/20 114/19 116/21
highway [2] 46/7 47/2
him [87] 4/14 11/19 15/23 15/24 20/1 20/2 23/21 23/21 23/22 23/22 24/9 24/21 24/24 25/3 25/13 25/16 25/19 25/20 26/6 26/7 26/13 26/13 27/6 27/7 27/7 27/9 27/19 28/1 28/3 28/18 28/22 29/5 29/6 29/7 29/8 29/9 29/11 29/17 29/17 29/21 30/14 34/17 42/7 44/4 44/5 44/8 51/13 55/20 55/20 56/15 56/17 56/21 56/24 57/2 57/6 57/7 57/7 58/4 58/6 61/8 61/14 61/17 63/17 65/21 65/22 66/13 69/8 69/9 81/19 82/6 86/15 89/10 89/11 89/12 89/15 89/16 89/17 89/18 90/5 90/5 90/7 90/7 90/10 90/10 95/23 104/10 109/6
his [69] 4/10 4/11 6/12 16/10 19/15 19/22 21/3 23/22 24/19 25/14 26/14 26/18 26/19 27/5 28/7 28/7 29/25 36/1 36/4 36/8 43/19 51/10 55/16 56/9 56/11 56/13 57/6 57/7 57/10 58/10 58/10 58/21 72/1 72/2 72/3 74/24 76/16 77/19 78/2 78/4 90/13 90/13 91/24 92/16 92/16 92/19 93/2 93/5 93/7 93/17 94/22 94/24 95/9 95/20 95/23 96/1 96/13 96/18 99/12 99/13 107/17 107/19 107/21 108/21 109/9 113/25 116/20
history [2] 11/10 80/22
Hodge [2] 84/21 87/19
hold [5] 5/3 64/5 98/8 99/1 111/22
holding [2] 61/15 76/2
holidays [1] 117/25
home [2] 79/6 92/25
Honda [1] 16/11
honest [1] 82/5
Honor [163]
HONORABLE [1] 1/10
hope [1] 48/15
Horton [2] 70/16 70/17
hours [8] 43/10 55/13 68/17 69/10 78/18 90/11 91/20 116/14
house [7] 25/14 65/25 66/2 66/6 66/8 91/10 91/20
how [37] 7/22 9/3 9/5 9/12 9/21 10/19 11/9 11/18 11/21 13/9 14/5 19/13 24/18 24/18 26/5 27/3 31/18 31/21 34/6 37/10 37/10 37/15 47/11 48/18 48/19 59/2 63/17 73/7 80/4 80/23 82/3 85/21 86/24 97/16 112/24 113/17 114/12
however [13] 56/17 66/25 85/7 89/20 90/2 90/18 90/19 98/12 99/13 100/1 100/4 108/3 117/14
huge [1] 79/4
hum [3] 26/16 33/24 52/20
humorous [1] 100/12
hundred [4] 30/13 62/24 64/15 64/23
Hundreds [1] 31/20
hydrochloride [1] 31/2

## I

I'd [4] 28/9 37/23 38/15 104/5
I'll [18] 8/9 42/13 47/9 47/17 74/19 80/16 88/23 93/25 94/4 103/24 104/22 113/24 114/3 117/24 118/1 118/1 118/2 118/4
I'm [80] 6/23 7/7 8/6 9/10 9/25 22/8 25/22 26/22 33/19 36/5 36/12 36/17 36/24 38/5 38/20 39/21 39/21 42/7 42/24 43/3 43/22 45/4 47/12 48/9 48/14 48/17 49/2 50/20

# I

I'm... [52]  51/17 52/14 52/15 55/13 55/13
59/12 60/10 62/21 62/25 63/4 63/13
66/25 67/24 68/18 68/20 69/20 69/24
70/23 70/24 71/24 75/25 77/12 78/6
79/19 79/21 81/23 82/12 88/21 91/2 99/9
99/24 100/20 101/13 101/24 102/4
104/15 105/22 105/23 105/25 107/9
107/13 108/13 112/12 113/6 113/12
115/2 115/2 115/5 116/11 116/12 116/13
116/15
I've [13]  4/13 9/14 9/22 47/13 47/25 68/23
68/25 108/6 115/19 116/8 116/9 117/18
116/6
i.e [2]  90/7 105/13
identified [7]  11/16 12/24 13/9 13/13 14/6
15/22 40/15
identify [2]  15/17 84/7
identifying [1]  13/5
identity [22]  6/6 7/18 7/18 35/16 37/25
41/15 74/6 74/12 75/2 75/7 76/14 76/18
76/18 76/22 76/25 77/7 78/22 78/23 80/7
80/11 93/22 116/9
if [120]
Illinois [9]  80/20 81/7 81/12 83/16 83/17
83/21 84/20 87/7 117/9
immediate [1]  73/1
immediately [5]  23/22 29/19 86/3 96/24
107/24
impaired [1]  93/3
impediment [1]  111/17
implication [1]  104/11
importance [1]  77/8
important [6]  95/8 95/18 96/9 103/13
116/12 116/15
imprisonment [1]  5/12
improper [1]  35/9
in [403]
inches [4]  38/20 38/20 76/2 76/3
incident [5]  8/3 35/6 93/6 93/13 93/15
including [1]  29/16
incorporated [2]  21/8 21/10
incorrect [1]  111/15
inculpates [1]  90/7
inculpatory [1]  96/2
indeed [3]  87/12 91/12 105/2
indicate [2]  24/16 30/7
indicated [17]  10/6 13/15 14/16 15/16
18/15 18/16 20/1 22/8 22/24 28/17 29/5
29/25 30/5 30/5 30/6 31/10 32/11
indicates [2]  48/12 105/2
indication [2]  42/12 93/1
indicia [1]  88/5
indictment [4]  4/22 5/1 5/4 5/18
individual [20]  10/17 10/22 11/21 11/21
13/9 15/22 19/7 19/10 25/15 86/12 86/13
86/13 86/14 86/15 88/1 88/1 89/22 89/23
92/14 95/5
individual's [1]  76/16
individually [1]  30/20
individuals [15]  11/1 11/13 12/6 12/11
13/22 15/24 17/21 50/14 50/17 50/25
62/5 85/19 85/19 85/20 104/24
indulgence [2]  31/6 71/19
inferred [1]  87/22
informant [37]  6/7 15/3 33/25 38/1 38/7
41/21 45/8 45/11 48/1 50/21 52/3 52/4
54/21 75/10 75/11 76/20 76/25 77/7 77/9
78/22 79/24 80/8 80/11 80/14 80/18 81/1
83/20 83/20 84/19 84/22 84/25 85/3 88/7
88/9 92/20 92/23 93/22
informant's [7]  76/14 76/18 76/18 76/22

87/18 87/21 87/23
informants [21]  7/19 10/21 11/3 11/8
12/23 15/10 34/16 47/14 51/20 51/21
51/21 53/19 74/5 74/6 74/12 75/3 84/2
87/5 88/24 89/1 116/9
information [66]  10/21 11/10 11/15 11/22
11/23 12/1 12/12 12/18 15/3 15/11 26/11
34/21 35/21 41/16 45/3 45/4 48/18 48/19
48/22 49/3 50/21 51/18 52/5 52/6 53/9
53/10 53/16 53/18 53/19 54/20 55/23
55/25 64/21 64/24 64/25 67/17 67/18
76/16 78/4 78/14 78/15 81/1 81/8 81/9
82/15 82/21 82/21 82/22 83/1 83/20 84/6
84/15 84/19 84/22 84/23 84/25 85/10
86/15 87/9 87/11 87/19 87/22 87/24
92/20 92/22 113/3
initial [2]  33/13 46/9
inquire [1]  42/14
inquiry [4]  48/16 80/25 108/3 108/3
inside [9]  16/6 19/5 19/16 19/18 19/23
38/22 58/6 58/12 65/20
instead [1]  111/19
integral [1]  75/11
integrity [1]  113/25
intend [1]  35/2
intensity [1]  9/19
intent [4]  4/23 5/6 5/9 94/13
intentional [8]  98/22 101/5 101/6 101/17
103/3 113/16 113/18 117/22
interaction [4]  39/11 39/17 40/6 40/8
interactions [1]  78/19
interest [1]  76/15
interpret [3]  63/25 110/25 111/1
interpretation [2]  77/5 110/9
interpreting [1]  84/20
interprets [1]  111/5
interreaction [1]  75/23
interrogated [1]  91/6
interrogation [2]  28/18 91/18
interrupted [2]  22/8 44/19
intersection [1]  45/21
into [26]  16/10 17/14 19/17 23/9 28/1
39/1 42/20 42/22 46/5 48/7 48/14 65/23
77/22 78/17 78/20 80/20 82/4 82/14 84/9
85/22 85/22 96/8 97/3 107/25 111/19
113/9
introduced [1]  95/9
invalid [1]  91/25
investigation [52]  15/18 17/4 19/10 20/4
29/9 32/9 53/14 53/21 53/25 54/3 54/8
54/12 54/14 59/13 60/13 60/17 60/22
60/24 61/1 61/4 67/3 70/15 70/22 70/25
75/21 86/4 86/5 86/9 92/14 95/12 95/24
96/15 97/9 97/10 97/22 104/4 104/6
104/9 104/15 104/17 104/19 105/21
105/23 106/2 107/13 107/18 107/23
108/2 108/6 109/12 109/13 114/9
investigations [5]  14/10 14/21 53/22
53/24 111/13
investigative [1]  13/18
investigatively [1]  12/19
investigator [2]  16/16 18/7
involved [5]  54/14 104/8 104/11 104/13
104/20
involvement [4]  86/10 96/6 96/25 96/25
involving [1]  79/23
ironically [1]  107/7
is [314]
isn't [11]  33/16 33/22 33/25 36/10 38/11
39/8 39/12 85/4 85/25 104/3 116/14
issuance [1]  117/10
issue [39]  7/6 7/15 7/16 7/12 7/10 72/12
72/16 73/10 74/1 74/3 74/4 76/14 78/22

78/24 79/1 79/9 87/5 88/10 88/17 92/9
93/23 94/2 94/12 103/15 103/18 105/1
105/5 105/15 105/18 106/10 106/11
108/5 108/9 108/23 110/18 116/11
116/17 117/9 117/14 118/4
issued [4]  110/8 110/16 111/13 116/25
issues [9]  41/19 71/14 73/15 73/15 74/3
79/7 87/4 90/25 102/3
it [315]
it's [98]  3/9 4/14 5/17 7/23 9/17 9/19 9/19
13/25 14/6 15/6 15/14 16/13 18/10 19/9
27/12 32/22 34/6 36/13 39/23 41/7 42/8
48/2 48/10 48/11 48/11 54/6 54/6 54/9
54/24 55/2 55/4 62/18 62/21 67/11 67/11
72/1 72/2 72/3 73/14 74/23 75/18 76/11
77/23 77/23 78/7 78/16 79/9 80/4 80/16
80/24 81/4 82/17 83/4 85/17 86/4 95/8
95/18 95/22 95/23 95/23 96/18 97/7
97/12 97/13 98/4 98/21 99/5 99/7 100/17
101/20 101/21 102/5 103/14 104/7
105/21 105/22 107/11 108/19 109/3
109/10 109/15 110/1 111/3 111/15
111/20 111/25 112/5 112/13 112/14
114/12 115/9 115/17 116/18 116/23
116/24 117/3 117/6 118/15
items [6]  50/14 50/25 68/11 68/14 88/4
92/25
its [6]  8/13 80/24 87/11 108/14 108/19
111/12
itself [8]  98/13 102/8 103/17 103/21 109/2
114/11 114/16 116/22
IVAN [2]  1/16 3/20

# J

JACKSON [29]  1/13 2/6 3/2 3/7 3/11 4/14
4/23 8/10 8/23 15/14 21/7 32/25 33/14
41/23 70/7 70/10 71/7 72/5 72/23 73/22
76/4 103/24 104/3 108/4 110/12 112/7
112/20 115/21 118/8
Jackson's [1]  114/6
jail [2]  65/14 69/14
January [1]  7/11
Jendrek [4]  27/24 28/1 59/6 62/14
Joe's [1]  116/1
joint [2]  54/7 94/25
JONES [69]  1/7 3/9 3/23 4/1 4/2 4/20 5/4
5/14 6/3 6/6 6/21 17/9 17/11 17/24 17/25
18/16 19/1 19/7 19/19 19/20 29/11 31/5
35/2 35/3 35/3 35/7 35/22 36/1 36/17
36/24 37/22 38/10 38/13 39/1 39/11
40/15 40/16 40/17 40/19 41/1 41/12
42/20 43/12 44/1 44/23 45/14 45/18
46/12 47/3 47/19 47/22 48/22 49/1 58/13
75/12 75/15 75/21 76/5 77/21 78/12
78/18 79/19 81/25 82/1 82/7 82/18 82/19
83/1 84/8
Jones earlier [1]  29/11
Jones' [6]  6/22 39/7 51/16 75/19 93/20
116/8
Joseph's [1]  116/3
judge [88]  1/11 20/19 20/23 33/2 33/19
34/10 34/15 34/17 36/5 36/23 36/23
36/24 37/3 38/2 40/11 41/6 45/18 48/21
49/18 55/11 55/15 55/19 55/22 56/1 75/8
75/9 75/14 75/22 75/24 76/6 77/20 77/21
78/3 79/15 79/16 81/23 82/3 83/7 83/7
83/8 83/12 94/10 94/11 95/15 98/7 98/8
98/8 98/9 98/19 101/8 101/9 101/10
101/22 101/24 102/1 102/6 102/13
102/17 103/2 103/4 103/5 103/20 104/2
105/9 105/12 105/13 105/14 105/18
106/9 106/21 106/21 106/21 107/1 107/8
107/9 107/9 107/10 108/9 111/19 113/1

## J

judge... [8]  113/9 113/24 114/14 115/5 115/8 115/9 115/22 117/10
judge's [1]  117/8
judges [3]  95/15 95/16 106/10
judgment [1]  106/20
judicial [2]  104/25 117/1
jurisdiction [1]  101/8
just [78]  4/7 4/16 6/13 10/3 11/14 18/24 27/5 27/16 28/18 31/6 32/9 35/20 35/24 36/13 37/1 37/3 38/23 39/19 39/21 40/9 42/14 44/25 46/6 47/9 48/2 48/2 48/10 48/17 53/23 54/12 59/18 65/20 67/2 70/8 71/13 71/20 71/24 72/23 73/7 75/2 76/6 76/8 77/20 77/24 78/3 78/16 79/21 80/5 80/9 80/22 82/8 83/4 83/11 83/13 84/24 85/2 86/16 88/19 90/2 90/9 92/22 98/3 102/16 103/5 104/1 105/4 105/20 108/17 111/10 112/20 113/7 113/9 113/10 115/11 115/20 116/15 116/16 118/4
Juvenile [1]  14/13

## K

keep [4]  16/22 48/10 50/19 52/16
KEITH [5]  2/5 3/12 8/13 8/20 69/21
key [11]  16/6 17/23 19/4 19/17 29/20 29/25 30/3 66/17 93/11 93/12 93/12
keys [1]  29/18
kind [4]  11/7 11/22 34/20 41/25
knew [12]  12/24 13/10 13/13 28/3 29/18 50/16 50/18 60/21 95/12 101/7 114/8
knocked [1]  66/3
knocking [2]  19/2 19/3
know [69]  11/25 13/25 14/5 18/13 21/20 25/24 25/25 26/4 26/5 27/10 28/5 28/5 28/14 29/18 31/21 36/9 37/19 39/2 39/2 39/7 42/24 45/16 47/14 49/11 49/12 49/17 50/22 51/4 51/10 51/15 51/17 52/16 59/17 71/24 72/12 73/20 74/23 75/20 75/23 77/8 78/3 79/18 81/15 81/23 81/24 82/4 82/7 82/15 83/10 85/11 85/12 91/25 96/17 99/21 104/10 108/13 108/14 108/20 110/17 111/3 111/4 111/25 113/25 114/1 114/22 114/23 115/6 115/13 115/20
knowing [2]  96/19 111/16
knowingly [1]  5/13
knowledge [1]  114/10
known [4]  10/22 11/2 91/23 114/6
knows [4]  86/20 111/11 113/24 115/22

## L

lack [5]  94/3 98/6 102/12 105/7 109/1
Lalor [2]  114/23 114/25
Lance [3]  81/11 81/15 81/20
lane [6]  23/10 44/4 44/8 46/7 73/11 82/17
language [3]  83/18 101/14 105/17
large [1]  29/22
larger [2]  84/12 84/13
last [5]  8/19 22/5 39/23 45/7 79/6
late [1]  106/9
later [5]  12/24 40/14 84/15 84/23 96/16
Latin [1]  116/4
latitude [4]  38/6 47/25 48/9 48/15
laughing [2]  113/10 113/23
law [29]  1/19 9/20 54/5 62/23 64/15 76/24 77/3 86/3 86/10 94/9 95/18 95/19 105/2 105/11 108/20 110/5 110/10 110/14 111/4 111/4 111/7 111/8 111/22 111/23 111/24 112/4 112/12 113/8 116/24
lawful [1]  93/15
laws [2]  110/9 110/16
lawyer [4]  24/5 24/6 24/7 78/9

lawyers' [1]  7/2
layman [2]  110/25 110/25
leading [1]  19/25
least [5]  11/17 13/21 21/20 34/14 37/24
leather [1]  37/17
leave [4]  4/13 7/7 7/13 19/1 19/24 23/7 43/12 56/6 61/14 72/18 99/16
leaves [1]  76/5
leaving [2]  85/14 88/5
led [3]  13/15 23/6 27/3
left [17]  13/14 13/24 15/15 16/7 16/12 17/11 17/13 17/22 17/25 39/16 40/17 40/19 45/14 56/9 60/15 76/6 84/13
legal [3]  71/13 73/8 118/4
legally [1]  106/1
Legg [3]  107/8 107/9 107/9
length [5]  90/14 91/5 91/18 91/21 91/25
lengthy [1]  11/25
Leon [3]  105/8 117/13 117/13
less [2]  85/15 109/2
let [33]  4/16 11/14 11/14 28/14 33/7 33/21 33/24 34/14 37/2 37/14 39/13 42/7 47/3 47/7 47/8 47/9 54/23 71/24 73/7 75/4 76/8 77/7 77/15 84/1 86/1 86/1 91/2 100/17 102/10 104/1 104/10 105/4 114/21
let's [15]  36/13 41/9 50/11 56/4 61/21 62/20 66/18 71/23 73/15 74/3 74/11 97/20 97/21 98/4 98/4
letter [2]  7/10 81/9
level [10]  79/17 85/7 85/18 86/20 86/21 95/17 96/23 97/18 102/3 117/15
Lexington [1]  115/8
license [1]  84/6
lie [1]  112/3
lied [2]  77/19 91/17
light [7]  6/25 18/5 18/11 18/13 104/11 117/25 118/3
lights [1]  19/5
like [14]  7/9 7/11 19/16 38/23 44/16 46/24 49/21 72/4 84/4 85/3 90/17 92/15 96/17 115/7
likely [1]  55/15 113/2
limitations [1]  110/6
limited [1]  35/24
Lindale [1]  28/7
line [3]  35/9 85/1 108/8
lines [2]  108/25 111/17
linger [1]  116/15
Lisa [2]  1/21 118/18
listed [2]  21/16 104/6
listing [2]  25/4 25/6
literally [1]  108/7
little [10]  31/9 38/6 42/7 42/14 78/7 82/3 85/7 90/9 98/19 104/2
live [1]  8/1
lived [4]  28/6 28/6 51/16 82/11
lives [5]  39/7 46/25 51/17 75/19 78/18
lo [1]  75/16
load [1]  81/17
local [16]  9/20 10/7 52/16 53/23 54/4 54/5 54/6 54/7 54/8 54/9 86/13 96/13 96/19 104/20 108/16 110/1/1
locality [1]  111/14
locally [1]  109/10
located [2]  22/18 105/16
location [30]  16/1 16/7 16/13 26/7 29/23 30/6 30/7 30/16 32/20 46/22 54/23 55/2 55/14 55/16 56/7 62/8 62/21 65/17 65/21 66/11 66/12 66/22 75/18 75/18 80/3 85/4 85/23 90/11 92/25 96/6
locations [2]  51/8 91/23
lock [3]  29/25 30/3 30/4

## M

Lombard [1]  1/22
long [5]  9/5 9/12 9/21 45/5 76/3
longer [2]  72/13 91/6
longstanding [1]  80/21
look [28]  18/12 56/4 58/13 59/19 59/20 61/22 62/10 63/9 64/5 65/1 74/12 84/5 84/12 84/13 85/8 85/17 90/2 90/20 90/22 94/23 95/8 95/18 96/9 96/21 96/22 97/3 102/1 110/6
looked [1]  53/10
looking [12]  64/6 83/14 83/18 84/3 84/4 84/11 86/21 96/5 99/10 101/13 102/3 106/2
looks [3]  90/20 90/25 92/15
Lord [1]  86/20
lose [1]  31/13
lot [6]  16/13 41/16 47/1 59/12 59/22 60/4
love [1]  104/5
lower [1]  86/12
Ludig [1]  106/21
Lynette [2]  4/20 40/15

## M

M-A-N-N-I-O-N [1]  106/18
M-A-R-L-Y-N [1]  16/4
M-c-M-I-L-L-I-O-N [1]  106/7
Madam [3]  21/10 93/19 115/17
made [29]  6/2 6/6 6/18 15/2 15/21 17/3 17/5 17/13 18/23 23/20 24/14 25/22 30/4 53/16 58/19 62/7 63/1 63/2 63/8 73/18 87/14 89/15 92/8 92/25 93/4 93/16 107/4 108/6 118/6
magistrate [12]  94/10 98/7 103/4 105/12 105/13 105/18 108/18 108/21 108/22 111/20 113/1 114/22
majority [1]  31/23
make [31]  7/9 11/11 16/23 20/8 21/11 28/12 44/4 46/3 47/11 48/3 48/4 54/9 72/23 77/15 78/8 79/16 83/14 86/18 86/23 91/16 92/18 92/21 104/16 105/25 108/5 108/23 109/18 110/7 113/24 115/17 116/4
makes [6]  89/19 90/6 90/7 96/1 107/21 107/25
making [7]  5/15 13/1 13/20 13/22 28/11 30/10 98/9
male [3]  11/2 12/24 84/8
malice [1]  83/10
Malone [18]  21/24 30/13 52/17 52/21 54/11 54/14 59/6 62/13 62/22 64/15 64/21 64/23 65/3 95/19 95/25 96/22 96/21 115/22
Malone's [1]  96/14
mandated [2]  98/24 101/11
manifest [1]  27/3
Mannion [1]  106/18
manufactured [1]  78/10
many [14]  31/18 31/21 33/16 47/11 59/2 80/4 83/8 84/14 91/9 91/19 109/13 109/14 111/12 111/12
March [1]  7/3
marijuana [2]  11/12 31/4
marked [3]  50/3 50/5 68/25
market [1]  14/1
Marlin [1]  17/23
Marlyn [19]  16/2 16/3 20/6 25/21 28/3 28/16 29/12 32/20 32/21 62/8 65/19 65/22 65/23 66/2 66/3 66/19 66/22 67/5 67/17
marshals [1]  68/9
Marter [4]  81/7 81/10 81/18 83/5
MARYLAND [26]  1/1 1/5 1/15 1/18 1/20

**M**

MARYLAND... [21] 1/23 14/15 16/1 18/4 20/20 20/24 21/1 31/22 42/21 87/13 87/13 87/16 105/2 105/13 109/17 109/17 109/20 110/1 111/8 111/9 111/22
material [3] 6/22 6/22 38/1
materials [1] 65/4
matter [28] 4/17 8/2 48/1 56/24 68/2 74/7 74/12 75/1 76/14 78/20 78/22 80/7 80/13 84/1 84/22 85/25 88/6 88/10 92/5 94/3 98/1 107/12 107/21 110/18 111/21 115/1 116/10 118/18
matters [3] 7/19 117/25 118/3
may [65] 1/16 4/7 5/23 6/10 6/13 6/13 6/15 6/17 6/23 6/24 8/11 10/15 12/20 13/15 15/8 15/14 17/5 17/16 21/15 22/2 23/19 33/8 33/19 35/21 35/22 35/24 36/2 36/20 37/3 41/10 41/17 41/19 41/25 42/14 43/23 44/11 45/7 50/13 51/8 53/18 53/18 68/21 73/6 74/21 77/10 77/20 80/3 80/18 87/8 87/22 92/14 100/5 102/1 102/2 109/6 109/13 109/24 110/7 110/7 110/11 110/11 110/14 111/9 114/6 115/20
maybe [3] 59/7 111/15 111/15
McMillion [1] 106/6
me [92] 4/16 8/6 10/24 11/10 11/14 15/17 21/14 22/2 25/1 25/19 27/9 28/6 28/22 29/19 29/23 30/15 30/15 30/17 33/7 33/21 33/24 34/14 37/2 37/14 39/13 41/19 42/16 47/3 48/4 48/10 48/12 54/10 54/23 59/19 62/10 63/7 63/8 63/9 63/18 63/19 63/19 64/22 67/8 69/17 71/24 73/7 73/19 74/4 74/23 75/4 76/8 77/7 77/15 78/7 78/11 79/23 82/17 82/18 82/23 84/1 86/1 86/1 89/9 91/2 92/10 92/22 94/2 95/8 95/18 96/4 96/5 96/9 96/19 99/9 100/7 100/12 100/17 102/10 104/1 104/3 104/14 104/16 105/4 106/20 108/2 113/17 113/17 113/23 114/21 116/1 116/17 117/6
mean [28] 22/25 25/20 25/21 28/7 28/13 28/21 45/7 48/1 48/11 48/11 48/11 53/4 69/17 69/25 78/5 79/4 79/19 81/24 84/18 86/4 89/21 91/8 95/6 96/10 97/20 113/11 115/7 115/20
means [3] 64/2 110/13 110/14
mechanical [1] 1/25
meet [4] 17/12 17/20 17/24 40/15
meeting [4] 15/24 16/10 17/9 17/25
meets [1] 82/9
member [3] 10/6 52/22 70/19
members [3] 22/3 22/9 67/16
men [1] 75/17
met [7] 15/23 15/24 16/7 17/10 39/16 39/19 84/8
metropolitan [1] 79/5
Michael [1] 106/10
Michigan [1] 93/14
might [7] 6/19 41/16 43/18 43/22 59/23 69/4 99/1
mile [3] 28/10 28/10 46/12
Miller [1] 87/21
Milton [1] 46/22
mind [3] 108/19 109/11 109/15
Mine [1] 45/16
ministerial [10] 97/11 97/13 99/24 100/4 101/15 101/20 102/16 103/14 112/14 117/16
minivan [5] 11/2 17/10 20/7 43/13 43/13
minor [2] 79/1 79/9
minute [5] 71/23 71/24 73/3 86/9 105/3

minutes [2] 16/11 29/19
Miranda [37] 23/22 57/6 58/10 58/13 58/21 59/9 65/5 69/10 88/12 88/15 88/18 88/19 88/21 89/10 89/12 89/15 89/16 89/22 90/13 90/14 90/21 90/23 90/24 91/1 91/4 91/9 91/10 91/14 91/17 91/19 92/11 92/17 92/19 92/24 93/1 93/5 93/16
Mirandi [1] 65/4
mirror [1] 18/12
misrepresentation [3] 35/12 42/6 48/5
misrepresentations [1] 42/12
missed [1] 46/19
misspoke [1] 114/18
mistake [1] 25/22
mistaken [5] 51/23 62/22 66/25 68/18 69/20 69/24 99/24
mix [1] 82/10
moment [7] 31/7 36/5 71/19 73/7 74/3 75/2 78/21
money [13] 27/16 27/24 29/22 39/1 39/6 57/21 68/7 82/2 82/18 82/19 82/23 85/11 96/25
month [2] 10/2 75/13
Monument [1] 46/8
moot [2] 6/19 41/7
Moravia [1] 25/19
more [14] 12/6 37/13 37/14 38/6 40/17 69/9 77/23 85/9 85/15 90/9 112/14 113/3 116/16 117/3
morning [24] 3/4 3/5 3/10 3/10 3/11 3/18 3/20 3/23 4/2 4/4 8/15 8/24 8/25 21/20 33/5 33/6 43/10 50/9 50/10 69/20 69/22 71/23 71/24 117/19
most [5] 55/15 68/12 89/9 91/11 113/2
mother [6] 28/7 39/7 51/16 75/19 78/18 82/11
motion [29] 5/20 5/24 6/4 6/13 6/16 7/6 7/14 7/18 7/22 35/16 41/6 73/17 74/5 74/7 74/13 74/15 80/5 80/8 87/6 92/6 93/20 93/20 93/24 115/11 115/14 115/17 115/19 116/6 116/8
motions [18] 1/10 3/10 4/5 4/16 4/19 4/21 5/19 6/3 6/8 7/12 20/15 20/18 21/12 73/8 115/18 115/18 116/6 118/7
Motor [2] 25/4 25/6
Motz [1] 106/21
move [3] 47/17 47/18 95/13
moved [1] 19/16
Mr [51] 2/6 2/6 2/7 3/2 3/11 3/22 3/23 4/14 5/4 7/10 8/23 15/24 21/7 25/10 25/13 33/4 38/5 38/7 42/9 50/8 70/10 71/6 71/10 71/16 72/23 73/15 74/8 74/15 74/19 76/4 78/11 80/14 80/17 83/25 84/1 84/2 85/3 87/3 89/5 91/2 91/15 92/4 94/5 100/21 107/22 110/12 114/4 114/17 114/18 114/20 116/5
Mr. [171]
Mr. Bates [25] 6/20 8/6 32/25 49/19 50/2 70/6 72/8 74/8 75/7 84/16 86/1 87/6 88/11 91/3 93/7 94/1 102/10 102/21 104/5 104/23 108/7 112/7 112/10 116/20 118/10
Mr. Bates' [2] 102/23 115/13
Mr. Claridy [91] 5/10 6/18 12/25 13/2 13/9 13/12 13/20 13/23 13/23 14/17 15/16 15/23 16/8 16/10 17/8 17/12 17/24 19/12 19/14 19/19 19/24 23/4 23/7 23/13 24/2 24/9 24/12 24/14 24/16 26/8 27/17 27/20 27/21 27/24 28/8 28/15 28/17 29/16 30/6 30/12 31/4 37/21 38/11 38/25 39/5 39/12 39/16 44/3 44/7 50/14 50/17 51/10 53/11 53/17 59/2 59/5 59/9 59/12 59/16 60/22 61/2 61/9 61/10 61/25 62/22 63/5 65/14

65/17 66/9 66/10 66/19 68/14 68/17 69/1 75/12 75/15 75/22 75/25 82/1 82/24 84/7 91/22 92/17 92/19 95/10 95/24 96/1 96/7 97/1 97/9 104/9
Mr. Claridy's [4] 53/17 92/6 92/8 93/20
Mr. Jackson [16] 4/23 8/10 15/14 32/25 33/14 41/23 70/7 72/5 73/22 103/24 104/3 108/4 112/7 112/20 115/21 115/8 118/8
Mr. Jackson's [1] 114/6
Mr. Needleman [27] 3/23 6/9 8/7 15/7 33/1 35/14 36/7 36/7 47/15 47/24 51/24 71/11 71/16 72/8 73/16 74/13 76/9 78/5 79/2 87/6 87/7 94/1 102/22 104/23 112/7 113/25 118/12
Mr. Norris [4] 16/1 17/13 17/20 66/10
Mr. Timothy [1] 3/21
Ms [26] 3/23 4/2 5/4 6/22 17/25 18/16 19/19 19/20 35/2 35/3 35/3 35/7 37/21 38/13 39/1 39/10 40/19 43/12 44/1 47/19 75/15 76/5 78/17 82/7 82/18 84/7
Ms. [21] 5/14 6/21 17/11 17/24 19/7 31/5 36/24 38/10 39/7 41/1 42/20 45/14 45/18 46/12 47/22 51/16 75/12 75/19 75/21 93/20
Ms. Jones [17] 5/14 6/21 17/11 17/24 19/1 19/7 31/5 36/24 38/10 41/1 42/20 45/14 45/18 46/12 47/22 75/12 75/21
Ms. Jones' [4] 39/7 51/16 75/19 93/20
much [9] 42/9 72/20 92/4 102/21 103/18 112/6 116/2 116/18 116/24
murdered [1] 79/6
must [9] 24/3 76/18 98/2 105/1 107/3 108/24 109/16 109/16 112/10
my [46] 3/25 7/9 11/9 13/12 14/7 17/15 19/18 26/13 27/15 28/8 33/13 35/17 39/13 44/16 46/21 48/25 50/18 50/21 52/7 52/16 56/6 56/20 61/22 62/8 62/17 70/3 70/3 71/20 74/24 78/13 78/14 79/20 82/11 82/15 83/16 92/21 100/7 100/11 101/6 104/2 106/20 108/19 113/18 115/25 117/11 118/1
myself [7] 34/3 54/12 55/8 59/6 62/6 63/18 108/13

**N**

name [7] 8/19 8/19 10/17 22/5 31/4 77/8 118/23
named [3] 27/25 88/1 88/1
narcotic [5] 11/24 17/22 53/22 53/23 54/3
narcotics [13] 14/10 14/21 14/23 16/16 16/17 18/7 20/11 20/11 29/9 31/19 60/24 63/8 111/13
narrative [1] 18/15
nature [9] 31/9 43/18 44/4 88/19 88/21 97/14 106/2 106/13 112/15
near [3] 16/9 17/19 23/9
necessarily [4] 84/17 86/11 90/19 111/5
necessary [1] 7/12
necessity [2] 4/10 77/6
need [13] 37/24 38/6 55/20 71/20 72/5 72/24 76/22 77/8 78/21 94/23 96/22 105/8 113/21
needed [1] 102/3
Needleman [42] 1/19 1/19 2/6 3/23 6/9 7/10 8/7 15/7 33/1 33/4 35/14 36/7 36/7 38/5 38/8 42/9 47/15 47/24 51/24 71/11 71/16 72/8 73/16 74/13 74/19 76/9 78/5 78/11 79/2 80/15 84/1 87/6 87/7 94/1 102/22 104/23 112/7 113/25 114/18 114/20 116/5 118/12
needs [2] 71/22 72/9
neighborhood [2] 85/22 87/1
nervous [3] 26/20 26/24 27/3

# N

never [23]  28/6 34/3 50/16 53/25 57/10
61/12 63/5 65/20 69/10 82/19 82/19
82/20 82/20 84/6 84/6 84/9 85/13 89/12
89/12 90/21 95/14 111/19 115/8
New [1]  14/15
next [7]  27/23 69/20 69/24 96/21 106/1
116/14 117/24
nexus [3]  41/23 42/1 115/1
nice [6]  3/17 3/19 3/22 3/23 3/25 4/2
Niemeyer [1]  106/10
night [2]  82/6 115/23
Ninth [1]  95/3
nitpick [1]  75/23
no [112]  1/3 9/25 15/19 17/5 19/9 21/22
22/11 24/13 24/15 26/10 26/23 27/15
27/22 28/2 31/16 32/9 32/23 34/18 34/24
35/1 35/5 36/3 37/1 37/7 39/1 39/11
39/15 39/17 40/6 40/21 40/23 41/3 41/5
42/11 42/12 42/12 42/13 44/2 44/6 44/24
45/6 45/13 46/24 46/25 49/2 49/9 49/13
50/15 51/23 52/14 52/22 53/22 54/7 55/1
56/3 56/10 56/18 56/23 57/6 57/9 57/23
57/23 58/11 58/23 61/16 62/1 62/1 63/7
63/8 65/4 65/5 70/4 71/4 71/12 72/7
72/16 77/17 79/3 79/10 79/12 79/22
79/25 80/9 80/22 80/23 82/1 82/8 82/15
82/25 91/6 91/7 92/10 93/1 93/3 93/6
93/16 97/19 98/12 99/18 105/17 106/14
109/5 110/12 111/18 111/23 113/22
115/24 115/24 116/18 117/16 118/9
118/13
non [8]  100/24 101/14 112/18 112/19
113/14 117/14 117/15 117/15
non-compliance [3]  117/14 117/15 117/15
non-constitutional [5]  100/24 101/14
112/18 112/19 113/14
none [9]  59/8 66/15 71/8 71/10 73/20
92/2 94/10 105/14 118/11
nor [2]  35/2 35/19
normal [1]  32/9
Norris [9]  15/22 16/1 17/12 17/13 17/20
25/20 66/10 67/4 91/14
north [8]  1/20 10/23 16/1 17/23 46/1 46/3
46/4 46/7
northeast [1]  16/8
NORTHERN [2]  1/2 16/9
not [174]
not someone [1]  77/24
note [5]  7/9 106/6 107/5 116/23 117/18
notebook [1]  49/15
noted [13]  5/18 6/7 15/6 15/14 48/25 87/7
99/11 106/22 107/11 108/8 113/13 117/2
117/3
notereading [1]  1/25
notes [26]  17/15 19/18 26/13 27/15 39/13
49/7 50/24 55/23 58/24 61/22 62/10
62/11 62/18 63/9 65/10 66/15 66/18
66/21 66/25 78/3 83/16 85/20 92/13
96/18 107/17 107/21
nothing [9]  27/20 41/20 46/23 48/12
49/18 78/19 85/9 89/17 89/19
notifications [2]  28/11 28/12
notified [1]  32/12
noting [1]  92/16
November [1]  6/1
novo [1]  117/6
now [57]  7/2 7/3 7/19 11/3 13/14 14/9
14/16 20/8 33/7 34/19 36/15 39/7 40/19
43/6 56/4 57/24 58/12 58/16 58/19 58/21
59/2 60/19 61/9 62/20 64/24 65/3 65/6
65/13 66/8 66/18 67/17 67/21 68/25

# O

object [31]  6/19 15/5 34/22 36/25 36/25
37/1 37/5 37/19 37/20 37/23 38/21 38/23
39/1 39/2 39/3 39/4 39/25 40/1 40/7
40/10 40/16 41/13 47/12 47/22 56/9
56/11 56/12 75/25 82/2 82/5 82/7
objection [19]  12/13 14/2 14/24 14/25
15/6 15/13 16/18 23/17 26/1 26/2 26/21
27/1 32/5 32/7 35/23 46/16 47/23 61/5
82/6
objections [1]  73/10
objects [1]  67/25
observation [3]  12/21 16/15 16/23
observations [13]  13/20 13/22 15/21
16/25 17/3 17/5 46/21 50/11 53/9 53/16
86/23 86/24 88/1
observe [3]  13/18 18/20 85/1
observed [17]  13/20 13/22 15/13 16/6
17/8 17/9 17/12 17/20 17/24 19/8 19/11
19/14 19/24 20/1 20/2 23/7 40/14
observing [3]  15/12 84/19 88/3
obtain [3]  11/11 13/11 85/5
obtained [5]  6/5 21/15 60/18 106/25
107/3
obtaining [2]  76/21 77/6
obvious [1]  97/8
obviously [4]  6/18 44/7 75/8 87/15
occasion [7]  17/12 19/15 39/19 39/20
39/25 75/24 78/17
occasions [9]  13/22 15/11 15/23 17/10
19/14 39/15 39/18 40/5 40/18
occupying [1]  26/8
occur [1]  20/3
occurred [4]  13/23 13/24 36/4 78/19
occurring [1]  29/8
occurs [1]  92/22
October [1]  36/10
off [11]  4/12 9/23 13/14 15/15 18/2 19/6
46/25 47/7 47/8 72/1 108/4
offense [2]  5/14 76/22
offenses [1]  104/13
office [9]  1/13 1/19 53/8 54/24 68/6 69/5
78/4 114/8 115/8
officer [40]  10/12 20/11 22/21 31/11
31/17 44/22 52/8 52/9 52/21 54/18 58/13
58/13 63/20 77/19 78/2 80/20 85/8 85/8
85/11 85/13 86/22 89/10 94/9 95/2 95/6
95/7 96/14 105/11 107/5 107/15 107/16
108/1 108/15 108/20 110/7 110/14 113/1
113/2 114/6 114/7
officer's [2]  44/21 112/15
officers [29]  10/7 10/8 22/15 54/8 54/10
59/2 59/4 61/15 62/6 62/7 62/15 84/24
86/13 90/22 91/17 96/17 96/20 104/21
104/25 105/24 109/18 110/5 110/11
111/5 111/16 111/16 111/24 112/4
115/23
official [1]  107/11 117/1
officials [1]  106/24
oh [2]  60/10 90/10

okay [58]  8/14 11/3 11/7 11/18 11/21 14/9
14/16 22/14 25/18 28/24 29/14 30/9
30/22 32/11 33/14 33/21 34/5 34/10
34/14 34/19 36/15 37/14 38/18 39/7
39/10 40/6 40/11 41/1 43/2 43/6 43/12
43/17 44/7 44/25 45/12 46/23 47/11
47/22 50/12 59/25 60/3 60/10 60/11
61/23 62/13 64/10 67/7 67/10 72/15 73/3
74/11 74/18 78/16 88/23 89/10 90/1
103/12 109/11
old [1]  48/18
Oliver [1]  46/2
on [213]
once [26]  12/18 16/17 21/15 28/22 51/18
53/16 57/7 57/13 57/18 58/1 62/4 62/20
65/3 65/10 65/13 65/16 66/2 88/8 89/2
91/4 96/6 96/15 96/24 97/3 97/10 116/25
one [57]  5/3 5/12 11/1 11/7 11/17 19/15
23/11 24/7 24/25 35/19 36/17 36/19
37/13 37/14 39/25 40/6 40/6 40/10 45/7
45/17 45/19 45/20 46/13 52/3 59/24
60/15 67/2 67/3 71/20 72/10 75/17 75/22
75/22 75/24 77/11 77/13 78/16 78/19
80/5 81/25 82/2 82/12 82/21 85/19 85/23
85/24 86/5 86/8 86/16 88/18 95/15 99/1
108/11 108/18 115/24 117/21 118/4
only [20]  10/7 13/10 17/3 18/11 19/7
30/16 35/3 35/7 53/22 75/17 75/24 76/20
82/2 95/15 101/3 101/15 107/17 111/9
113/14 117/7
open [3]  14/1 87/24 88/5
opened [3]  19/4 19/23 29/21
operating [5]  12/25 13/20 15/23 96/13
107/16
opine [2]  4/9 6/20
opinion [31]  12/10 12/16 14/20 75/4 76/11
76/13 80/9 80/10 81/13 84/21 87/8 87/10
87/20 93/14 99/9 99/10 103/22 106/3
106/7 106/9 106/17 106/20 106/22 107/7
107/10 116/12 116/14 117/5 117/11
117/24 118/2
opinions [2]  106/5 107/5
opportunity [2]  29/24 78/6
opposite [1]  83/5
or [127]
oral [1]  89/10
orally [3]  89/16 90/14 92/19
order [2]  80/11 112/11
orders [1]  79/16
organizations [1]  86/17
organized [2]  9/10 94/24
Osbourne [1]  67/15
other [32]  4/24 4/25 11/18 16/25 17/11
19/10 22/9 28/1 28/3 28/3 29/6 32/2
61/14 64/6 67/25 71/6 73/15 75/12 78/16
81/5 86/23 87/4 94/18 95/15 95/16 98/1
102/11 115/19 116/10 117/25 118/3
118/7
others [2]  14/17 15/17
otherwise [1]  87/23
ought [1]  73/7
our [8]  32/20 50/11 71/23 95/3 98/25
101/6 101/11 107/9
out [28]  16/12 19/1 19/17 29/24 32/1
47/19 51/10 55/16 57/2 57/4 57/8 57/13
60/15 63/17 78/17 79/6 81/6 82/12 87/13
87/15 98/6 100/13 103/8 104/2 105/9
111/4 111/19 118/2
outline [2]  20/10 24/1
outlined [1]  112/5
outside [1]  65/20
outweighs [1]  79/18
over [11]  9/7 9/22 11/15 11/17 11/17 12/7

## O

over... [5] 39/6 46/7 49/3 98/10 113/10
overborne [1] 93/2
overlooking [1] 104/16
overruled [15] 12/14 14/3 15/1 15/6 15/14
16/19 23/18 26/3 27/2 32/6 32/8 35/24
42/8 46/20 61/7
own [9] 95/9 101/21 101/22 107/21 109/9
109/11 111/12 114/13 114/14
owned [1] 25/15
ownership [1] 6/22

## P

p.m [3] 39/19 40/6 69/18
pad [1] 78/3
page [10] 59/20 60/1 64/9 67/11 99/10
99/10 100/6 100/7 107/19 107/20
pales [2] 81/7 81/7
panel [2] 106/10 106/21
paper [13] 5/21 5/25 6/3 37/6 38/19 40/7
76/2 82/3 92/9 93/19 93/20 93/20 116/7
papers [3] 8/8 35/17 71/14
paperwork [2] 31/3 31/4
paragraph [3] 63/11 63/13 110/7
park [1] 47/4
parked [1] 43/13
parking [4] 16/13 59/12 59/22 60/3
Parkway [1] 16/9
part [12] 10/12 18/17 21/11 22/14 29/8
30/19 46/9 47/9 54/22 68/12 75/11 93/21
parte [2] 79/16 79/24
participate [2] 31/19 70/22
participated [1] 62/11
participation [1] 97/7
particular [7] 9/8 9/12 11/19 31/25 84/8
92/9 95/22
particularly [2] 86/7 93/16
party [1] 85/12
passed [6] 37/21 38/22 38/24 39/4 39/25
40/7
past [3] 18/21 18/24 97/2
paths [1] 109/12
pattern [1] 18/6
Paul [2] 45/12 115/8
Pause [1] 31/8
penalty [2] 98/14 98/18
pending [4] 5/19 6/8 73/8 74/6
people [7] 62/8 79/8 88/4 91/9 91/19
104/12 104/24
Peora [1] 81/20
per [5] 23/22 57/6 102/12 106/9 106/19
perfectly [1] 104/3
perhaps [3] 89/23 104/11 112/12
period [8] 16/11 18/3 19/3 19/16 19/21
31/23 90/15 91/5
permission [1] 27/8
permit [3] 38/6 42/13 44/5
person [8] 11/16 13/13 18/11 19/4 77/22
80/22 93/7 105/16
personnel [1] 104/20
pertains [1] 35/3
Phil [1] 3/6
PHILIP [1] 1/13
phone [6] 44/4 45/13 45/14 49/3 55/19
72/21
photo [1] 13/13
photos [3] 13/11 13/11 13/12
physical [3] 24/11 54/23 65/21
picked [1] 55/19
picture [2] 84/12 84/13
piece [5] 37/5 38/19 40/7 76/2 82/3
place [5] 14/17 28/19 82/25 96/9 109/8

placed [2] 28/8 28/17
plain [2] 111/25 112/1
plates [1] 84/6
please [11] 3/3 6/10 8/15 8/18 42/17
50/19 60/7 74/21 89/1 94/18 104/16
pleasure [1] 118/15
plural [1] 80/5
point [32] 6/19 6/23 6/24 28/7 41/7 47/15
48/11 48/13 53/13 53/20 56/14 56/17
57/24 58/9 59/8 59/12 62/1 62/2 63/3
65/14 70/4 72/6 77/22 91/8 91/10 96/1
102/14 105/3 109/3 111/6 114/19 118/8
pointed [1] 13/1
points [2] 97/21 104/4
pole [2] 86/25 87/1
police [43] 3/12 3/14 9/4 9/6 9/9 10/4 10/7
14/4 14/7 14/8 22/3 22/21 23/2 23/2
28/19 29/2 32/12 41/11 41/11 44/22
52/14 52/21 54/24 55/4 58/2 58/6 67/16
67/22 67/25 70/11 70/14 70/16 75/16
77/19 81/21 89/11 90/4 90/22 91/17
92/16 97/2 107/15 108/1
Porsche [12] 10/24 13/21 16/10 19/22
19/24 20/6 21/1 23/8 25/15 28/8 29/16
29/21
portion [2] 67/8 87/6
position [1] 102/25
possessing [1] 5/13
possession [3] 4/22 5/6 5/9
possible [1] 34/6
possibly [3] 22/12 85/16 114/12
pounds [1] 84/8
powder [1] 30/25
powers [4] 31/14 52/14 52/15 110/15
precise [3] 103/15 106/10 118/4
precisely [4] 112/13 114/7 116/17 117/14
prejudice [5] 98/2 103/15 115/2 115/3
117/19
prejudiced [8] 101/3 101/16 112/22
112/24 113/15 113/17 113/20 117/17
premarked [1] 49/23
premises [5] 5/15 5/15 43/7 43/12 43/23
prepare [1] 76/16
prepared [5] 34/15 44/20 105/20 105/22
105/23
preparing [2] 30/11 77/9
preponderance [1] 89/7
present [7] 8/10 70/23 70/24 70/25 75/12
75/14 81/25
presentation [1] 7/21
presented [6] 68/25 73/9 91/24 102/13
111/6 111/17
presently [3] 4/18 5/19 6/8
pressed [1] 113/12
presumably [1] 110/16
pretrial [3] 3/10 20/18 21/12
pretty [4] 77/3 77/4 77/5 116/24
previously [4] 27/7 50/4 66/9 68/25
primary [1] 79/15
Pringle [1] 87/14
print [1] 100/12
Printed [1] 118/23
printout [2] 100/8 100/9
prior [14] 6/2 12/10 25/10 31/25 33/19
34/21 35/22 38/25 48/24 63/1 83/18
87/11 88/15 92/8
probability [1] 79/18
probable [7] 41/16 41/18 81/21 81/23
82/9 87/8 88/7 88/25 92/20 102/13
102/15 103/1 105/7 116/22 117/1 117/7
117/10
probably [2] 113/2 113/7
problem [2] 79/4 109/9

Procedure [5] 94/4 97/15 99/15 109/7
110/1
proceed [7] 3/2 4/5 7/20 7/22 8/11 35/24
73/7
proceedings [4] 1/25 99/14 118/16 118/18
processed [5] 68/8 69/6 69/7 69/8 69/8
produce [2] 35/16 75/7
produced [3] 1/25 68/23 92/13
produces [1] 75/17
product [1] 83/10
proffer [2] 48/4 86/18
proffered [4] 37/24 48/12 71/6 71/9
proffering [1] 35/19
prohibition [1] 111/23
promises [1] 24/14
prong [2] 83/18 87/11
property [3] 21/4 99/17 105/16
propose [2] 73/9 74/18
proposing [1] 6/16
proposition [1] 97/25
prosecuted [1] 31/22 32/3
prosecutions [2] 109/14 110/19
prosecutor [1] 32/2
protecting [1] 76/15
proved [1] 89/7
provide [2] 11/23 12/12
provided [4] 12/11 73/9 78/15 92/11
providing [1] 11/22
provision [6] 98/23 101/5 101/17 103/20
113/16 113/19
provisions [1] 103/3
public [1] 76/15
published [1] 107/5
pulled [2] 53/10 53/17
punishable [1] 5/11
purchases [1] 85/14
purpose [1] 5/16
purposes [4] 21/9 76/21 91/13 107/19
pursuant [2] 6/14 75/23
pursue [1] 109/11
put [8] 20/15 30/3 67/17 67/18 75/9 83/1
83/1 113/21
putting [1] 115/6

## Q

quality [1] 118/14
quantities [1] 11/11
quarter [1] 28/9
query [1] 97/20
question [11] 25/1 25/12 27/7 39/23 61/6
80/1 91/18 103/13 114/1 115/14 117/20
questioned [1] 91/21
questioning [4] 24/7 24/8 28/18 35/9
questions [15] 24/3 24/6 24/10 24/20
24/22 32/23 44/21 45/7 51/24 70/5 71/4
95/14 101/25 112/25 114/9
quickly [1] 116/20
quite [2] 15/9 81/7
quote [1] 59/18
quoted [1] 107/6

## R

raid [3] 62/5 67/13 67/13
raise [1] 8/15
raised [3] 71/14 72/11 104/5
ran [2] 18/4 18/5
rang [1] 83/5
rather [3] 31/22 109/10 112/1
RCX [1] 2/3
RDB [2] 1/3 3/9
RDB-07-0244 [2] 1/3 3/9
RDX [1] 2/3
reached [2] 32/1 56/24

**R**

reaction [1]  26/15
read [8]  24/1 40/12 60/6 63/17 64/3 75/24 100/5 116/16
reading [2]  39/21 60/10
ready [5]  3/2 4/5 7/20 30/15 71/13
real [1]  116/18
realize [1]  79/20
realized [2]  53/13 53/20
really [12]  74/25 78/7 80/15 82/13 90/24 93/6 102/5 111/4 111/19 112/4 113/12 117/16
rear [3]  27/12 66/7 66/8
rearview [1]  18/12
reason [7]  6/17 72/24 79/22 82/8 89/23 93/5 103/12
reasonable [2]  109/3 109/11
reasonableness [1]  7/25
reasonably [2]  94/11 105/14
reasons [3]  93/18 93/18 117/18
recall [6]  7/3 34/12 43/16 51/14 56/12 69/4
recalled [1]  43/17
receipt [1]  99/17
received [13]  10/21 12/18 15/3 15/11 20/5 48/22 49/3 50/25 52/5 53/19 54/20 69/13 81/2
receiving [1]  11/15
recently [1]  117/4
recess [4]  71/23 71/24 73/4 73/5
recipe [1]  82/11
recognize [2]  90/18 90/18
recollection [2]  62/17 62/18
record [33]  8/19 9/16 10/19 11/7 11/22 12/1 13/5 13/7 15/20 16/3 16/20 21/11 22/6 23/11 24/1 29/2 53/18 58/22 93/19 94/11 105/14 106/11 107/12 107/21 108/5 113/11 113/21 115/16 116/4 117/8 117/18 118/4 118/18
recorded [2]  1/25 43/18
records [2]  12/7 34/11
recovered [2]  31/3 68/11
red [1]  18/5
redirect [2]  70/6 70/9
refer [6]  17/15 19/18 26/13 27/15 39/13 40/3
reference [17]  11/23 21/17 53/17 63/8 72/11 72/12 80/1 87/14 87/25 89/8 94/23 101/25 102/2 106/12 107/17 107/20 114/5
referred [2]  12/3 116/3
referring [3]  11/19 81/12 83/16
refers [1]  107/24
reflect [2]  13/7 107/21
reflected [1]  115/17
reflects [2]  20/18 92/13
regard [4]  12/16 32/15 98/8 116/5
regarding [1]  20/4
regardless [1]  102/14
regards [2]  78/12 116/10
registered [1]  52/3
registration [1]  21/2
regular [1]  52/16
rein [1]  48/15
reiterated [1]  87/13
rejected [1]  99/12
relate [2]  35/4 41/22
related [19]  10/22 10/23 25/14 26/19 26/23 27/25 28/2 30/8 30/12 30/15 31/19 34/12 59/18 60/6 60/9 60/12 60/16 63/14 63/16
relation [2]  17/4 30/7

relationship [1]  19/11
relayed [1]  24/19
released [2]  69/21 91/23
relevancy [1]  47/13
relevant [1]  76/19
reliability [22]  15/10 35/20 38/7 48/1 74/5 75/2 78/20 80/13 80/17 82/22 83/7 83/19 84/2 84/4 87/5 87/11 87/21 87/23 88/6 88/8 88/9 89/1
reliable [2]  12/17 15/4 33/25 80/16 83/12 87/9 88/25 92/23
relied [1]  12/12
rely [1]  48/8
remain [1]  24/4
remand [1]  99/19
remanded [1]  99/14
remarks [1]  33/7
remedy [4]  98/18 99/17 112/15 117/23
remember [3]  32/18 33/10 56/11
removed [1]  19/4
render [4]  89/21 89/24 90/19 117/24
renders [2]  90/15 91/25
reparked [2]  19/16 19/22
repeat [2]  42/16 67/14
repeated [1]  40/17
report [11]  48/23 54/16 63/10 64/6 64/24 65/1 67/3 67/5 67/17 67/18 69/21
reported [1]  111/4
reporter [4]  1/21 44/19 99/7 118/20
reporters [1]  118/25
reports [5]  33/13 52/25 53/1 95/20 95/21
represented [1]  48/16
representing [1]  3/21
request [2]  94/8 105/11
require [2]  8/1 75/7
required [1]  106/12
requirement [1]  105/10
requirements [2]  76/20 97/15 97/17
requires [1]  89/18
residence [5]  18/21 18/25 22/18 55/16 63/14
residences [3]  21/16 60/14 60/18
respect [21]  7/18 73/10 73/21 73/23 74/2 74/4 78/8 80/5 80/7 80/13 87/4 88/8 91/15 92/9 92/21 92/23 92/25 93/5 93/17 93/21 106/2
respective [1]  115/18
respond [2]  25/2 32/15
response [8]  20/15 20/17 21/7 21/12 26/18 26/22 51/25 110/12
rest [2]  8/7 27/12
restrict [1]  110/10
result [4]  5/22 11/12 11/14 99/21
retreated [1]  116/20
revealed [1]  76/18
review [4]  38/15 75/10 79/25 116/25
RICHARD [1]  1/10
right [85]  3/13 3/15 3/25 4/15 5/3 6/25 8/2 8/9 8/16 13/4 21/14 24/4 24/5 26/25 27/2 27/10 28/21 34/2 34/7 35/23 36/20 37/4 38/9 41/8 46/4 46/4 47/1 47/3 49/2 49/19 49/24 50/2 57/7 59/24 64/7 67/11 71/5 71/21 72/15 72/20 73/6 73/21 74/1 74/11 74/18 74/22 76/16 77/6 77/22 79/13 83/25 87/3 88/17 88/23 89/5 89/5 89/11 91/8 92/4 93/12 94/17 94/20 96/3 96/6 96/24 98/14 99/2 99/9 99/21 100/11 100/20 102/10 102/21 102/25 103/9 103/12 104/1 105/25 109/23 112/6 113/23 114/8 114/17 116/2 116/5
rights [10]  23/22 24/16 24/19 57/6 57/7 57/10 58/10 58/10 58/21 99/13
ring [3]  29/20 29/25 83/4

RMR [1]  1/21
road [44]  5/23 6/5 18/17 18/22 19/2 19/8 19/15 19/20 19/24 20/6 20/25 21/18 22/18 23/7 23/12 25/20 28/4 28/5 29/7 29/10 29/17 29/20 29/21 41/12 42/21 61/10 61/17 61/25 62/4 62/12 63/15 65/16 73/11 73/12 73/13 73/14 73/23 76/6 82/24 83/2 90/6 93/23 96/1 116/11
Robert [1]  83/7
Robinson [1]  117/4
role [1]  95/19
Room [1]  1/22
roots [1]  86/20
rough [1]  49/7
Roviero [6]  75/4 76/10 76/14 77/6 79/16 80/9
Royal [1]  30/25
rule [61]  6/19 38/4 83/21 94/4 94/9 94/14 97/11 97/23 98/5 98/13 98/23 99/15 101/2 101/2 101/5 101/7 101/14 101/17 101/19 102/7 102/8 102/9 102/16 102/18 103/4 103/8 103/20 104/22 105/10 105/10 105/23 105/24 106/3 106/12 107/1 107/3 108/11 108/11 108/14 108/16 108/25 109/1 109/4 109/7 109/7 109/16 109/17 110/10 110/15 110/18 111/23 112/1 112/3 113/14 113/16 114/7 114/10 114/13 114/16 115/25 117/15
ruled [2]  116/6 116/7
rules [4]  94/4 97/15 106/3 108/22
ruling [1]  103/13
rumor [1]  83/9
Run [57]  5/23 6/5 18/4 18/17 18/22 18/24 19/2 19/8 19/15 19/17 19/20 19/23 19/24 20/2 20/3 20/6 20/25 21/5 21/18 22/18 23/7 23/12 26/6 28/4 28/5 28/15 29/7 29/10 29/17 29/20 29/21 30/1 30/20 32/13 41/12 41/23 42/21 56/6 61/10 61/17 61/25 62/4 62/12 63/15 65/16 67/19 67/21 73/11 73/14 73/23 82/23 83/2 89/3 90/6 93/23 95/25 116/11

**S**

safe [1]  68/2
said [35]  22/24 24/10 25/20 25/21 25/21 25/22 37/1 38/23 43/6 44/25 56/6 56/19 57/14 58/9 58/12 59/18 60/2 63/11 63/13 66/8 74/23 76/6 77/22 80/22 81/3 81/4 81/8 81/9 81/19 82/8 85/3 85/9 86/5 99/23 104/8
same [8]  5/14 16/25 29/20 40/9 64/6 66/8 75/19 85/18
sat [1]  19/15
saw [15]  14/16 15/16 16/25 17/7 36/17 36/24 39/10 39/25 45/18 45/20 46/21 50/14 56/15 82/2 85/9
say [38]  6/13 18/16 20/12 24/4 28/9 28/12 31/21 31/24 36/13 38/20 39/10 47/19 53/19 61/19 61/21 63/16 63/19 63/20 63/25 65/10 69/21 75/13 76/6 80/4 82/16 84/7 85/6 86/4 90/9 98/16 98/22 100/5 101/13 105/1 108/16 111/8 113/7 114/5
saying [14]  6/23 43/22 46/12 57/10 60/8 77/16 77/25 80/16 89/10 102/5 105/8 111/23 113/11 115/5
says [36]  4/10 38/10 38/13 40/12 60/3 60/4 60/6 60/9 63/10 64/1 64/13 66/16 67/13 67/13 75/11 75/12 75/24 78/2 78/16 81/14 81/22 85/9 94/24 96/7 96/16 100/5 100/5 100/7 101/4 104/23 108/22 109/2 110/6 111/7 111/10 114/7
scale [1]  31/3
scales [1]  31/3

# S

scanning [1] 19/3
scenario [1] 81/19
scene [1] 85/15
scheduled [1] 7/3
scheduling [1] 71/25
scheme [1] 86/12
School [2] 16/10 116/3
Schuford [1] 6/14
scintilla [1] 104/4
scope [1] 86/6
se [1] 102/12
search [89] 5/22 7/16 7/17 7/17 8/3 11/9
11/11 12/3 20/4 20/5 20/8 20/10 20/16
20/18 20/22 20/24 21/1 21/5 21/15 22/12
25/8 25/9 26/14 26/19 26/23 28/11 29/10
29/15 30/11 30/12 32/1 32/12 33/16 35/4
35/4 35/6 35/8 42/2 43/7 51/7 54/5 56/14
57/14 57/15 60/13 60/17 62/11 62/21
62/25 64/14 65/6 65/8 70/25 73/10 73/11
74/2 76/21 77/1 79/23 87/18 89/3 93/13
93/15 93/23 93/25 94/13 95/17 96/11
96/12 99/12 99/13 99/15 99/16 102/1
102/12 102/13 104/24 105/15 106/13
106/15 108/15 109/19 110/8 110/11
110/16 111/7 111/10 111/12 116/25
searched [7] 27/10 27/17 30/20 57/4
57/13 57/15 57/18
searches [1] 93/6
seasoned [1] 115/23
seat [1] 27/12
seated [2] 8/18 73/6
second [14] 5/3 5/9 11/15 30/24 39/10
39/15 40/22 46/9 59/20 59/21 60/1 63/13
99/1 107/20
secondarily [1] 103/15
secondly [1] 73/14
section [11] 4/21 5/6 5/7 5/11 9/11 9/13
9/14 67/9 67/13 109/20 110/4
secured [2] 28/10 30/11
security [2] 78/24 79/17
Seddiq [1] 1/16
see [46] 3/17 3/19 3/22 3/24 3/25 4/2
4/17 13/2 18/12 37/20 38/21 38/21 38/25
39/19 41/10 41/12 41/14 42/20 43/12
44/4 45/3 47/4 51/13 62/10 62/16 63/9
64/11 79/22 79/25 82/7 93/3 93/16 94/21
95/8 95/9 95/18 95/20 96/15 96/20 97/4
97/14 100/17 104/18 104/22 113/12
114/15
seeing [2] 56/12 80/2
seek [1] 108/24
seeking [6] 6/1 6/4 6/6 31/25 76/25 92/7
108/17 116/9 116/10
seeks [2] 5/21 108/15
seem [2] 37/23 74/8
seems [14] 41/19 74/3 82/18 82/23 94/2
95/21 104/3 104/14 110/9 110/10 111/22
111/24 113/17 116/17
seen [6] 29/11 29/17 47/3 78/18 95/1
107/18
sees [4] 81/11 81/20 85/18 85/19
seize [2] 11/11 105/15
seized [8] 5/21 6/1 21/4 67/21 92/8 93/15
93/24 96/23
seizure [21] 5/22 20/5 20/19 20/25 21/1
21/15 25/8 28/11 33/16 35/4 35/8 43/7
51/7 54/5 60/13 95/17 102/1 110/8
110/16 111/8 111/12
seizures [2] 32/3 35/4
self [1] 93/3
self-determination [1] 93/3

selling [2] 10/22 86/19
Senior [1] 106/21
sensical [1] 86/2
sentence [1] 86/2
sentencing [1] 104/14
separate [3] 17/10 19/14 55/4
separately [2] 11/4 11/6
September [1] 36/10
sergeant [10] 21/25 22/2 22/2 22/5 22/9
32/19 52/7 52/8 54/13 59/6
seriatim [1] 104/5
series [3] 45/7 87/17 88/3
serious [1] 117/16
seriousness [2] 61/8 104/13
services [1] 80/7
set [4] 7/11 103/2 110/7 118/3
severance [2] 6/14 7/6
share [1] 52/6
she [41] 17/9 18/11 18/13 18/14 18/16 18/20
18/20 18/21 18/21 18/23 18/24 19/2 19/3
19/4 19/21 36/2 36/3 36/8 39/11 39/11
39/16 41/18 42/24 42/25 44/2 46/13
46/25 47/6 47/7 47/8 47/8 47/11 51/17
70/19 70/21 70/22 70/23 82/15 82/16
83/2 91/5
She'd [1] 81/16
shirt [1] 13/4
shopped [1] 111/18
shopping [6] 98/19 98/19 102/7 102/17
103/21 104/2
shops [2] 80/2 86/17
short [1] 116/12
shorter [1] 115/9
should [18] 18/15 20/11 41/15 41/20 74/4
80/11 83/12 91/6 97/8 97/8 98/9 98/14
101/19 102/18 103/21 108/21 112/15
115/19
shouldn't [3] 34/25 81/24 86/19
show [5] 34/20 48/21 61/2 61/8 98/2
showing [5] 25/4 25/6 35/10 35/11 42/4
103/5 105/17
shown [2] 13/12 117/1
shows [3] 69/12 78/2 96/24
shut [1] 19/5
side [4] 31/22 31/22 31/24 97/7
sight [1] 19/1
sign [21] 18/4 45/19 45/19 45/20 46/13
46/21 55/20 57/8 58/10 58/24 59/9 75/10
75/10 89/12 89/17 89/18 89/23 90/5
91/14 92/15 95/17
signal [1] 46/13
Signature [1] 118/20
signed [13] 20/19 55/6 55/11 57/10 65/4
65/5 69/10 83/12 91/11 91/12 91/13
92/12 92/17
significance [6] 14/21 16/15 18/6 18/9
27/20 86/8
significant [1] 96/4
significantly [1] 20/3
signs [1] 89/12
silent [1] 24/4
silver [1] 11/1
Simmons [5] 98/21 99/2 99/11 103/23
113/13
Simmons' [1] 99/14
simple [1] 90/20
simply [2] 111/21 112/3
simultaneously [1] 44/18
since [40] 11/13 29/17 109/1 116/3
Sinclair [5] 23/10 44/3 44/8 46/7 82/17
single [4] 85/24 85/24 90/11 95/21
sir [56] 3/17 3/25 6/15 6/19 6/24 7/8 8/11
9/1 10/10 27/23 33/5 33/12 34/14 35/15

37/2 37/20 39/21 41/7 41/9 42/10 42/15
42/16 45/18 46/2 47/18 48/5 56/8 58/3
61/24 67/6 71/12 71/18 73/13 74/14 75/6
76/23 77/10 77/17 79/10 81/14 81/14
82/17 83/15 83/23 88/24 89/4 99/6 99/8
99/20 102/20 102/24 103/11 108/12
114/21 116/1 118/13
sit [6] 84/12 86/23 86/25 90/9 91/19 94/23
sitting [7] 38/23 59/11 78/4 90/8 107/8
111/1 111/25
situation [3] 61/8 84/18 84/24
six [7] 9/22 38/20 68/17 69/10 75/17 76/2
90/11
size [6] 38/19 38/21 40/7 75/25 76/1 76/5
small [6] 31/3 36/25 37/1 37/2 37/19
37/20
smaller [4] 37/9 37/10 37/11 37/12
smile [1] 116/20
Smith [2] 58/13 101/4
snitch [1] 79/7
snitches [1] 79/8
so [100] 4/13 5/17 6/7 7/6 7/12 7/14 7/19
8/2 9/3 10/3 11/25 13/7 21/10 24/18 25/9
28/24 30/10 34/3 34/6 35/8 36/1 36/8
37/20 38/24 41/1 43/18 43/20 44/25
46/12 46/23 48/10 48/13 51/7 51/15
51/18 52/2 52/15 52/23 53/8 53/25 54/3
54/6 54/7 55/15 55/23 57/10 57/13 57/15
59/4 60/21 61/19 61/25 63/5 63/18 64/1
66/6 68/11 69/9 71/13 72/25 73/20 74/1
75/14 76/24 77/3 77/17 79/9 80/11 81/25
82/11 82/20 85/4 85/16 88/5 88/8 88/17
88/23 91/21 92/19 93/18 95/8 100/12
105/18 105/20 107/11 107/12 107/13
107/25 108/9 108/12 108/19 109/5
109/10 109/13 109/14 111/23 113/9
115/15 116/4 117/6
some [21] 22/12 24/10 27/25 30/13 32/19
32/20 38/10 43/18 47/15 48/11 72/24
75/22 83/21 86/15 91/5 91/11 98/2 113/8
116/16 116/19 116/19
somehow [1] 90/15
someone [9] 18/10 47/7 66/11 77/24
78/10 79/17 83/11 86/7 91/4
something [11] 17/10 37/16 41/19 43/10
43/18 57/20 78/16 85/13 85/16 85/19
105/2
sometime [1] 13/15
somewhat [2] 78/10 82/22
somewhere [1] 115/10
soon [1] 46/25
sorry [13] 22/8 26/22 33/19 34/17 36/17
36/17 36/24 43/3 50/20 60/10 63/13
75/25 77/12
sort [2] 4/16 91/11
sought [1] 111/19
source [10] 11/10 11/18 34/8 41/15 42/20
54/21 78/1 78/10 80/1 87/9
sources [4] 12/7 13/12 79/11 87/10
south [2] 1/14 46/5
southeast [4] 18/1 46/5 46/10 47/6
speak [2] 44/18 71/20
special [11] 21/24 21/25 62/13 62/22
64/14 64/18 95/4 95/5 95/19 96/2 104/21
specific [6] 38/24 47/9 62/6 70/24 87/24
96/18
specifically [15] 14/7 17/8 24/25 25/21
30/14 34/12 43/22 46/21 76/17 83/17
87/8 94/25 107/21 110/4 113/13
spell [3] 9/16 16/3 22/5
spelling [2] 8/19 16/23
spend [1] 72/3
Spinelli [1] 83/24

**S**

spirited [1] 115/7
spite [1] 83/9
spoke [3] 28/22 84/22 95/15
spoken [1] 86/14
squad [2] 32/19 70/19
St [4] 45/12 115/8 115/25 116/3
staff [1] 71/22
stack [1] 39/6
stale [1] 48/19
stand [1] 97/25
standard [6] 76/9 113/5 113/6 113/11
  114/19 116/21
standards [1] 113/20
standing [6] 7/17 72/11 72/14 73/21 73/22
  74/1
Stanley [2] 1/19 1/19
start [2] 49/21 104/6
started [2] 33/8 96/11
starting [1] 12/20
starts [2] 59/21 96/12
stash [1] 80/3
stashed [1] 82/23
state [32] 31/24 54/4 54/7 83/9 83/9
  87/15 94/11 95/1 95/15 96/23 101/10
  101/23 102/1 102/4 103/5 105/9 105/14
  106/11 106/25 108/9 109/12 109/14
  110/9 110/13 110/16 110/17 111/9 113/5
  113/21 114/14 114/20 116/21
stated [3] 28/4 51/15 93/18
statement [7] 7/24 35/1 35/2 63/10 65/3
  89/7 90/6
statements [25] 5/25 6/1 6/6 6/18 6/21
  7/15 8/3 41/2 41/4 63/1 63/11 73/16
  73/17 73/18 74/7 88/14 89/2 92/5 92/7
  92/8 93/4 93/15 93/17 96/1 96/2
STATES [31] 1/1 1/3 1/11 1/13 3/7 3/7
  4/21 5/5 5/7 5/10 6/14 6/14 38/11 75/23
  76/10 76/12 84/20 87/16 87/19 87/20
  95/3 97/24 98/21 103/23 106/4 106/6
  106/17 107/5 117/2 117/4 117/13
stating [1] 8/18
station [12] 28/19 29/2 58/2 58/7 67/22
  81/16 81/17 89/11 90/5 91/10 91/20 97/2
statute [3] 110/14 111/25 112/1
stay [8] 29/19 46/6 46/7 48/15 72/5 72/9
  76/8 91/3
stayed [4] 18/2 29/18 39/11 47/8
Stemmers [58] 5/23 6/5 18/3 18/17 18/22
  18/24 19/2 19/8 19/15 19/17 19/20 19/22
  19/24 20/2 20/3 20/6 20/25 21/5 21/18
  22/18 23/7 23/12 26/6 28/4 28/5 28/15
  29/7 29/10 29/17 29/20 29/21 30/1 30/20
  32/13 41/12 41/23 42/21 56/6 61/10
  61/17 61/25 62/4 62/12 63/15 65/16
  67/19 67/21 73/11 73/14 73/23 76/6
  82/23 83/2 89/3 90/6 93/23 95/25 116/11
stenography [1] 1/25
step [4] 38/5 105/4 105/4 106/1
step-by-step [1] 105/4
still [24] 9/24 60/23 66/12 72/12 74/6 76/11
stipulate [2] 72/14 104/22
stood [1] 18/24
stop [24] 18/4 19/25 23/21 25/7 25/10
  28/10 28/21 28/21 29/6 44/8 45/19 45/19
  45/20 46/13 46/21 47/4 47/18 48/10
  50/13 56/4 56/14 56/17 56/21 108/22
stopped [14] 16/13 23/9 23/13 25/1 25/3
  25/16 26/7 28/14 28/24 29/8 44/3 56/24
  59/2 59/4
stopping [1] 23/21
stored [1] 82/25
storing [1] 5/16
straight [2] 33/7 69/2
street [28] 1/14 1/17 1/20 1/22 10/23
  12/21 12/22 17/1 17/6 23/14 23/16 23/20
  36/16 39/8 39/8 40/16 44/11 45/12 46/2
  46/5 46/8 46/22 80/2 82/11 85/1 88/2
  104/12 114/8
Streets [1] 115/9
strictly [1] 10/3
strip [2] 27/25 27/25
strong [1] 77/5
structured [1] 112/4
stuck [1] 42/1
stuffing [1] 38/25
subcategorized [1] 53/23
subdivisions [1] 22/15
subject [4] 6/12 83/9 95/11 110/6
submission [1] 77/19
submit [1] 92/3
Subsection [1] 110/6
substance [2] 5/17 37/21
substantial [2] 83/11 117/8
substantive [2] 112/18 112/19
such [1] 111/5
Sue [2] 81/11 81/15
sufficient [1] 102/14
suggest [3] 7/24 78/9 86/8
suggesting [2] 113/4 113/6
suggestion [1] 116/19
suggests [1] 91/4
Suite [1] 1/17
summarize [1] 4/16
summarized [1] 117/18
summarizing [1] 118/5
summary [1] 63/10
summer [1] 36/13
superseding [3] 5/1 5/4 5/17
support [3] 111/13 111/13 117/10
supporting [1] 117/8
supports [1] 112/13
supposed [1] 101/7
suppress [7] 5/19 5/20 5/24 92/6 93/16
  93/24 116/7
suppressed [1] 102/19
suppressing [1] 93/4
suppression [26] 4/19 5/21 6/1 6/5 7/14
  7/15 8/2 73/16 73/17 74/7 92/5 92/7
  98/17 98/24 100/2 101/2 101/11 101/15
  101/19 103/18 103/23 106/23 112/16
  113/14 116/10 117/23
Supreme [10] 75/4 76/11 80/9 81/8 81/13
  83/17 83/20 87/10 87/13 117/6
sure [23] 21/11 36/12 40/13 42/24 51/17
  55/13 55/13 62/25 63/4 67/24 68/20
  70/23 72/23 77/15 81/19 83/14 92/21
  101/24 108/5 112/12 113/24 115/17
  116/4
surely [3] 48/8 49/3 82/15
surface [1] 85/7
surrounding [1] 22/15
surveillance [15] 18/10 18/14 18/18 19/5
  19/6 21/18 22/12 33/8 36/15 38/1 46/9
  46/24 47/9 85/1 88/3
sustained [4] 47/15 47/24 82/6 82/8
switch [1] 81/16
sworn [1] 8/17

**T**

t-shirt [1] 13/4
table [1] 13/2
tag [1] 10/24
tags [2] 25/3 25/6
tainted [1] 82/22
take [24] 21/17 28/19 38/10 41/4 58/4
  58/6 58/24 61/9 64/3 64/4 65/13 71/21
  71/22 71/22 71/23 73/3 84/24 89/11 90/5
  90/10 97/17 97/22 103/8 116/13
taken [21] 35/1 41/2 61/12 67/22 68/8
  68/11 68/18 82/2 90/20 91/9 91/11 93/7
  96/24 96/25 97/1 97/1 97/2 97/4 99/17
  107/24 109/5
taking [4] 14/17 66/19 109/10 110/17
talk [9] 6/20 24/5 62/20 66/18 66/21 70/1
  84/11 86/15 96/18
talked [6] 19/21 27/6 46/10 63/17 94/22
  112/20
talking [8] 24/12 39/2 39/3 46/11 70/24
  85/19 86/22 115/22
talks [6] 95/2 95/4 95/19 98/23 100/24
  101/4
tan [1] 30/25
tangible [2] 5/24 92/6
tapes [1] 87/1
target [9] 59/13 60/13 60/17 60/22 60/24
  61/3 95/24 97/10 107/22
targeting [1] 14/6
task [22] 9/15 9/19 9/21 9/24 10/1 10/6
  10/13 22/14 29/9 31/10 31/11 31/17
  31/18 70/1 70/12 70/15 70/19 70/20
  94/25 104/7 107/17 108/7
teacher [1] 115/25
team [9] 18/18 22/14 30/19 41/11 41/11
  62/5 67/13 67/13 99/15
teeth [1] 103/8
tell [18] 10/19 15/20 17/7 36/4 37/18 40/8
  44/7 47/22 61/9 63/9 73/7 77/10 86/25
  95/13 104/2 104/16 113/17 116/1
telling [4] 27/9 30/15 30/18 95/24
tells [2] 95/10 97/9
ten [4] 46/12 71/23 71/24 73/3
ten-minute [2] 71/24 73/3
ten-or-fifteen [1] 71/23
ten-or-so [1] 46/12
Tenth [1] 97/24
tenure [2] 14/7 31/18
term [4] 5/12 10/1 53/25 75/14
termed [1] 11/4
terminated [1] 19/6
terms [24] 7/21 33/21 35/12 71/17 75/2
  77/6 77/9 80/16 80/17 80/25 81/5 83/19
  84/18 86/2 86/10 91/24 93/24 103/4
  103/16 103/19 104/12 110/17 116/18
  116/24
test [15] 29/24 76/10 76/12 76/15 79/14
  83/18 83/21 87/11 87/12 87/15 107/1
  110/20
tested [1] 31/1
testified [8] 15/9 15/10 15/11 46/17 80/21
  83/5 88/2 92/11
testify [1] 14/9
testimony [21] 7/21 8/1 13/1 14/16 15/9
  15/15 18/15 30/5 33/7 35/1 36/15 36/24
  37/25 44/25 45/14 51/15 62/21 94/22
  108/1 109/9 111/11
text [1] 59/18
TF [1] 60/8
TFO [10] 60/6 60/9 60/12 60/16 62/13
  62/13 62/14 62/14 62/14 67/14
than [14] 28/3 31/22 37/5 77/23 85/9
  86/23 90/9 109/2 112/14 113/5 113/20
  114/20 115/9 116/21
thank [35] 4/11 7/8 8/12 8/21 13/8 16/5
  17/18 21/13 32/25 33/2 34/7 35/25 49/19
  49/20 49/24 50/2 50/6 70/6 71/3 71/5
  72/20 75/6 83/25 87/3 92/4 94/6 94/19
  102/21 110/3 112/6 112/6 114/17 116/2

**T**

thank... [2]  118/9 118/14
that [723]
that's [97]  3/8 4/15 4/15 6/23 8/4 8/5 8/9 13/17 16/21 22/23 25/22 25/22 29/2 33/10 33/13 35/17 35/23 38/12 38/13 38/13 38/17 39/9 43/4 43/9 44/9 45/20 46/15 47/15 49/16 53/6 54/17 55/18 57/12 58/15 60/4 61/4 62/3 62/17 62/19 64/1 64/2 64/17 65/19 66/20 66/24 67/3 67/20 68/5 68/6 68/13 69/11 69/16 69/17 69/19 71/18 72/12 73/3 73/25 74/6 75/14 76/4 76/24 78/13 78/14 79/1 79/14 79/19 80/8 80/15 81/3 81/22 82/11 82/24 83/3 86/21 90/6 90/17 91/11 91/12 92/9 94/14 96/4 96/14 97/22 98/3 98/24 99/2 100/11 100/15 102/25 103/9 103/12 104/8 105/16 114/6 115/10 117/22
The federal [1]  112/20
their [16]  18/12 75/7 79/6 85/1 101/21 101/22 109/11 109/12 109/13 109/14 109/15 111/10 114/13 114/14 115/8 118/15
them [18]  4/22 10/22 11/4 11/9 15/25 17/21 18/13 28/14 47/8 49/10 89/18 89/19 100/12 104/25 105/1 105/1 106/5 109/10
them print [1]  100/12
then [94]  4/17 5/14 6/2 7/11 7/17 10/4 16/7 17/22 18/3 18/11 19/4 19/6 19/19 19/22 19/23 20/22 20/24 21/3 21/4 21/5 21/14 23/8 27/9 31/1 34/25 35/23 38/2 39/1 39/16 39/18 46/3 46/7 47/4 47/8 48/7 53/9 53/18 55/16 58/1 60/6 61/9 62/7 63/18 64/22 68/18 71/21 72/4 72/16 72/17 72/17 72/17 74/3 74/6 74/11 75/16 76/5 77/18 80/16 81/18 81/25 86/3 86/9 86/14 86/17 88/5 88/9 88/17 89/2 89/2 89/11 89/14 89/17 89/22 90/5 90/10 91/23 94/1 94/17 94/23 95/4 95/7 96/21 97/7 98/1 101/3 101/4 101/11 105/18 105/25 106/1 106/12 107/23 108/4 117/23
theory [2]  41/11 79/23
there [141]
there's [63]  7/6 20/22 21/2 21/4 35/1 35/9 35/11 42/11 42/11 42/12 47/1 48/5 48/11 51/20 66/13 72/16 75/22 76/10 77/11 77/13 78/1 79/22 79/25 80/9 80/23 82/3 82/8 82/15 82/25 83/11 85/6 86/5 86/9 86/16 88/25 89/17 91/11 92/10 93/6 93/9 93/13 95/2 97/23 98/18 98/18 102/17 106/6 106/12 106/16 109/5 109/17 111/18 111/22 113/4 113/6 113/17 113/11 113/18 114/19 117/10 117/16 117/21 117/22
therefore [12]  35/9 41/6 73/20 81/25 82/20 82/22 82/24 83/6 96/13 106/25 115/15 115/25
thereto [1]  8/3
these [22]  11/3 11/8 11/12 12/6 12/11 14/22 16/25 21/15 32/3 32/4 33/7 34/16 50/16 50/17 50/25 53/9 85/20 86/24 87/4 90/22 111/17 116/16
they [113]  5/7 5/8 6/8 7/19 10/22 11/4 11/4 11/6 12/11 12/17 12/24 13/10 13/12 13/13 13/13 13/24 14/23 16/12 16/13 17/10 18/11 21/11 22/3 22/4 22/13 25/3 39/19 42/20 49/11 49/12 49/14 49/15 51/2 51/4 51/4 51/4 51/8 53/1 53/22 75/17 75/20 75/21 78/17 79/8 81/16 81/19 82/7 82/16 83/23 84/11 84/25 85/1

85/4 85/11 85/21 85/21 85/21 85/21 85/22 85/22 86/4 86/7 86/14 86/18 86/20 86/22 86/24 86/24 86/25 87/2 89/11 89/12 89/14 89/16 89/17 89/22 89/23 91/19 95/10 95/11 96/3 96/6 96/8 96/8 99/18 99/23 101/7 101/7 101/9 101/9 101/10 101/13 101/21 101/21 102/5 102/6 105/5 105/6 107/5 109/12 109/15 109/16 111/3 111/7 112/2 114/8 114/9 114/10 114/13 114/14 114/22 114/23 115/10
they'd [1]  81/16
They'll [1]  50/2
they're [20]  18/11 18/13 21/6 21/11 51/21 52/25 53/23 81/19 86/6 91/9 91/10 91/20 91/21 102/6 105/8 105/9 109/10 111/6 111/25 112/2
They've [2]  49/23 50/4
thing [2]  95/21 96/21
things [2]  7/25 102/2
think [48]  8/1 8/7 15/2 20/23 21/6 22/8 30/5 34/23 35/9 41/7 43/17 46/16 48/5 72/8 72/24 73/7 75/20 78/7 79/1 79/9 80/15 81/8 83/6 85/18 86/7 88/8 89/2 90/8 90/19 90/25 92/11 93/22 95/1 99/1 104/15 109/3 109/15 110/12 113/7 113/19 114/19 114/21 114/23 116/3 116/4 116/5 116/12 116/15
third [4]  39/18 40/8 40/24 64/9
this [198]
those [23]  7/25 13/11 15/21 17/13 20/3 20/8 20/10 24/16 31/21 31/23 39/18 43/7 43/12 43/19 43/23 59/16 60/25 63/18 74/3 93/18 97/17 97/21 110/15
though [1]  57/14
thought [3]  46/10 57/20 111/21
thousand [2]  65/22 80/5
thousands [8]  75/14 75/15 78/13 78/13 80/2 80/4 80/5 82/4
three [9]  9/14 38/20 40/5 49/21 49/25 76/3 78/18 78/19 86/25
through [16]  13/11 14/6 18/4 18/10 18/11 18/13 20/4 31/14 45/3 45/9 46/13 61/22 62/10 81/10 87/9 116/16
thrust [3]  80/15 82/4 89/14
thus [1]  93/21
Tim [5]  10/22 10/24 12/24 13/10 13/13
time [74]  7/5 10/15 10/16 11/15 12/8 16/7 16/11 17/7 17/8 17/11 18/18 19/4 19/6 19/16 19/21 21/19 21/24 23/3 24/2 24/11 24/12 24/21 26/9 27/15 27/16 29/6 30/19 31/1 31/23 32/11 36/17 37/13 37/14 38/10 39/10 39/15 40/10 40/20 40/22 40/24 41/17 41/18 43/2 44/3 47/16 48/11 49/15 53/13 53/24 56/17 57/24 58/9 59/8 59/12 60/12 60/16 62/1 62/2 63/3 65/14 66/6 70/4 70/15 70/23 78/19 82/2 90/20 91/5 91/25 92/14 96/1 99/16 115/21
timeframe [1]  61/20
timeout [1]  81/24
times [3]  83/8 91/11 91/19
TIMOTHY [8]  1/5 3/8 3/21 4/20 10/17 13/6 63/11 87/25
tip [1]  87/18
tipster [2]  75/10 77/23
to be [1]  74/18
today [9]  4/12 6/12 13/3 23/24 33/11 34/10 34/19 36/23 80/21
today's [2]  91/13 107/19
together [1]  11/5
told [21]  25/3 25/19 27/9 28/6 29/7 29/8 29/9 29/17 29/19 29/23 34/10 36/8 36/23

40/11 45/18 55/20 59/16 63/5 63/7 63/19 64/25
too [2]  69/8 84/14
took [5]  61/17 61/25 65/17 65/21 65/22 68/2 69/1 87/1 96/9
top [1]  67/4
total [2]  40/5 102/24
totality [17]  81/22 83/22 84/4 84/11 87/12 87/14 90/3
totally [4]  55/2 85/15 86/9 90/7
touched [1]  82/19
toward [4]  13/2 23/14 23/16 56/19
Town [4]  11/1 17/9 17/25 19/20
track [5]  11/7 11/22 11/25 12/7 34/11
trafficking [5]  9/19 13/25 15/12 17/14 86/6
trained [1]  115/23
training [1]  14/20
transaction [3]  16/17 39/20 40/9
transactions [13]  13/23 13/24 14/17 14/22 14/23 15/13 15/16 15/25 17/21 17/22 85/2 85/10 88/4
Transcriber [1]  118/21
transcript [4]  1/10 1/25 106/23 118/18
transferred [1]  68/9
transpire [1]  102/2
transported [4]  28/9 59/22 60/3 82/20
travel [1]  46/4
traveling [1]  23/12
trial [2]  7/1 79/19
trickles [1]  111/5
tried [4]  6/21 82/14 86/15 115/8
triggered [2]  96/15 97/11
triggers [1]  96/5
troubling [3]  78/7 78/10 82/17
true [9]  11/25 25/5 25/7 33/12 34/8 80/24 82/18 83/4 83/6
truly [1]  8/8
truthful [3]  12/2 25/24 26/4
try [7]  16/22 32/2 48/3 48/3 95/17 115/10 116/13
trying [6]  84/14 48/17 54/9 71/25 86/6 91/2
turn [7]  36/8 46/4 46/4 48/13 50/1 64/9 67/1
turned [1]  10/16
turns [1]  47/11
twice [2]  36/17 36/18
two [22]  10/21 10/25 11/3 13/24 15/23 16/12 17/10 17/13 19/14 20/3 34/16 39/15 39/18 40/17 51/20 51/21 59/21 77/14 83/18 87/11 117/21 117/24
two-prong [2]  83/18 87/11
type [3]  18/6 32/9 85/8
typed [2]  48/23 118/23

**U**

u-turns [1]  47/11
U.S [5]  68/9 87/7 93/14 114/8 117/13
ultimately [3]  23/13 85/4 91/23
Um [3]  26/16 33/24 52/20
Um-hum [3]  26/16 33/24 52/20
unavailability [2]  103/5 105/17
Uncle [2]  25/14 25/14
under [27]  4/21 19/10 28/17 36/8 57/24 58/1 75/3 79/15 80/9 80/10 92/14 93/13 94/9 103/22 105/10 106/3 107/16 108/7 108/16 110/8 110/15 110/16 111/8 112/16 116/13 116/24 117/13
undercover [1]  85/14
undergo [1]  75/3
underneath [1]  30/25
understand [21]  24/3 24/9 37/17 42/5 44/12 48/20 53/15 60/23 60/25 65/15

## U

understand... [11] 66/1 71/25 77/15 78/5 88/11 90/24 98/9 103/9 110/13 110/24 114/12
understanding [2] 46/6 96/19
understands [1] 36/1
understood [1] 24/19
unidentified [1] 15/17
unit [6] 18/3 18/17 19/7 22/10 22/16 109/13
UNITED [31] 1/1 1/3 1/11 1/13 3/7 3/7 4/21 5/5 5/7 5/10 6/14 6/14 38/11 75/23 76/10 76/12 84/20 87/16 87/19 87/20 95/3 97/24 98/21 103/22 106/3 106/6 106/17 107/5 117/2 117/4 117/13
unknown [1] 80/3
unlawfully [2] 5/13 5/16
unless [6] 35/9 35/11 42/3 73/9 91/15 113/17
unload [1] 81/20
unlocked [1] 19/17
unpublished [4] 106/3 106/4 106/17 106/22
until [3] 19/5 48/10 63/2
up [18] 7/10 7/23 19/25 23/6 38/2 41/1 46/3 46/7 50/19 55/19 64/5 66/18 75/21 78/2 81/17 88/4 109/14 111/22
upheld [1] 87/18
upon [11] 19/1 30/10 88/6 92/20 93/24 103/3 108/1 116/6 116/7 116/18 116/24
upstairs [6] 30/14 62/24 63/4 63/5 63/7 64/16
urging [3] 107/4 107/11 107/14
us [7] 36/8 40/8 47/22 62/7 84/6 85/7 85/10
use [1] 24/11
used [10] 6/17 6/23 18/10 24/4 34/3 53/25 61/2 61/4 76/20 111/9
useful [1] 79/18
uses [1] 48/7
using [1] 41/10
utilized [1] 81/1

## V

vacation [3] 72/2 72/3 72/4
valid [2] 93/13 105/9
validity [1] 88/12
value [1] 30/22
van [1] 19/21
variety [2] 21/16 41/19
vehicle [25] 19/15 19/16 23/22 25/3 25/4 25/6 25/16 26/14 26/19 27/9 27/10 27/11 28/8 28/22 51/10 56/13 56/14 56/15 57/2 57/4 57/5 57/13 57/14 57/18 72/12
vehicles [3] 29/16 60/14 60/18
Ventresca [1] 75/24
versus [2] 23/23
very [25] 70/8 72/20 78/8 78/14 79/19 83/7 84/3 89/6 92/4 94/21 95/18 96/9 96/18 98/8 102/21 103/18 111/6 112/6 112/9 112/20 116/2 116/12 116/17 116/18 116/20
video [1] 79/7
view [3] 52/13 72/6 118/8
viewed [3] 69/13 97/5 97/8
viewing [1] 79/16
violated [2] 99/13 99/15
violation [31] 5/5 5/6 5/10 97/11 97/12 97/13 97/14 97/23 98/11 99/18 99/24 99/25 101/3 101/15 101/16 101/18 102/16 103/16 103/22 105/19 105/20 108/12 112/12 112/19 112/19
violations [4] 31/19 100/25 101/14 113/14
violative [2] 102/18 103/17
vis [2] 110/11 110/11
vis-a-vis [1] 110/11
voice [1] 50/19
voluntary [1] 89/8

## W

Wachovia [1] 68/8
wagon [2] 81/16 81/17
waiting [1] 81/20
walk [2] 51/13 85/22
walked [7] 18/21 18/24 19/2 19/20 51/5 51/8 85/21
walking [2] 19/1 84/9
Walther [1] 16/9
want [19] 4/11 7/22 7/22 8/3 33/12 41/9 42/16 64/5 76/8 87/4 92/21 105/3 105/20 108/4 108/5 113/11 114/1 116/16 118/14
wanted [3] 34/3 95/13 104/10
wants [2] 8/10 33/1
warning [1] 90/10
warnings [25] 88/12 88/15 88/18 88/20 88/22 89/10 89/15 89/16 89/22 90/13 90/14 90/21 91/5 91/9 91/10 91/14 91/18 91/19 92/12 92/17 92/19 92/24 93/1 93/5 93/16
warrant [80] 5/22 7/16 11/9 12/3 20/6 20/19 20/22 20/25 21/1 21/5 25/8 25/9 28/11 30/12 30/12 34/23 35/4 35/5 35/8 39/22 42/2 42/2 42/3 43/7 48/7 55/6 55/11 55/20 56/14 57/15 64/14 65/9 66/16 69/25 69/25 70/25 73/10 76/21 77/1 79/23 82/13 82/16 83/3 83/13 89/3 93/25 94/8 94/12 95/17 98/4 99/17 102/1 102/12 102/13 102/15 103/2 103/17 103/18 105/6 105/7 105/9 105/15 106/11 106/25 106/25 107/3 107/4 108/15 108/16 108/17 108/24 108/24 111/10 113/14 116/19 116/22 116/23 116/25 117/9 117/11
warrantless [1] 35/5
warrants [30] 7/17 7/17 11/11 20/4 20/8 20/10 20/16 21/15 22/12 29/10 29/15 32/1 32/4 33/16 51/7 54/5 60/13 60/17 74/2 87/18 101/2 101/15 103/23 104/25 109/19 110/8 110/11 110/16 111/8 111/12
was [297]
wasn't [9] 27/10 30/17 44/2 44/20 55/14 82/16 104/2 109/6 115/24
watched [1] 56/6
watches [1] 81/18
way [12] 11/19 34/3 37/14 80/23 98/6 111/2 111/24 112/4 112/5 112/22 113/8 114/21
ways [1] 102/6
we [113] 4/5 4/12 4/16 4/16 4/17 4/18 5/19 5/20 6/2 6/25 7/5 7/10 7/14 7/15 7/16 7/17 8/4 15/25 17/5 18/5 18/22 19/5 19/6 21/18 22/11 22/1 24/3 24/6 26/6 26/7 28/10 28/14 28/15 29/10 30/4 30/11 30/24 31/3 34/25 35/2 35/6 36/7 40/1 40/6 41/1 41/16 41/17 41/17 43/19 46/10 47/24 48/21 52/12 62/7 64/5 65/10 69/5 69/8 71/5 71/21 72/24 72/24 72/25 73/7 73/8 74/4 74/17 75/3 75/16 76/12 78/20 79/4 79/7 81/24 84/18 84/23 84/24 87/1 88/8 88/10 89/2 89/2 89/10 90/10 90/25 91/15 92/2 92/9 94/21 94/23 95/1 95/2 95/5 95/7 95/8 95/9 95/9 95/13 95/18 95/20 96/15 96/20 96/22 97/12 97/13
we'll [9] 4/17 7/10 7/11 71/22 72/3 74/2 78/20 94/1 106/1
we're [14] 3/9 7/20 33/11 34/23 41/25 48/2 48/13 71/13 71/21 75/1 86/21 113/10 115/6 117/25
we've [3] 35/1 79/5 97/10
wearing [1] 13/4 51/4
Wednesday [1] 118/2
week [2] 12/20 118/1
welcome [1] 110/4
well [73] 4/15 4/24 4/25 6/17 8/9 11/14 14/5 24/25 28/15 29/15 29/15 30/8 31/2 31/3 31/5 33/11 33/24 36/1 37/2 37/14 38/16 39/4 39/14 41/22 41/25 43/17 44/13 45/18 46/8 48/21 52/8 63/2 64/1 64/3 65/17 68/7 70/22 70/24 72/3 74/16 77/18 77/20 78/5 78/12 78/19 79/14 79/19 80/17 83/7 83/25 85/25 86/11 87/3 90/4 90/10 91/2 91/17 92/4 93/9 94/18 96/4 97/1 99/2 101/13 102/25 104/19 105/3 105/25 108/14 114/25 115/23 116/2 118/14
well-trained [1] 115/23
went [36] 19/5 19/6 19/15 19/17 19/18 19/22 19/23 25/5 28/24 43/10 46/13 53/8 55/6 55/6 62/8 63/5 65/20 65/23 65/24 65/24 66/2 66/6 66/12 66/16 66/22 67/24 67/24 67/25 76/6 95/14 95/15 101/9 101/10 101/21 101/22 114/14
were [57] 9/21 10/7 10/12 10/16 12/17 12/22 13/1 13/12 13/15 14/23 15/25 18/5 18/17 21/21 22/9 22/11 22/13 23/12 25/4 31/10 36/7 39/15 39/18 41/2 43/6 44/7 45/16 46/11 51/2 51/4 55/9 62/4 62/5 62/6 62/14 64/6 65/6 68/1 68/11 68/14 68/14 70/14 75/20 75/21 85/11 88/18 88/25 96/17 96/20 97/1 101/7 104/10 106/10 106/24 109/16 116/19 117/12
weren't [1] 86/16
West [1] 1/22
Westlaw [2] 100/9 100/15
what [125]
what's [5] 68/25 77/25 79/7 96/9 115/22
whatever [9] 4/9 6/12 8/10 34/3 42/1 42/20 89/23 115/16 115/23
whathaveyou [1] 104/14
whatsoever [3] 89/12 113/7 114/9
Whelan [1] 95/3
when [64] 6/16 10/1 16/23 18/20 18/21 24/12 25/16 27/6 28/12 30/3 31/14 36/4 38/22 41/1 44/3 47/19 48/6 48/18 49/2 51/24 52/5 53/8 55/6 56/9 56/13 56/15 57/4 58/21 59/4 61/19 65/6 75/13 80/24 81/10 81/16 81/23 82/10 82/16 83/3 83/4 84/12 85/16 90/5 90/6 90/19 90/25 95/5 96/21 97/7 98/22 99/16 101/3 101/4 101/15 101/16 104/7 108/15 108/17 111/25 112/3 112/4 113/14 113/15 114/14
whenever [2] 27/7 86/5
where [55] 4/16 4/17 12/24 13/14 15/15 15/17 16/13 22/18 23/9 23/12 25/13 25/22 26/7 27/24 28/24 30/16 32/11 34/23 35/14 38/23 39/15 40/7 41/14 44/22 45/25 46/10 46/25 48/5 49/11 49/12 49/17 51/4 54/23 55/11 60/4 62/11 62/16 63/9 66/13 67/24 68/8 75/18 76/20 81/9 81/14 84/24 85/21 87/17 87/19 91/14 100/24 104/22 106/9 107/21 113/12
Whereabouts [1] 28/19

## Column 1 (miscellaneous at top)

113/15 117/17 117/20 117/20 117/21
97/14 98/25 101/20 111/11 111/19
111/24 114/7 114/23

# W

wherever [1]  55/16
whether [26]  12/11 25/24 29/24 41/14
  41/16 41/20 80/4 80/16 80/24 95/22
  95/23 95/23 103/14 105/18 106/12 107/2
  107/3 107/11 108/10 108/10 113/18
  117/7 117/16 117/21 117/21 117/23
which [47]  4/19 5/20 5/21 5/25 6/22 7/22
  11/10 11/24 16/8 17/11 17/22 19/6 21/3
  28/9 30/25 35/6 36/23 39/17 39/19 41/17
  45/9 45/9 46/2 67/2 69/17 78/24 79/7
  80/6 83/18 87/14 91/5 92/23 96/20
  101/14 104/11 106/9 106/18 107/6
  107/20 109/4 109/18 110/5 110/9 110/10
  110/18 116/20 117/5
while [9]  13/1 13/20 13/22 17/20 18/5
  39/11 69/5 69/7 78/4
white [1]  13/4
who [23]  11/1 11/2 12/24 15/22 21/23
  25/15 32/18 45/9 52/11 55/6 59/4 62/4
  62/7 62/11 74/18 76/5 85/20 96/17 96/19
  107/8 108/23 108/23 114/10
who's [1]  52/5
whoever [2]  33/1 111/20
whose [1]  78/18
why [11]  6/25 12/22 38/5 61/4 71/5 79/14
  100/15 103/8 104/2 111/19 114/7
Widener [1]  106/9
Wilhelm [2]  114/23 114/25
will [25]  4/10 6/20 6/20 7/9 7/20 8/4 13/7
  21/10 24/7 44/21 50/19 62/10 72/14
  72/24 73/1 74/24 78/21 79/18 80/6 80/12
  93/2 93/19 94/19 100/11 102/22
willful [3]  35/12 42/12 48/5
William [2]  18/22 21/25
Williams [1]  107/6
willing [3]  24/10 24/20 30/15
Wilson [1]  67/15
wind [1]  109/14
wiretap [1]  111/12
wish [1]  24/8
wit [1]  5/17
within [9]  9/8 52/11 79/6 90/3 95/22
  102/13 102/15 105/16 117/24
without [4]  96/4 102/8 114/11 115/14
witness [6]  8/13 8/17 32/24 44/18 68/21
  71/20
witnesses [2]  71/6 71/9
wonder [1]  90/23
word [4]  6/17 6/23 60/15 115/6
wording [1]  105/16
words [7]  59/16 59/17 60/25 75/12 78/16
  98/1 102/11
wore [1]  85/22
work [2]  13/18 81/21
workable [1]  74/8
worked [1]  63/17
works [1]  115/21
would [83]  4/9 4/13 6/21 7/9 7/11 7/24
  8/18 15/5 16/3 21/8 23/11 23/13 23/14
  23/16 28/15 30/17 31/21 31/23 31/24
  33/8 34/1 35/3 35/7 36/8 37/5 37/8 37/9
  37/16 38/10 42/2 43/21 46/3 46/9 48/15
  49/15 49/21 54/8 61/19 62/13 62/23 65/1
  69/17 73/9 74/18 77/7 77/22 78/7 79/24
  80/19 81/15 81/15 81/25 82/21 84/4 85/6
  85/7 86/11 86/18 89/15 90/2 90/17 92/2
  93/12 95/5 101/15 103/7 103/17 106/18
  108/20 111/17 112/10 113/1 113/2 113/7
  114/5 114/10 115/7 116/1 116/1 116/23
  117/11 117/12 117/23
wouldn't [3]  46/6 46/6 49/14

# W

write [5]  48/18 51/7 55/23 64/24 65/1
writes [2]  95/10 95/20
written [11]  33/15 43/21 50/24 52/25
  69/25 83/8 90/21 107/7 116/12 116/14
  118/2
wrong [9]  8/6 59/23 60/10 65/25 66/2 66/4
  66/6 66/12 66/22
wrote [7]  45/5 49/3 49/7 54/16 61/1 64/1
  78/3

# Y

yeah [4]  25/22 47/7 49/22 81/4
year [4]  5/12 6/4 11/17 75/13
years [6]  9/7 9/14 9/22 9/22 33/14 79/7
yellow [2]  23/23 23/24
yes [153]
yet [1]  78/24
York [1]  14/15
you [589]
you'd [2]  59/20 100/22
you'll [4]  3/2 67/8 89/1 94/17
you're [40]  10/3 35/19 35/19 39/2 39/3
  42/8 45/3 46/12 48/4 48/10 48/12 54/8
  58/16 59/11 60/8 62/20 66/2 73/17 76/2
  76/25 77/15 77/16 77/18 77/20 78/8 79/5
  80/15 81/12 84/13 88/11 88/17 90/4 98/9
  102/11 103/1 103/2 108/17 110/4 113/23
  115/22
you've [13]  11/3 11/16 14/16 21/6 47/3
  48/12 48/16 53/25 91/24 113/13 113/24
  115/13 116/3
your [273]
yourself [2]  52/13 55/9